CHRISTOPHER CELENTINO (131688)
Christopher.Celentino@dinsmore.com
YOSINA M. LISSEBECK (State Bar No. 201654)
yosina.lissebeck@dinsmore.com
CHRISTOPHER B. GHIO (259094)
Christopher.Ghio@dinsmore.com
Jacob R. Bothamley (319457)
Jacob.bothamley@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group, P.C.,<br><br>    Debtor. | Chapter 11<br><br>Case No. 8:23-bk-10571-SC<br>Adv. No. 8:24-ap-01138-SC |
| Richard A. Marshack,<br>Trustee of the LPG Liquidation Trust,<br><br>    Plaintiff,<br><br>      v.<br><br>New Vision Debt LLC; New Vision Capital Group, LLC d/b/a New Vision Debt Relief LLC; New Vision Debt Relief, LLC; New Vision Debt Relief – 2; New Vision – 3; New Vision – 6.<br><br>    Defendants. | **SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(5) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DAYS OF THE PETITION DATE;**<br><br>**(6) AVOIDANCE, RECOVERY AND PRESERVATION OF** |

UNAUTHORIZED POST-PETITION TRANSFERS;

**(7) CONVERSION;**

**(8) PARTICIPATING IN SCHEME TO CONTINUE TO DEEPEN LPG'S CONTINUING INSOLVENCY;**

**(9) AIDING AND ABETTING;**

**(10) TURNOVER;**

**(11) AVOIDANCE, PRESERVATION, AND RECOVERY OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**

**(12) AVOIDANCE, PRESERVATION, AND RECOVERY OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(13) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**

**(14) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(15) AVOIDANCE, RECOVERY AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS;**

**(16) TORTIOUS INTERFERENCE WITH CONTRACT;**

**(17) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONSHIP; AND**

**(18) DISALLOWANCE OF CLAIMS**

Judge: Hon. Scott C. Clarkson
Dept. 5C

For his *Second Amended Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Transfers Within 90-Days of the Petition Date; (6) Avoidance, Recovery, and Preservation of Post-Petition Transfers; (7) Conversion; (8) Participating in Scheme to Continue to Deepen LPG's Continuing Insolvency; (9) Aiding and Abetting*; *(10) Turnover; (11) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (12) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (13) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (14) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (15) Avoidance, Recovery, and Preservation of Post-Petition Transfers; (16)Tortious Interference With Contract; (17) Tortious Interference With Prospective Economic Relationship; and (18) Disallowance of Claims* ("SAC"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

**<u>STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE</u>**

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A),(B) (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court"). Additionally, the New Vision Defendants (defined below) have consented to jurisdiction over this Court pursuant to its filing of the Proof of Claim (as defined below).

///

2.     Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.     Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.     Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5.     Plaintiff, Richard A. Marshack, is the duly-appointed, qualified, and former Chapter 11 Trustee of Debtor's Estate, and is now the current duly-appointed, qualified, and acting Liquidating Trustee of the LPG Liquidation Trust.

6.     Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

1.     Defendant, New Vision Debt LLC ("New Vision"), is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of Wyoming.[1]

2.     Related entity, New Vision Capital Group, LLC ("NVCG"), is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of California. According to NVCG's Operating Agreement dated August 1, 2022, NVCG does business as "New Vision Debt Relief LLC" ("NVDR").[2]  A true and correct copy of the NVCG Operating Agreement is attached hereto as **Exhibit 1** and incorporated herein. Trustee is also aware of other entities bearing the New Vision moniker such as New Vision 2 (or New Vision Debt Relief

---

[1] According to the California Secretary of State website, there is also an entity called "New Vision Debt Inc.", which lists Sarvenaz Esfahani as the registered agent. This entity also shares the same address as defendant, New Vision Capital Group, LLC. However, the transfers of funds subject to the FAC were all paid to New Vision Debt *LLC*, which is why the LLC is the named defendant.

[2] For purposes of the FAC, New Vision Capital Group, LLC ("NVCG") and New Vision Debt Relief LLC ("NVDR") are interchangeable.

– 2), New Vision 3, and New Vision 6. On information and belief, these additional entities are alternate business names for NVCG or New Vision as the case may be. New Vision and NVCG, along with NVCG's alternate business names may also be collectively referred to as "New Vision Defendants".

3.    Defendant Sania Hashempour ("Hashempour") is a member of NVCG and New Vision, and on information and belief, is the wife of defendant, Serj Guetssoyan.

4.    Defendant Sarvanez Esfahani also known as Sarvanez Moarefian (for purposes of the SAC "Esfahani") is a partner of NVCG and New Vision. On information and belief, Esfahani is the wife of defendant, Mehdi Moarefian.

5.    Defendant Serj Guetssoyan ("Guetssoyan") is a principal of New Vision – 2, an entity related to New Vision and NVCG. On information and belief, Guestssoyan is the husband of Hashempour.

6.    Defendant Mehdi Moarefian ("Moarefian") on information and belief is also a principal of one of the identified New Vision entities.

7.    Defendant QuikStart LLC ("QuikStart") is Wyoming Limited Liability Company founded on February 7, 2023. On information and belief, QuikStart was established and operated by Guetssoyan and Moarefian.

## GENERAL ALLEGATIONS

### A.    The Bankruptcy Case

14.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

15.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

16.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

17.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted).

18.    Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

19.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

///

///

6

**B.     Protective Order**

20.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

21.     On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 2** and incorporated here.

22.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.     LPG**

23.     LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

24.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

25.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

26.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

27.     Tony Diab ("Diab") and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

28.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers.

29.     The marketing affiliates sometimes went so far as to assist with the execution of an engagement letter between the consumer and LPG.

30.     In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

31.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals. Diab, working in concert with others, converted LPG funds from consumer payments and loan transactions to fund his personal extravagancies to the detriment and harm to LPG and its businesses.

32.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

33.     Diab used entities he controlled, including without limitation, Vulcan Consulting Group, Coast Processing, PrimeLogix, LLC, Phoenix, Marich Bein and/or Maverick Management LLC ("Maverick") and Validation Partners to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection and to avoid payment disputes and complications. The money that flowed from Debtor through these bank accounts to defendants consisted of Client Funds or loan proceeds designated to be received by Debtor or otherwise that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank accounts such that they received Client Funds and/or loan proceeds directly from Debtor in addition to future Accounts Receivable.

**D**.     **The New Vision Defendants, Moarefian, Guetssovan, Hashempour, and Esfahani**

34.     The New Vision Defendants were marketing companies that procured clients for LPG.

35.     According to the NVCG Operating Agreement, NVCG's purpose is to "Act as an Affiliate to LPG (Litigation Practice Group)…" (*See* **Exhibit 1**, p. 1, § 1.3.)

36.     The NVCG Operating Agreement also states that NVCG "owns and operates a system of generating leads consisting of consumers interested in the legal services referenced by signed and executed Affiliate Contracts… in this Limited Liability Operating Agreement." (*See* **Exhibit 1**, pp. 1-2, § 1.3.).

///

8

37.    LPG agreed to pay, and in fact paid, New Vision Defendants a portion of the monthly payments received from consumers referred by New Vision Defendants.

38.    Hashempour and Esfahani are named as managers of the New Vision Defendants on several documents in the record.

39.    For example, as will be discussed further below, both Hashempour and Esfahani signed official New Vision documentation including the NVCG Operating Agreement (*see* **Exhibit 1**), Affiliate Agreements on behalf of the New Vision Defendants (*see* **Exhibit 3** and **Exhibit 4**), multiple Accounts Receivable Purchase Agreements ("ARPA") (*see* **Exhibit 6** and **Exhibit 6.1**); Esfahani signed the New Vision Defendants' proof of claim (*see* proof of claim #102396-1, **Exhibit 22**), and have signed stipulations in this case binding the New Vision Defendants. *See* Adv. Dkt. No. 7).

40.    On information and belief, although their names are rarely included in the official New Vision documents, Moarefian and Guetssoyan ran the day-to-day operations of the New Vision Defendants and were the main principals of the New Vision Defendants.

41.    On information and belief, Moarefian and Guetssoyan negotiated the Affiliate Agreements that the New Vision Defendants entered, even though, as discussed below, they are signed by Hashempour and Esfahani.

42.    On information and belief, Moarefian and Guetssoyan were the architects of the New Vision Defendants and their business affairs, including with LPG.

43.    Under Moarefian and Guetssoyan's control, the New Vision Defendants performed

i.    **Affiliate Agreements**

44.    On or about October 20, 2022, Debtor entered into an affiliate agreement with New Vision ("Affiliate Agreement 1") signed by Hashempour for New Vision on October 24, 2022. A true and accurate copy of Affiliate Agreement 1 is attached as **Exhibit 3** and incorporated here.

45.    Also on or about October 20, 2022, Debtor entered into an affiliate agreement with New Vision ("Affiliate Agreement 2") signed by Sarvanez Moarefian (Esfahani) for New Vision on October 27, 2022. A true and accurate copy of the Affiliate Agreement 2 is attached as **Exhibit 4**

///

and incorporated here. It is unclear which of these two affiliate agreements is or was operative, but for purposes of the SAC, it makes no difference.

46.     The New Vision Affiliate Agreements state that New Vision "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG."

47.     Pursuant to the New Vision Affiliate Agreements, New Vision generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

48.     New Vision went so far as to assist with the execution of an engagement letter with the consumer.

49.     Pursuant to the New Vision Affiliate Agreements, Debtor agreed to pay New Vision as follows:

> LPG shall pay 85% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $31.46 (15% of the $76.38 plus $20), which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive [*sic*] for such cost and Affiliate shall not have to share such expenses.

(*See e.g.*, **Exhibit 3**, ¶ 6.)

50.     On information and belief, the New Vision Defendants generated leads consisting of consumers interested in the legal services offered by LPG or one of the related entities and referred those consumers to Debtor or a related entity.

51.     The Affiliate Agreements identified in **Exhibit 3** and **Exhibit 4** violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. CAL. BUS. & PROF. CODE § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise

///

the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

52.     Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business).

53.     Because the Affiliate Agreements and associated referral activities violate federal and state law, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor or any other Diab-controlled entity under the Affiliate Agreements was unlawful.

54.     Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

///

ii.    **Account Receivable Purchase Agreements and Asset Purchase**

**Agreements**

55.    On or about November 24, 2022, New Vision entered into an Account Receivable Purchase Agreement ("ARPA") with Debtor and MRD Marketing LLC. A true and accurate copy of the ARPA is attached as **Exhibit 5** and incorporated here.[3]

56.    Pursuant to the ARPA, Debtor purported to sell New Vision streams of monthly payments from consumers that should have been held in trust until earned. (*See* **Exhibit 5**.)

57.    On or about August 25, 2022, NVCG entered into an ARPA with ProofPositive LLC with ProofPositive LLC as the buyer and NVCG as the seller (ARPA 2). A true and accurate copy of ARPA 2 is attached as **Exhibit 6** and incorporated here.

58.    On or about August 26, 2022, NVCG entered into an ARPA with ProofPositive LLC with ProofPositive LLC as the buyer and NVCG as the seller (ARPA 3). A true and accurate copy of ARPA 2 is attached as **Exhibit 6.1** and incorporated here.[4]

59.    On or about January 13, 2023, NVDR entered into an ARPA with ProofPositive LLC with ProofPositive LLC as the buyer and NVDR as the seller. ("ARPA 4"). This ARPA was likely never executed because it lacks signatures. A true and accurate copy of ARPA 4 is attached as **Exhibit 7** and incorporated here.

60.    On or about August 29, 2022, "New Vision 2" entered into an ARPA with ProofPositive LLC. Guetssoyan signed the ARPA on behalf of New Vision 2. As noted, Guetssoyan is known to Trustee as, *inter alia*, the husband of Hashempour, one of the named principals of New Vision. A true and accurate copy of the New Vision 2 ARPA is attached as **Exhibit 8** and incorporated here.

61.    Furthermore, Trustee is also in possession of a copy of a void ARPA between ProofPositive LLC and New Vision 2 dated, October 13, 2022. In this void agreement, the wire

---

[3] This particular ARPA was not signed by a representative of New Vision, and may not have been active.

[4] As far as can be determined, the main difference between these two ARPAs is the total purchased accounts. For the ARPA dated August 25, 2022, 500 accounts were to be purchased for $500 per account ($250,000). By contrast, for the ARPA dated August 26, 2022, 200 accounts were to be purchased for $500 per account ($100,000).

1  instructions on the final page lists New Vision as the account holder and New Vision's Newport

2  Beach address. As mentioned above, Trustee believes that the New Vision 2 entity is likely just an

3  alternate dba for NVCG. A true and accurate copy of the voided New Vision 2 ARPA with

4  ProofPositive LLC is attached as **Exhibit 9** and incorporated herein.

5      62.    By entering into ARPA Agreements Debtor and the New Vision Defendants violated

6  federal and state laws by selling unearned legal fees or funds that were supposed to be held in trust

7  or used for the benefit of consumers.

8      63.    The effect of the ARPA Agreements was to accomplish an unlawful purpose. Thus,

9  the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris*

10 *Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes,*

11 *Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has

12 been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a

13 corporation to purchase its own stock has the effect of illegally withdrawing and paying to a

14 stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the

15 fact that the contract is fully performed by the sellers and partially performed by the corporation.);

16 *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*,

17 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons

18 from engaging in particular activity, or is for purpose of regulating occupation or business for

19 protection of public, imposition of penalty amounts to prohibition against engaging in occupation

20 or business without license, and contract made by unlicensed person in violation of statute is

21 invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real

22 estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license

23 required by law to carry on his business.).

24     64.    Because the ARPA Agreements violate federal and state laws, they are void,

25 unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor

26 or any other Diab-controlled entity, under the ARPA Agreements was unlawful.

27     65.    Unlawful consideration is that which is: "(1) contrary to an express provision of law;

28 (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary

to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### iii.    Preference Letters and Preference Payments

66.    On or about September 15, 2023, the Trustee sent a letter to New Vision (though addressed to "New Vision Debt **Relief, LLC**" (the "Preference Letter") seeking to avoid litigation by identifying suspected preferential transfers (i.e., transfers to New Vision from Debtor falling within the 90-day preference window provided in 11 U.S.C. § 547) and offering an opportunity for New Vision to come forward with any defenses or exculpatory information it might have. The Preference Letter also included settlement terms relating to those suspected preferential transfers. A true and accurate copy of the Preference Letter is attached hereto as **Exhibit 14** and incorporated herein.

67.    The transfers to New Vision inside the 90-day preference window total at least $165,381.29. A true and accurate list of the presently known payments made by Debtor to New Vision inside the 90-day preference period is attached as **Exhibit 15** and incorporated herein. The transfers inside the 90-day preference window are referred to as the "the Preference Transfers".

68.    Also on or about September 15, 2023, the Trustee sent a letter to NVCG (the "Preference Letter 2" and collectively the "Preference Letters") with substantively identical terms as the Preference Letter above. A true and accurate copy of Preference Letter 2 is attached hereto as **Exhibit 16** and incorporated herein.

69.    The transfers to NVCG inside the 90-day preference window total at least $73,597.07. A true and accurate list of the presently known payments made by Debtor to NVCG inside the 90-day preference period is attached as **Exhibit 17** and incorporated herein.

70.    Since the Preference Letter was sent, additional transfers inside the 90-day window have been discovered.

71.    At least one payment inside the 90-day preference period was made to "New Vision Debt Relief – 2" for $17,219.01. Added to the transfers to NVCG, the total is $90,816.08. A true

1    and accurate list of the presently known payments made by Debtor to "New Vision Debt Relief –
2    2" inside the 90-day preference period is attached as **Exhibit 18** and incorporated herein.

3    72.    At least one payment inside the 90-day preference period was made to "New Vision
4    6" for $1,441.18. A true and accurate lists of transfers to New Vision 6 inside the 90-day preference
5    period is attached as **Exhibit 19** and incorporated herein. (Collectively with the New Vision and
6    NVCG preference window transfers, "New Vision Preference Transfers"). In sum, these Preference
7    Transfers total at least **$257,638.55**.

8    73.    On October 6, 2023, counsel for both New Vision and NVCG responded to the
9    Preference Letter indicating the intent of both entities to raise affirmative defenses. Importantly,
10   counsel for both entities confirmed their relatedness. A true and accurate copy of the New Vision
11   Defendants' response to the Preference Letters is attached as **Exhibit 20** and incorporated herein.

12   **E.    Other Payments to the New Vision Defendants**

13   74.    During the applicable reach-back period for fraudulent transfers, Debtor paid New
14   Vision the sum of at least $344,791.38 between October 2022 and February 2023. A true and
15   accurate list of the known payments made by Debtor to New Vision is attached as **Exhibit 10** and
16   incorporated here.

17   75.    During the applicable reach-back period for fraudulent transfers, Debtor paid NVCG
18   the sum of at least $627,170.52[5] between July 2021 and February 2023 ("NVCG Transfers"). A true
19   and accurate list of the known payments made by Debtor to NVCG is attached as **Exhibit 11** and
20   incorporated here.  Additionally, The Trustee is aware that Validation Partners transferred the sum
21   of $87,224.

22   76.    Finally, during the applicable reach back period for fraudulent transfers, Debtor paid
23   NVDR the sum of at least $156,012.14 between December of 2021 and February of 2023. A true
24   and accurate list of the known payments made by Debtor to NVDR is attached as **Exhibit 12** and
25   incorporated here. It should be noted that according to the notes on Debtor's transaction dated
26   February 9, 2023, this transfer was to "New Vision Debt Relief – 2". (*See* **Exhibit 12**.) However,

27

28   [5] Trustee is also aware of the possibility that additional transfers may be identified. Trustee will
     supplement should additional transfers be found.

1   as noted, NVDR is a dba for NVCG, so those sums are properly combined, for a total of at least

2   $870,406.66.

3       77.     Trustee's records also indicate that an entity called "New Vision 6" received

4   $1,441.18 in pre-petition transfers within 4 years of the Petition Date. A true and accurate list of

5   transfers to New Vision 6 is attached as **Exhibit 13** and incorporated herein (Collectively, these

6   transfers along with the transfers to New Vision, NVCG, and the related entities are the "New Vision

7   Pre-Petition Transfers" and total $1,216,639.22).

8       78.     Trustee is aware of at least one post-petition payment made to NVCG in the amount

9   of $20,000 ("New Vision Post-Petition Transfers"). A true and accurate list of post-petition transfers

10  to NVCG is attached as **Exhibit 21** and incorporated herein. As the investigation into Debtor

11  remains ongoing, additional post-petition transfers to New Vision Defendants may be discovered.

12      79.     Collectively, the New Vision Pre-Petition Transfers (including the New Vision

13  Preference Transfers) and New Vision Post-Petition transfers are referred to as "the Transfers").

14          **F.      Diab's use of LPG in a Ponzi Scheme**

15      80.     The Ponzi Scheme Presumption exists in this Bankruptcy.

16      81.     The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to

17  defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme.

18  No other reasonable interference is possible. A Ponzi scheme cannot work forever. The investor

19  pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme

20  will eventually collapse as a result of the inability to attract new investors. The perpetrator

21  nevertheless makes payments to present investors, which, by definition, are meant to attract new

22  investors. He must know all along, from the very nature of his activities, that investors at the end of

23  the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of

24  the law, *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future

25  investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman*

26  *Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.

27  D. Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its

28  effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within

the meaning of § 548(a)(1)).” *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.

82.     “But if all the debtor receives in return for a transfer is the use of the defendant’s money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor’s estate. In such a situation, the use of the defendant’s money cannot objectively be called “reasonably equivalent value.” *Id*. at 859. Therefore, “[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute ‘property of the estate,’ and the trustee can recover them.” *Id*. at 853 n.17 (citations omitted).

83.     Diab used LPG to operate a Ponzi scheme that utilized Defendants and several other entities as investors, whether pursuant to unlawful fee-sharing agreements, cash investments, diversion of funds, or diversion of “loan” proceeds, to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, Diab was running a Ponzi scheme with LPG and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).

84.     Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were preferential and fraudulent.

**G.     Moarefian’s, Guetssoyan’s, Hashempour’s, and Esfahani’s Actual Knowledge of, and Substantial Assistance to The New Vision Defendants’ Participation in Illegal Agreements and Diab’s Ponzi Scheme**

85.     Plaintiff is informed and believes that Moarefian, Guetssoyan, Hashempour, and Esfahani knew or should have known that the scheme they engaged in with Diab or his lieutenants was unlawful and fraudulent, and that the Debtor would be harmed as a result.

86.     On information and belief, Moarefian and Guetssoyan had a prior business relationship with Brian Reale (“Reale”), an LPG principal.

87.     On information and belief, Reale recruited Moarefian and Guetssoyan to join the LPG scheme, and the New Vision Defendants were the vehicles for doing so.

88.     On information and belief, Moarefian and Guetssoyan, given their prior experience in the same or similar industry, Moarefian and Guetssoyan knew or should have known that the debt settlement industry is heavily regulated, and they knew or should have known about the regulations.

89.     On information and belief, Moarefian and Guetssoyan reviewed the various Affiliate Agreements and ARPAs and authorized them.

90.     On information and belief, due to Moarefian and Guetssoyan's prior experience in the same or similar industry and their specific recruitment by Reale, Moarefian and Guetssoyan had cause to know that the LPG business model, and particularly the misappropriation of unearned legal fees from LPG clients, was unlawful.

91.     Furthermore, on information and belief, due to Moarefian and Guetssoyan's relative sophistication, Moarefian and Guetssoyan knew or should have known that the LPG business model was a Ponzi scheme.

92.     On information and belief, Moarefian and Guetssoyan joined the LPG scheme knowing that LPG's business model was unlawful and accepted the risk.

93.     On information and belief, Moarefian and Guetssoyan had control and decision-making power over the New Vision Defendants such that the New Vision Defendants could not have entered into the affiliate agreements and ARPA agreements, received the transfers, or participated in the Ponzi scheme without their consent and approval.

94.     On information and belief, Moarefian and Guetssoyan enlisted their wives, Esfahani and Hashempour, to be "front" names for the New Vision entities (i.e., names that go on paperwork and official corporate documents).

95.     On information and belief, Moarefian and Guetssoyan knew that the New Vision Defendants were engaging in tortious conduct through the Affiliate Agreements, ARPA Agreements, and other business dealings with LPG or LPG's related entities and failed to take any action to stop the tortious conduct. Rather, on information and belief, Moaerfian and Guetssoyan

directed and approved of the New Vision Defendants' participation in the tortious conduct described herein.

96.    On information and belief, Moarefian and Guetssoyan enlisted their wives for the purpose of concealing or obscuring their own involvement in the New Vision Defendants and the wider LPG scheme.

97.    On information and belief, Moarefian and Guetssoyan directed and approved the use of the New Vision Defendants to do business with LPG and other entities controlled by Diab to insulate themselves as well as Hashempour and Esfahani from exposure resulting from Diab's illegal activity and distance themselves from liability based on their decision to participate in and further the Diab Ponzi scheme.

98.    On information and belief, Hashempour and Esfahani knew or should have known that the New Vision Defendants were involved in a fraudulent enterprise because their husbands, despite running the day-to-day operations of the New Vision Defendants, took measures to conceal their involvement.

99.    Furthermore, after agreeing to take on executive level roles with the New Vision Defendants, Hashempour and Esfahani knew or should have known of the standards and regulations of the debt servicing industry.

100.    On information and belief, Hashempour and Esfahani either knew of the unlawful business practices of LPG and the New Vision Defendants' participation in same, or Hashempour and Esfahani were willfully ignorant.

101.    On information and belief, upon reviewing the Affiliate Agreements and ARPAs that they signed, Hashempour and Esfahani understood or should have understood that the New Vision Defendants would be paid out of unearned legal fees by LPG.

102.    On information and belief, given their roles in the New Vision Defendants, Hashempour and Esfahani had at least some control and decision-making power over the New Vision Defendants such that the New Vision Defendants could not have entered into the Affiliate Agreements and ARPA agreements, received the transfers, or participated in the Ponzi scheme without their consent and approval as well.

103.    On information and belief, Hashempour and Esfahani knew that the New Vision Defendants were engaging in tortious conduct through the Affiliate Agreements, ARPA Agreements, and other business dealings with LPG or LPG's related entities and failed to take any action to stop the tortious conduct. Rather, on information and belief, Hashempour and Esfahani directed and approved of the New Vision Defendants' participation in the tortious conduct described herein by, among other things, signing their names on illegal contracts in furtherance of Diab's Ponzi scheme.

104.    On information and belief, Moarefian's, Guetssoyan's, Hashempour's, and Esfahani's status as a corporate officers does not insulate them from liability for aiding and abetting the New Vision Defendants' and Diab's tortious conduct. The "corporate director or officer status neither immunizes a person from personal liability for tortious conduct nor subjects him or her to vicarious liability for such acts." *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1379 (Ct. App. 2000) (citing *Frances T. Village Green Owners Assn.*, 723 P.2d 573, 581 (Cal. App. 1986). The California Supreme Court has been explicit in stating that directors or officers of a corporation may be held personally liable for torts committed by the company when the officer knowingly consented to or approved the action. *See United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 463 P.2d 770, 775 (Cal. 1970). "A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts." *Kadisha*, 78 Cal. App. 4th at 1380. A corporate officer or director may also be liable for tortious actions of the corporation if the officer knew or reasonably should have known of the tortious conduct and negligently failed to take action to avoid the harm. *Id.*  Moarefian's, Guetssoyan's, Hashempour's, and Esfahani's liability for aiding and abetting is not based on their titles as officers of a company, but rather based on their direction, consent, and approval of the New Vision Defendants' actions. Moarefian, Guetssoyan, Hashempour, and Esfahani exerted varying degrees of control over the New Vision Defendants in furtherance of Diab's Ponzi scheme and are therefore liable. On information and belief, Moarefian, Guetssoyan, Hashempour, and Esfahani had actual knowledge of, and substantially assisted, the tortious actions described in this SAC.

///

**H.    LPG's Prepetition Creditors**

105.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

106.    Plaintiff directs Defendants to the Order Denying Greyson's Motion to Vacate the Preliminary Injunction entered as Bankr. Docket No. 1545 ("Order") where the Court found "it is clear to this Court that Debtor since its pre-petition inception (and through the time of the appointment of the Chapter 1 Trustee) was in the Court's opinion operating a criminal enterprise" and that "[t]here is also evidenced before the Court that the Debtor was running a Ponzi scheme and paying some outside (or 'network') attorneys with funds obtained from new clients." Order p. 3, 1, 11-13; p. 4,1 14-15. Insolvency is presumed as a matter of law if the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonald,* No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven then the debtor is proven insolvent from the time of its inception").

107.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UfaCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported

108.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

109.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

110.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James

secured or unsecured claims.

Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

111.    As of the filing of this complaint, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of $717,507,462.29. Debtor's profit and loss statements reflect at least $115,000,000 of "Total Income" for the three-year period ending December 31, 2021, and based on information and belief that a substantial portion of this income had not actually been earned by Debtor. Proper accounting treatment of this unearned "income" would have been to record the unearned portion as cash received in client trust or IOLTA bank account with an offsetting client retainer liability account in the same amount. Thus, the unearned portion of the income would be present only on the balance sheet and not on Debtor's profit and loss statement. Debtor's balance sheets reflect two trust accounts, the highest balance of which was approximately $346,000 in November 2021. The balance sheets do not reflect a client retainer liability account. Thus, it appears that Debtor overstated its income during the three years ending December 31, 2021, though the extent to which it is overstated remains unknown. Further, assuming (as it appears to be the case) Debtor did not properly record its unearned income on its balance sheets using a trust account and offsetting client retainer liability account then Debtor's assets and liabilities on those balance sheets would be inaccurate.

112.    Additionally, just because Debtor had incoming cash that does not necessarily mean it was solvent. Based on information and belief Debtor's incoming cash was related to unearned income and should have been held in an appropriate trust account and recorded on its balance sheet with an offsetting client retainer payable account until it was earned. This treatment is further reinforced as appropriate by the fact that Debtor offered its clients a refund for unearned income. Thus, Debtor's incoming cash neither increased its assets (due to the offsetting client retainer liability in the same amount) nor would it increase its profitability until services were rendered and the income was actually earned.

///

113.     Debtor's balance sheets for the 36 months ending December 31, 2021 show only approximately $17,900,000 in total assets (primarily comprised of accounts receivable and merchant loans receivable) at its highest point in November 2021. Obviously, this amount is significantly less than the $700,000,000 of claims filed, further evidencing Debtor's state of insolvency.

**I.      Defendant QuikStart**

114.     Defendant QuikStart LLC ("QuikStart") is Wyoming Limited Liability Company founded on February 7, 2023. On information and belief, QuikStart was established and operated by Guetssoyan and Moarefian.

115.     On August 2, 2023, the Court approved Trustee's Motion For Entry of an Order: (A) Approving Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b); and (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements [Bankr. Dkt. No. 191] ("Trustee's Sale Motion"). See [Bankr. Dkt. 352]. The successful buyer of Debtor's assets was Morning Law Group ("MLG"). *Id.* at p. 3, ¶F. Debtor and MLG executed an Asset Purchase Agreement. *See* Trustee's Report of Sale, Exhibit 1 [Bankr. Dkt. 416].

116.     On information and belief, shortly after the formation of QuikStart, and upon learning of Debtor's impending bankruptcy filing, Defendant QuikStart, through Guetssoyan and Moarefian, caused Debtor's master client database, containing personally identifying information, including social security numbers, credit histories, and outstanding debt records, to be unlawfully transferred to QuikStart and possibly to one or more of the New Vision Defendants.

117.     On information and belief, these transfers of client files occurred both pre-petition ("Pre-Petition QuikStart Transfers") and post-petition ("Post-Petition QuikStart Transfers").

118.     These assets, belonging to Debtor and Debtor's bankruptcy estate, were the subject of Trustee's sale of assets to MLG. *See* [Bankr. Dkt. 191].

119.     Upon transferring Debtor's client files to Quikstart and possibly to one or more of the New Vision Defendants, on information and belief, QuikStart and/or New Vision then would refer Debtor's clients to one of MLG's competitors.

///

120.    QuikStart, possibly one or more of the New Vision entities, and possibly even Guetssoyan and Moarefian personally, would receive a referral fee or some other type of benefit.

121.    On information and belief, a significant number of Debtor's former clients were diverted away from MLG by these actions.

122.    On information and belief, these actions continued post-petition while the Debtor's client files were being collected and indexed in preparation for the sale of Debtor's assets.

123.    On information and belief, QuikStart, Guetssoyan and Moarefian's actions were intended to: 1) frustrate and/or interfere with the purpose of Debtor's contractual sale of assets to MLG; and 2) unjustly enrich QuikStart/New Vision as well as Guetssoyan and Moarefian.

## FIRST CLAIM FOR RELIEF

### Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers

### Against New Vision Defendants

### [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]

124.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 123 as though set forth in full.

125.    The Affiliate Agreements, ARPA Agreements, and all or a portion of the New Vision Pre-Petition Transfers occurred within the two years prior to the Petition Date.

126.    On or after the date that such agreements were made and the New Vision Pre-Petition Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

127.    The Pre-Petition Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

132.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay the New Vision Defendants sums received from consumers under the affiliate agreement, which constitutes an illegal capping agreement between New Vision Defendants and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

///

///

133.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to buy portions of accounts receivable from New Vision Defendants, which is illegal under federal and state laws.

134.     The New Vision Pre-Petition Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

135.     The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

136.     The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

137.     The  Affiliate Agreements, ARPA Agreements, and the New Vision Pre-Petition Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

138.     The Affiliate Agreement, ARPA Agreements, and New Vision Pre-Petition Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**SECOND CLAIM FOR RELIEF**

**Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**Against The New Vision Defendants**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

139.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 138 as though set forth in full.

///

140.    The Affiliate Agreements, ARPA Agreements, and all or a portion of the New Vision Pre-Petition Transfers occurred within the two years prior to the Petition Date.

141.    On or after the date that such agreements were executed and such New Vision Pre-Petition Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

142.    The New Vision Pre-Petition Transfers happened while Debtor:

       a.    was insolvent or became insolvent was a result;

       b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

       c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

143.    Because the referrals from the New Vision Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the New Vision Pre-Petition Transfers made, Debtor received less than reasonably equivalent value.

144.    Because both the initial sale of the accounts receivable from Debtor to the New Vision Defendants and the accounts receivable sale from the New Vision Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the New Vision Pre-Petition Transfers made, Debtor received less than reasonably equivalent value.

145.    Furthermore, the Debtor did not receive the reasonably equivalent value of the New Vision Pre-Petition Transfers because by using the New Vision Defendants' money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the New Vision Pre-Petition Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of the New Vision Defendants' money to further the

1  Debtor's Ponzi scheme cannot be consideration for the Pre-Petition Transfers and cannot objectively

2  be called reasonably equivalent value.

3      146.    Therefore, the New Vision Defendants were acting as investors in the Debtor's

4  Ponzi scheme. Any transfers made to the New Vision Defendants can be avoided by the Plaintiff

5  since the New Vision Pre-Petition Transfers are preferential and fraudulent such that they constitute

6  property of the Estate in which the Plaintiff can recover. The Affiliate Agreements, ARPA

7  Agreements, and the Pre-Petition Transfers should be avoided as fraudulent under 11 U.S.C.

8  § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and

9  preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

10      147.    The Affiliate Agreements, ARPA Agreements, and the New Vision Pre-Petition

11  Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544 and 548(a)(1)(B), and such

12  transferred property, or the value thereof, should be recovered and preserved for the benefit of the

13  Estate pursuant to 11 U.S.C. §§ 550 and 551.

**THIRD CLAIM FOR RELIEF**

**Count III - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**Against the New Vision Defendants**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

18      148.    Plaintiff realleges and incorporates here by reference each and every allegation

19  contained in paragraphs 1 through 147 as though set forth in full.

20      149.    The Affiliate Agreements, ARPA Agreements, and all or a portion of the New

21  Vision Pre-Petition Transfers occurred within the four years prior to the Petition Date.

22      150.    On or after the date that such agreements were entered and such New Vision Pre-

23  Petition Transfers were made, entities to which Debtor was or became indebted include the

24  Prepetition Creditors.

25      151.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay

26  the New Vision Defendants sums received from consumers under the  affiliate agreement, which

27  constitutes an illegal capping agreement between the New Vision Defendants and Debtor.

28  ///

152. The New Vision Pre-Petition Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the New Vision Pre-Petition Transfers were made as is evidence by the filing of the voluntary petition.

153. The value of the consideration received by Debtor for such transfers was not reasonably equivalent to the value of the New Vision Pre-Petition Transfers because the New Vision Pre-Petition Transfers were used to further assist Debtor in its Ponzi scheme.

154. Because the referrals from the New Vision Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the New Vision Pre-Petition Transfers made, Debtor received less than reasonably equivalent value.

155. Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to buy accounts receivable from the New Vision Defendants, which is illegal under federal and state law. Because they are illegal under federal and state law, they are void and subject to avoidance as fraudulent.

156. The New Vision Pre-Petition Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

157. The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

158. The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

159. The Affiliate Agreements, the ARPA Agreements, and the New Vision Pre-Petition Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.04(a) and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are

///

1  allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under

2  11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

3     160.    Accordingly, the  Affiliate Agreements, the ARPA Agreements, and the Pre-

4  Petition Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code

5  §§ 3439.04(a) and 3439.07, under the common law tort of intentional fraudulent transfers, and such

6  transferred property, or the value thereof, should be recovered and preserved for the benefit of the

7  Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

8  **FOURTH CLAIM FOR RELIEF**

9  **Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

10  **Against The New Vision Defendants**

11  **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

12     161.    Plaintiff realleges and incorporates here by reference each and every allegation

13  contained in paragraphs 1 through 160 as though set forth in full.

14     162.    The Affiliate Agreement, the ARPA Agreements, and all or a portion of the New

15  Vision Pre-Petition Transfers occurred within the four years prior to the Petition Date.

16     163.    The New Vision Pre-Petition Transfers happened while Debtor:

17        a.    was insolvent or became insolvent as a result;

18        b.    was engaged or was about to engage in a transaction for which any property

19  remaining with Debtor was of unreasonably small capital; or

20        c.    intended to incur, or believed that it would incur, debts beyond its ability to

21  pay as such debts matured.

22     164.    Because the referrals from the New Vision Defendants to Debtor are illegal under

23  federal and state law, the agreements are void and subject to avoidance as fraudulent. Any

24  purported consideration constitutes unlawful consideration, which cannot constitute reasonably

25  equivalent value. Thus, at the time the agreements were made and the New Vision Pre-Petition

26  Transfers made, Debtor received less than reasonably equivalent value.

27     165.    Furthermore, the Debtor did not receive the reasonably equivalent value of the

28  New Vision Pre-Petition Transfers to the New Vision Defendants because by using the New Vision

Defendants' money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the New Vision Pre-Petition Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of the Defendant's money to further the Debtor's Ponzi scheme cannot be consideration for the New Vision Pre-Petition Transfers and cannot objectively be called reasonably equivalent value.

166.    The New Vision Defendants were therefore acting as investors in the Debtor's Ponzi scheme and any New Vision Pre-Petition Transfers made to the New Vision Defendants can be avoided by the Plaintiff since the New Vision Pre-Petition Transfers to the New Vision Defendants are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

167.    Because the sale of the accounts receivable from the New Vision Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the New Vision Pre-Petition Transfers made, Debtor received less than reasonably equivalent value.

168.    The Affiliate Agreement, the ARPA Agreements, and the New Vision Pre-Petition Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against this Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

169.    Accordingly, the Affiliate Agreements, the ARPA Agreements, and the New Vision Pre-Petition Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

///

///

## FIFTH CLAIM FOR RELIEF

### Count V - Avoidance, Recovery, and Preservation of Preferential Transfers to the New Vision Defendants Preference Period

### Against the New Vision Defendants

### [11 U.S.C. §§ 547, 550, and 551]

170.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 169 as though set forth in full.

171.    The New Vision Preference Transfers were made for, or on account of, an antecedent debt or debts owed by the LPG to the New Vision Defendants, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of the New Vision Defendants.

172.    The New Vision Preference Transfers happened while LPG was insolvent.

173.    Debtor is also entitled to the presumption of insolvency when the New Vision Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

174.    As a result of the New Vision Preference Transfers, the New Vision Defendants recovered more than they would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the New Vision Preference Transfers had not been made; and (iii) the New Vision Defendants received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

175.    In accordance with the foregoing, the New Vision Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

///

///

///

///

## SIXTH CLAIM FOR RELIEF

### Count VI - Avoidance, Recovery, and Preservation of Post-Petition Transfers

### Against the New Vision Defendants

### [11 U.S.C. §§ 549, 550, and 551]

176.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 175 as though set forth in full.

177.    Subsequent to the Petition Date, the New Vision Defendants received the New Vision Post-Petition Transfers.

178.    Under 11 U.S.C. §549(a), the Trustee may avoid a transfer of property of the estate that occurs after the commencement of the case and that is not authorized by the court of the Bankruptcy Code.

179.    The Post-Petition Transfers cannot avoid being voided by the Trustee by 11 U.S.C. 549(b) or (c). In accordance with the foregoing, the Post-petition Transfers are voidable pursuant to 11 U.S.C. § 549, and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## SEVENTH CLAIM FOR RELIEF

### Count VII – Conversion

### Against the New Vision Defendants, Guetssovan, Moarefian, Hashempour, and Esfahani

### [11 U.S.C. § 541; California Common Law]

180.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 179 as though set forth in full.

181.    Defendants have possession or control over property of Debtor in the form of the New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers, and other property of Debtor, made illegal pursuant to illegal and unenforceable agreements and/or business operations.

182.    The New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers are not of inconsequential value to the Estate.

///

183.    At all material times, Debtor had rightful ownership and a right to possession and control of its assets.

184.    The New Vision Defendants, Guetssoyan, Moarefian, Hashempour, and Esfahani unlawfully converted Debtor's assets in the form of the New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers, and other property of the Debtor, by their wrongful execution of unlawful agreements and fraudulent transfers of assets resulting in a disposition of Debtor's possession and control over these assets.

185.    Debtor sustained damages because of these defendants' unlawful dominion and control over assets to which Debtor had a right of possession.

186.    Accordingly, Trustee is entitled to a judgment for conversion of the New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers and any other property belonging to the Debtor which these defendants unlawfully converted to their own use, pursuant to 11 U.S.C. § 541 and California common law.

## EIGHTH CLAIM FOR RELIEF

**Count VIII – Participating in Scheme to Continue to Deepen LPG's Continuing Insolvency**

**Against the New Vision Defendants, Guetssoyan, Moarefian, Hashempour, and Esfahani**

**[11 U.S.C. § 541; California Common Law]**

187.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 186 as though set forth in full.

188.    As set forth herein, Moarefian and Guetssoyan were recruited by Reale and possibly other representatives of LPG, and they, in turn, recruited their wives, Hashempour and Esfahani, to participate in, further, and advance the Diab Ponzi Scheme designed and orchestrated to deplete the assets of LPG and deepen LPG's continuing insolvency.

189.    The defendants have engaged in a pattern and course of conduct, including the execution of and entry into unlawful agreements and/or unlawful operations, and the receipt of transfers of assets of the Debtor, which resulted in direct harm to Debtor.

190.    The defendants acted in furtherance of the Ponzi scheme by causing entities under their control, including the New Vision Defendants, to enter into a series of formal contractual

34

1  agreements and unlawful operations with LPG through which these defendants and the New Vision

2  entities under their control would receive and continue to receive a stream of money from the Debtor

3  thereby facilitating the prolonged operation of the Ponzi scheme. These actions converted assets of

4  LPG to the these defendants and possibly others, and significantly contributed to the deepening

5  insolvency of Debtor, resulting in exacerbating damage claims of third parties vis-à-vis LPG.

6      191.    Accordingly, Trustee is entitled to a judgment for deepening insolvency of the

7  Debtor in the amount of at least the sum of the New Vision Pre-Petition Transfers, New Vision

8  Preference Transfers, and New Vision Post-Petition Transfers, and any other property belonging to

9  the Debtor which these defendants unlawfully converted to their own use, pursuant to 11 U.S.C. §

10  541 and California common law.

## NINTH CLAIM FOR RELIEF

### Count IX - Aiding and Abetting

### Against the New Vision Defendants, Guetssoyan, Moarefian, Hashempour, and Esfahani

### [11 U.S.C. §§ 541; California Common Law]

15      192.    Plaintiff realleges and incorporates herein by reference each and every allegation

16  contained in paragraphs 1 through 191 as though set forth in full.

17      193.    Moarefian, Guetssoyan, Hashempour, and Esfahani have possession or control over

18  property of the Estate, including, but not limited to the Transfers made pursuant to illegal and

19  unenforceable agreements that were used to perpetuate and conceal the Ponzi Scheme and fraudulent

20  transfers.

21      194.    Moarefian, Guetssoyan, Hashempour, and Esfahani had knowledge of the

22  fraudulent transactions, transfers and illegal and unenforceable agreements that were used to

23  perpetuate and conceal the Ponzi scheme and fraudulent transfers. Their knowledge is evidenced

24  by, among other things, the facts described at ¶¶ 85-103 herein and as otherwise alleged in this

25  complaint.

26      195.    Moarefian, Guetssoyan, Hashempour, and Esfahani, with the foregoing knowledge,

27  intended to, and did, help Diab and other scheme participants in perpetuating and concealing the

28  Ponzi scheme and fraudulent transfers of money, causing injury to Debtor. Moarefian, Guetssoyan,

Hashempour, and Esfahani's knowledge is evidenced by, among other things, the facts described at ¶¶ 85-103 herein and as otherwise alleged in this complaint.

196.    At all material times, Moarefian, Guetssoyan, Hashempour, and Esfahani had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business operations of LPG and the Ponzi Scheme going.

197.    Concealing the true nature of the Ponzi Scheme was paramount to being able to continue to rely on its operation to receive fraudulent transfers of money at Debtor's expense.

198.    Without an intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme, Moarefian, Guetssoyan, Hashempour, and Esfahani would no longer receive the benefits of said transfers and had a vested interest in keeping the Ponzi scheme moving forward for as long as they possibly could.

199.    Moarefian, Guetssoyan, Hashempour, and Esfahani assisted, and did actually engage in, Diab's commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of LPG monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme, causing injury to Debtor.

200.    Without in any way limiting the foregoing, Moarefian, Guetssoyan, Hashempour, and Esfahani, as Managing Members of the New Vision Defendants, used their control over the New Vision Defendants to support, participate in, and benefit from Diab's Ponzi scheme and fraudulent transfers.

201.    The injuries to Debtor directly, proximately and reasonably foreseeably resulting from and caused by these fraudulent transfers and Ponzi scheme include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies and the continuation of the criminal enterprise.

202.    LPG incurred an overwhelming amount of debt resulting from the Ponzi Scheme. The payments LPG made to the New Vision Defendants, and the New Vision Defendants' demands for further payments, caused LPG to seek out additional streams of income and investments, thereby

perpetuating the fraud and deepening LPG's insolvency. Due to the involvement of the New Vision Defendants in the Ponzi Scheme, LPG continued to incur far greater debt that it could possibly repay.

203.    Moarefian, Guetssoyan, Hashempour, and Esfahani furthered the deepening insolvency of LPG by engaging in the Ponzi Scheme. Moarefian, Guetssoyan, Hashempour, and Esfahani did so with knowledge that LPG was likely already insolvent. This knowledge is evidenced by, among other things, Moarefian, Guetssoyan, Hashempour, and Esfahani's knowledge that LPG was failing to pay its clients and customers whose accounts were being looted. Moarefian, Guetssoyan, Hashempour, and Esfahani understood the issues faced by LPG affiliates with their own sales floor as they operated such a floor in furtherance of the Diab Ponzi scheme. By aiding and abetting Diab's Ponzi Scheme, these defendants delayed LPG's filing for bankruptcy and caused direct injury to LPG by deepening its insolvency.

204.    Moarefian, Guetssoyan, Hashempour, and Esfahani's continued actions in furtherance of the Ponzi scheme specifically resulted in the deepening insolvency of LPG based on the specific funds which were diverted to the New Vision Defendants controlled by Moarefian, Guetssoyan, Hashempour, and Esfahani without any benefit received by LPG.

205.    The deepening insolvency of LPG caused by Moarefian, Guetssoyan, Hashempour, and Esfahani, the New Vision Defendants, and other entities affiliated with Diab, resulted in LPG incurring a direct harm independent of the harm to its creditors as the harm was not limited to an inability to pay creditors, but extended far deeper into a larger inability to operate as a going concern and continue business operations of any kind whatsoever due to the depletion of resources caused by the Diab Ponzi scheme and Moarefian, Guetssoyan, Hashempour, and Esfahani's aiding and abetting of the same.

206.    Due to Moarefian, Guetssoyan, Hashempour, and Esfahani's aiding and abetting Diab's Ponzi Scheme, Diab caused LPG to engage in the wrongful expenditure of corporate assets thereby prolonging LPG's life through bad debt and causing the dissipation of corporate assets.

207.    The property, including but not limited to the New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers are not of

37

inconsequential value to the Debtor and recovering these funds is paramount to rectifying Debtor's injury.

208.    Plaintiff and the Debtor also suffered damages by incurring attorney's fees and costs associated with the prosecution of these defendants' unlawful activities.

209.    Moarefian, Guetssoyan, Hashempour, and Esfahani, upon information and belief, assisted, and did actually engage in, the commission of fraud and the scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the scheme.

210.    "Under the Bankruptcy Code, 'all legal or equitable interests to the debtor in property as of the commencement of [a bankruptcy] case' belong to the bankruptcy estate created at the debtor's filing of the bankruptcy petition." *Bercy v. City of Phx.*, 103 F.4th 591, 594 (9th Cir. 2024) (citing 11 U.S.C. § 541(a)(1)). "A claim belonging to the debtor at the time of the bankruptcy filing is such a property interest." *Id.* "The scope of section 541 is broad, and includes causes of action." *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir. 1986) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 & n. 9 (1983)).

211.    "California imposes liability 'on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.'" *Berger v. Varum*, 35 Cal. App. 5th 1013, 1025 (2019).

212.    California recognizes fraud as an intentional tort. *See e.g., Hensley v. McSweeney*, 90 Cal. App. 4th 1081, 1085 (2001) ("Fraud is an intentional tort; it is the element of fraudulent intent, or intent to deceive, that distinguishes it from actionable negligent misrepresentation and from nonactionable innocent misrepresentation.").

213.    California also recognizes the intentional tort of fraudulent transfer. *See e.g., Berger*, 35 Cal. App. 5th 1013, 1025 ("Because transferring funds in order to evade creditors constitutes an intentional tort.") *See also* Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07.

214.    To be clear, the Trustee is alleging that the New Vision Defendants as well as Moarefian, Guetssoyan, Hashempour, and Esfahani aided and abetted in commission of the following intentional torts: (1) fraud; (2) commission of a fraudulent transfer; and (3) conversion.

215.    Moarefian, Guetssoyan, Hashempour, and Esfahani knew, or should have known, that Diab was utilizing LPG in committing these intentional torts given their status as executives of companies actively involved in perpetuating the Ponzi scheme. Despite having an understanding that the basis of Diab's use of LPG's business operations were unlawful, Moarefian, Guetssoyan, Hashempour, and Esfahani nevertheless determined to continue their business dealings in furtherance of the Diab Ponzi scheme.

216.    Moarefian, Guetssoyan, Hashempour, and Esfahani were aware, or should've been aware of the intentional torts while they were being recruited to work with LPG and/or while continuing to work with LPG, and, as a result, every transfer made to the New Vision Defendants pursuant to Moarefian, Guetssoyan, Hashempour, and Esfahani's continued business dealings with LPG were with Moarefian, Guetssoyan, Hashempour, and Esfahani's knowledge that they constituted a fraudulent transfer of LPG's assets in furtherance of the scheme.

217.    The harm alleged herein was to the Debtor and the result of Defendants' participation, direction, and concerted effort with Diab or his lieutenants to advance the Ponzi scheme and the fraudulent conduct outlined herein to the detriment of the Debtor. Stated differently, the Trustee alleges that these Defendants' participation, direction, and concerted effort with Diab and/or his lieutenants in furtherance of the Ponzi scheme aided and abetted the fraudulent Ponzi scheme orchestrated by Diab.

218.    Moarefian, Guetssoyan, Hashempour, and Esfahani substantially assisted in the furtherance of the Ponzi scheme by causing entities under their control, including the New Vision Defendants, to enter into agreements with LPG through which Moarefian, Guetssoyan, Hashempour, and Esfahani and the New Vision Defendants (under Moarefian, Guetssoyan, Hashempour, and Esfahani's control) would receive and continue to receive a stream of money from the Debtor thereby facilitating the prolonged operation of the Ponzi scheme. These actions converted assets of LPG to the New Vision Defendants and the direction and control of Moarefian,

Guetssoyan, Hashempour, and Esfahani, and significantly contributed to the deepening insolvency of Debtor, resulting in exacerbating damage claims of third parties vis-à-vis LPG.

219.   Moarefian, Guetssoyan, Hashempour, and Esfahani substantially assisted Diab in defrauding Debtor by entering into various unlawful agreements with Debtor and entities controlled by Diab to effectuate and advance the Ponzi scheme and caused the New Vision Defendants to receive transfers of Debtor's assets pursuant to the terms of these unlawful agreements.

220.   Moarefian, Guetssoyan, Hashempour, and Esfahani substantially assisted in the tort of fraudulent transfer as the transfers of Debtor's assets to the New Vision Defendants, entities under Moarefian, Guetssoyan, Hashempour, and Esfahani's control, pursuant to the unlawful agreements at the direction of Diab constitute fraudulent transfers.

221.   Moarefian, Guetssoyan, Hashempour, and Esfahani substantially assisted in the tort of conversion as Diab exercised wrongful dominion of assets belonging to Debtor by unlawfully transferring these assets to the New Vision Defendants, entities controlled and directed by Moarefian, Guetssoyan, Hashempour, and Esfahani, pursuant to unlawful agreements entered into by Moarefian, Guetssoyan, Hashempour, and Esfahani and the New Vision Defendants.

222.   The conduct of Moarefian, Guetssoyan, Hashempour, and Esfahani in continuing to perform under the illegal agreements set forth herein provided the groundwork for Diab to carry out the continued operation of his Ponzi scheme and siphon funds away from LPG to its detriment.

223.   But-for Moarefian, Guetssoyan, Hashempour, and Esfahani and other similarly situated business associates of Diab, the unlawful Ponzi scheme would not and could not continue to operate as intended by Diab.

224.   With the performance of the agreements, Moarefian, Guetssoyan, Hashempour, and Esfahani's actions directly and specifically deepened the insolvency of the debtor as each fraudulent transfer of LPG's assets to the New Vision Defendants, entities controlled by Moarefian, Guetssoyan, Hashempour, and Esfahani, further deepened the insolvency of the Debtor into a position where Debtor could no longer carry out ordinary business functions and operate as a going concern. Moarefian, Guetssoyan, Hashempour, and Esfahani's participation in the Diab Ponzi scheme thereby resulted in a direct harm to the Debtor which could be specifically traced back to

the New Vision Defendants and Moarefian, Guetssoyan, Hashempour, and Esfahani based on the amount of each of the fraudulent transfers received by the New Vision Defendants under the control of Moarefian, Guetssoyan, Hashempour, and Esfahani.

225.    Because the instant claim for aiding and abetting alleges direct harm to the debtor, and is not a derivative state law creditor claim, pursuant to 11 U.S.C. § 541(a)(1)), the Trustee has standing to pursue this claim against these defendants in this Adversary Proceeding. *See e.g., Huntsberger v. Umpqua Holdings Corp (In re Berjac of Or.)*, 538 B.R. 67, 82 (D. Or. 2015) ("Here, plaintiff argues that by aiding and abetting, acting in concert with, and/or conspiring with the Holcombs and others, the bank defendants caused debtor to incur indebtedness to new investors that it had no ability to pay. Consequently, because the Ninth Circuit recognizes that prolonging a debtor's life through bad debt constitutes a cognizable harm to debtor, and plaintiff alleges that the bank defendants caused debtor to incur indebtedness to new investors that it could not pay, thereby, prolonging debtor's life through bad debt, this Court finds that plaintiff has standing to bring its third claim.").

226.    The Trustee bases the foregoing claims in Count IX of its SAC on the standing conferred under 11 U.S.C. § 541(a)(1), and does not assert any basis for these claims under 11 U.S.C. § § 544(b), 550, or 551.

## **TENTH CLAIM FOR RELIEF**

### **Count X- Turnover of Estate Property**

**Against the New Vision Defendants, Guetssoyan, Moarefian, Hashempour, and Esfahani**

**[11 U.S.C. § 542]**

227.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 226 as though set forth in full.

228.    Defendants have possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

229.    The New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers are not of inconsequential value to the Estate.

///

230.    The funds that are the subject of the New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers are paramount to Debtor's ability to pay creditors.

231.    Accordingly, Trustee is entitled to a judgment for turnover of the New Vision Pre-Petition Transfers, New Vision Preference Transfers, and New Vision Post-Petition Transfers pursuant to 11 U.S.C. § 542.

**ELEVENTH CLAIM FOR RELIEF**

**Count XI - Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer**

**11 U.S.C. §§ 548(a)(1)(A), 550 and 551**

**(Against New Vision Defendants, Guetssoyan, Moarefian, and QuikStart)**

232.    Plaintiff hereby incorporates by reference Paragraphs 1 through 231 and realleges these paragraphs as though set forth in full herein.

233.    As noted above, Defendants Guetssoyan and Moarefian, on behalf of QuikStart, transferred a significant amount (actual amount to be proven at trial) of Debtor's client files without authorization and proceeded to divert Debtor's clients to competitors of MLG.

234.    The unauthorized Pre-Petition Quikstart Transfers occurred within two years prior to the Petition Date.

235.    At the time of each of these transfers of client files, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each pre-petition transfer and on the Petition Date.

236.    The Pre-Petition QuikStart Transfers occurred at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

237.    As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

238.    As noted, the Pre-Petition QuikStart Transfers were done  with actual intent to hinder, delay, or defraud both Debtor and Debtor's creditors, which resulted in direct harm to the Debtor. The full extent of that harm will be proven at trial.

///

239.    Such malicious intent to harm Debtor and Debtor's creditors may support an award of punitive damages.

240.    Based on the foregoing, Plaintiff may avoid the Pre-Petition QuikStart Transfers under 11 U.S.C. § 548(a)(1)(A).

## TWELFTH CLAIM FOR RELIEF

**Count XII - Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**

**11 U.S.C. §§ 548(a)(1)(B), 550 and 551**

**(Against New Vision Defendants, Guetssoyan, Moarefian, and QuikStart)**

241.    Plaintiff hereby incorporates by reference Paragraphs 1 through 240 and realleges these paragraphs as though set forth in full herein.

242.    As noted above, Defendants Guetssoyan and Moarefian, on behalf of QuikStart, transferred a significant amount (actual amount to be proven at trial) of Debtor's client files without authorization and proceeded to divert Debtor's clients to competitors of MLG.

243.    The unauthorized Pre-Petition Quikstart Transfers occurred within two years prior to the Petition Date.

244.    Debtor did not receive reasonably equivalent value in exchange for the Pre-Petition QuikStart Transfers because the client files were transferred without Debtor's authorization.

245.    The Pre-Petition QuikStart Transfers occurred at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

246.    As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

247.    Debtor was undercapitalized when the Pre-Petition QuikStart Transfers occurred.

248.    Debtor was about to incur debts that were beyond its ability to pay at the time the Pre-Petition QuikStart Transfers occurred.

249.    Based on the foregoing, Plaintiff may avoid the Pre-Petition QuikStart Transfers under 11 U.S.C. §548(a)(1)(B).

///

///

**THIRTEENTH CLAIM FOR RELIEF**

**Count XIII - Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer**

**11 U.S.C. §§ 544, 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07**

**(Against New Vision Defendants, Guetssoyan, Moarefian, and QuikStart)**

250.    Plaintiff hereby incorporates by reference Paragraphs 1 through 249 and realleges these paragraphs as though set forth in full herein.

251.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code section 3439.04(a)(1).

252.    The Pre-Petition QuikStart Transfers were property of Debtor as defined in 11 U.S.C. §101(54).

253.    The Pre-Petition QuikStart Transfers occurred within four years prior to the Petition Date.

254.    The Pre-Petition QuikStart Transfers were made without authorization and with actual intent to hinder, delay, or defraud Debtor and Debtor's creditors, which may allow Plaintiff to obtain punitive damages.

255.    At the time of the Pre-Petition QuikStart Transfers, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each of the Pre-Petition QuikStart Transfers and on the Petition Date.

256.    Debtor had been sued or threatened with suit before some or all of the Pre-Petition QuikStart Transfers.

257.    Debtor incurred substantial debt shortly before or shortly after some or all of the Pre-Petition QuikStart Transfers.

258.    As the Pre-Petition QuikStart Transfers were done without Debtor's authorization, Debtor did not receive reasonably equivalent value for the Pre-Petition QuikStart Transfers.

259.    The Pre-Petition QuikStart Transfers occurred at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

///

260.    The Pre-Petition QuikStart Transfers were not made in good faith or for value.

261.    The Pre-Petition QuikStart Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

262.    Based on the foregoing, Plaintiff may avoid the pursuant to 11 U.S.C. § 544 and California Civil Code section 3439.04(a)(1).

263.    Based on the foregoing, Plaintiff may recover and preserve the value of the Pre-Petition QuikStart Transfers, in an amount to be determined at trial, for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and California Civil Code section 3439.07.

## FOURTEENTH CLAIM FOR RELIEF

**Count XIV - Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**

**11 U.S.C. §§ 544, 550 and 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

**(Against New Vision Defendants Guetssoyan, Moarefian, and QuikStart)**

264.    Plaintiff hereby incorporates by reference Paragraphs 1 through 263 and realleges these paragraphs as though set forth in full herein.

265.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code sections 3439.04(a)(2) and 3439.05.

266.    The Pre-Petition QuikStart Transfers occurred within four years prior to the Petition Date.

267.    As noted above, Debtor did not receive reasonably equivalent value in exchange for because the Pre-Petition QuikStart Transfers were unauthorized.

268.    The Pre-Petition QuikStart Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

269.    As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

270.     At the time each Pre-Petition QuikStart Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

271.     At the time each Pre-Petition QuikStart Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

272.     At the time each Pre-Petition QuikStart Transfer was made Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each pre-petition transfer and on the Petition Date.

273.     The Pre-Petition QuikStart Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

274.     Based on the foregoing, Plaintiff may avoid the Pre-Petition QuikStart Transfers pursuant to 11 U.S.C. § 544 and California Civil Code sections 3439.04(a)(2) and 3439.05.

275.     Based on the foregoing, Plaintiff may recover and preserve the value of the Pre-Petition QuikStart Transfers from Defendants respectively, in an amount to be proven at trial, as the initial transferees for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and California Civil Code sections 3439.07.

## FIFTEENTH CLAIM FOR RELIEF

**Count XV - Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers**

**11 U.S.C. § 549, 550, and 551**

**[Against New Vision Defendants, Guetssoyan, Moarefian, and QuikStart]**

276.     Plaintiff hereby incorporates by reference Paragraphs 1 through 275 and realleges these paragraphs as though set forth in full herein.

///

///

277.     As noted above, the transfers of Debtor's client files by the New Vision Defendants and QuikStart through Guetssoyan and Moarefian continued after the Petition Date (previously defined as the "Post-Petition QuikStart Transfers").

278.     The full extent of the Post-Petition QuikStart Transfers will be proven at trial, but Plaintiff, on information and belief, avers that the number of client files transferred is significant.

279.     As noted, the Post-Petition QuikStart transfers were not authorized by the Bankruptcy Code or any order of this Court, and, therefore, may be avoided, recovered, and preserved for the benefit of the Estate under 11 U.S.C. §§549, 550, and 551.

## SIXTEENTH CLAIM FOR RELIEF

### Count XVI - Tortious Interference With Contract

### [Against Quikstart, Guetssoyan, Moarefian]

280.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 279 as though set forth in full.

281.     Tortious interference with contractual relations requires (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020).

282.     Following this Court's Order Approving Trustee's Sale Motion, there existed a valid contract for the sale of certain of Debtor's assets to MLG in the form the Asset Purchase Agreement.

283.     On information and belief, Guetssoyan and Moarefian were aware of Debtor's financial peril and impending bankruptcy. With that knowledge, Guetssoyan and Moarefian founded QuikStart approximately six weeks prior to the Petition Date and set their scheme in motion. On information and belief, Guetssoyan and Moarefian, had either actual notice or constructive notice of the sale of Debtor's assets to MLG.

284.     The Pre-Petition QuickStart Transfers and Post-Petition QuikStart Transfers were carried out deliberately by Guetssoyan and Moarefian with the knowledge that transferring

Debtor's client files and diverting significant numbers of Debtor's clients to other law firms would be detrimental and disruptive to both Debtor and any entity seeking to purchase Debtor's assets in bankruptcy. The full extent of the detriment and disruption of the contractual relationship between Debtor and MLG will be proven at trial.

285.    On information and belief, as a direct result of the actions taken by QuikStart through Guetssoyan and Moarefian, a significant number of Debtor's clients opted to use the services of a different law firm, which directly interfered with negotiation and consummation of the Asset Purchase Agreement.

286.    As noted, the full extent of that interference will be proven at trial, but Plaintiff, on information and belief, avers that a significant number of Debtor's clients were wrongfully diverted by QuikStart causing equally significant damage to value of the Asset Purchase Agreement.

### SEVENTEENTH CLAIM FOR RELIEF

### Count XVII - Tortious Interference With Prospective Economic Relationship

### [Against QuikStart, Guetssoyan, Moarefian]

287.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 286 as though set forth in full.

288.    Tortious interference with prospective economic advantage…does not depend on the existence of a legally binding contract. "A plaintiff asserting this tort must show that the defendant knowingly interfered with an economic relationship between the plaintiff and some third party, [which carries] the probability of future economic benefit to the plaintiff. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1141.

289.    QuikStart, through the actions of Guetssoyan and Moarefian, wrongfully transferred Debtor's client files before and after the Petition Date with knowledge of Debtor's severe financial distress.

290.    On information and belief, Guetssoyan and Moarefian had access to Debtor's master client list and had negotiated with other entities such as an entity called Beyond Finance to use Debtor's unlawfully transferred client information.

///

48

291.     On information and belief, QuikStart, Guetssoyan, and Moarefian carried out this scheme before and after the Petition Date when they either knew or should have known that Debtor was or would soon be in bankruptcy.

292.     All actions in furtherance of this scheme after the Petition Date were done without the authorization of Plaintiff, or the Court.

293.     As a result of the actions by QuikStart, Guetssoyan, and Moarefian, Debtor's economic relationships were damaged in that they caused unnecessary strain on Debtor's ability to sell its assets in bankruptcy.

294.     Due to the significant diversion of Debtor's clients to law firms other than MLG, the value of and purpose selling Debtor's client files was reduced and hindered. The precise amount of damages will be proven at trial.

## EIGHTEENTH CLAIM FOR RELIEF

### Count XVIII - Disallowance of Claims

### [11 U.S.C. § 502(d)]

### [Against New Vision Defendants]

295.     Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 294 as though set forth in full.

296.     On February 23, 2024, Defendants filed a Proof of Claim as Claim No. 102396-1[6], in the amount of $1.00 (noting that New Vision is still assessing the value of its claim and will be amending in the future). Defendant's basis for the Proof of Claim is based on its procurement and sale of consumer leads for LPG legal services. (*See* **Exhibit 22**.)

297.     As set forth above, the basis of the New Vision Defendants' proof(s) of claim are based on a right to payment resulting from illegal contracts and conduct. In short, there is no valid basis for payment.

///

///

---

[6] Trustee is also aware of Proof of Claim #102509-1, which appears to be identical or nearly so, and the basis for objecting to this proof of claim is the same.

298.    Thus, based on the Defendant's conduct set forth in the preceding paragraphs, the Proof of Claim and any other claims having been filed or to be filed by or on behalf of the New Vision Defendants in the Bankruptcy case should be disallowed pursuant to 11 U.S.C. § 502(d).

## **RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Pre-Petition Transfers against the New Vision Defendants;

**On the Fifth Claim for Relief:**

2.    Avoiding, recovering, and preserving the Preference Transfers against the New Vision Defendants;

**On the Sixth Claim for Relief:**

3.    Avoiding, recovering, and preserving the Post-Petition Transfers against the New Vision Defendants;

4.    Punitive, treble, and/or exemplary damages;

**On the Seventh, Eighth, and Ninth Claim for Relief**

5.    Awarding Plaintiff monetary damages in the amount of all fraudulent transfers obtained by Defendants from Debtor;

**On the Tenth Claim for Relief**

6.    Ordering Defendants to immediately turn over the property of the estate, including, but not limited to, the Transfers and/or Preference Transfers; and

///

///

**On the Eleventh, Twelfth, Thirteenth, and Fourteenth Claims for Relief:**

7.      Avoiding, recovering, and preserving the Pre-Petition QuikStart Transfers or the value thereof against QuikStart, Guetssoyan, and Moarfian;

**On the Fifteenth Claim For Relief**

8.      Avoiding, recovering, and preserving the unauthorized Post-Petition QuikStart Transfers or the value thereof against QuikStart, Guetssoyan, and Moarefian.

**On the Sixteenth and Seventeenth Claims For Relief:**

9.      Awarding Plaintiff damages for tortious interference with contract and prospective economic relations in an amount to be proven at trial.

**On All Claims for Relief:**

10.     Awarding costs of suit incurred here;

11.     Awarding compensatory and punitive damages against the Defendants;

12.     Awarding attorney's fees;

13.     Awarding pre-judgment and post-judgment interests; and

14.     Granting any other and further relief as the Court deems just and proper.

Dated: January 15, 2026

Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ Yosina M. Lissebeck
    Christopher Celentino
    Yosina M. Lissebeck
    Jacob R. Bothamley
    *Attorneys for Richard A. Marshack,*
    *Trustee of the LPG Liquidation Trust*

# EXHIBIT 1

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**New Vision Capital Group, LLC**

A Member-Managed Limited Liability Company

**OPERATING AGREEMENT**

THIS OPERATING AGREEMENT is made and entered into effective August 1st, 2022  by and among: Sania Hashempour, Sarvanez Esfahani, Relief Center LLC and ProofPositive LLC ( LLC Members collectively referred to in this agreement as the "Members").

**SECTION 1**

**THE LIMITED LIABILITY COMPANY**

1.1 *Formation*. Effective August 1st, 2022, the Members formally join as Managing Members in an existing limited liability company under the name New Vision Capital Group L.L.C. (the "Company") on the terms and conditions in this Operating Agreement (the "Agreement") and pursuant to the Limited Liability Company Act of the State of California (the "Act").  The Members agree to file with the appropriate agency within the State of California charged with processing and maintaining such records all documentation required for the formation of the Company and documentation of this Limited Liability Company Operating Agreement. The rights and obligations of the parties are as provided in the Act except as otherwise expressly provided in this Agreement. This Limited Liability Company Operating Agreement supersedes and replaces all other previous versions and revisions that the Company may have.

1.2 *Name*. The business of the Company will be conducted under the name New Vision Capital Group, LLC or such other name upon which the Members may unanimously agree.

1.3 *Purpose*.  The purposes of the Company shall be (a) Act as an Affiliate to LPG (Litigation Practice Group) hereinafter referred to as LPG as referenced by aforementioned signed and executed Affiliate Contract documented as Exhibit A in this Limited Liability Operating Agreement; (b) Act as an Affiliate to Borrowers Club LLC hereinafter referred to as BC as referenced by aforementioned signed and executed Affiliate Contract documented as Exhibit B in this Limited Liability Operating Agreement; (c) Act as an Affiliate to any other Company that all Members agree upon and add as an Affiliate Contract addendum Exhibit in this Limited Liability Operating Agreement; (d) to invest and reinvest, in any manner and in any real or personal property which the Members deem appropriate; and (e) to conduct any other business or make any investment which a limited liability company may conduct or make under California law.

New Vision Capital Group, LLC owns and operates a system of generating leads consisting of consumers interested in the services referenced by signed and executed Affiliate Contracts

DocuSign Envelope ID: 132E56EF-829A-4732-AB4A-3A8354365A12

documented as Exhibits in this Limited Liability Operating Agreement. New Vision Capital Group, LLC acts solely as a marketing company and has no control whatsoever in the conduct, marketing, customer service, services or products provided by the Companies it provides services to or acts as an Affiliate to.

1.4  *Office*. The Company will maintain its principal business office within the State of California at the following address: 3857 Birch Street. Suite 25,
Newport Beach, CA. 92660.

1.5  *Registered Agent*. SANIA HASHEMPOUR is the Company's initial registered agent in the State of California, and the registered office is 3857 Birch St. Suite 25, Newport Beach, CA. 92660.

1.6  *Term*. The term of the Company commences on August 1st, 2022 and shall continue perpetually unless sooner terminated as provided in this Agreement.

1.7  *Names and Addresses of Members*. The Members' names and addresses are attached as Schedule 1 to this Agreement. All notices to Members will not be considered delivered unless sent via certified postal mail or responded acknowledged email to a Members email address.

1.8  *Admission of Additional Members*. Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the prior unanimous written consent of the Members.

## SECTION 2

## CAPITAL CONTRIBUTIONS

2.1  *Initial Contributions*. The Members initially shall contribute to the Company capital as described in Schedule 2 attached to this Agreement.

2.2  *Additional Contributions*.  No Member shall be obligated to make any additional contribution to the Company's capital without the prior unanimous written consent of the Members.

2.3  *Interest on Initial Capital Contributions*. Members earn interest of 15% annually on their capital contributions to the Company.

## SECTION 3

## ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

2

DocuSign Envelope ID: 1325E6EF-829A-4738-A81A-3A8354365A12

3.1 *Profits/Losses*. For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital contribution in the Company as set forth in Schedule 2. Once Members capital contribution in the Company as set forth in Schedule 2 is complete for financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule 2 as amended from time to time in accordance with U.S. Department of the Treasury Regulation.

3.2 *Distributions.* The Members shall determine and distribute available funds quarterly or at more frequent intervals as they see fit.  Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managers.  Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to U.S. Department of the Treasury Regulation. To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in U.S. Department of the Treasury Regulation.

3.3 *No Right to Demand Return of Capital*. No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company. In the event of dissolution of the Company, Members will be entitled to what hard assets and equipment of the Company in proportion to each Member's relative capital contribution in the Company as set forth in Schedule 2.

## SECTION 4

### INDEMNIFICATION

The Company and each Member shall indemnify any Member who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if all remaining Members with the exclusion of the Member in question determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful. If upon a majority vote of the remaining Members the Member in question

DocuSign Envelope ID: 1325E6EF-839A-4733-A04A-3A8354365A12

is found to be culpable of actions harmful/detrimental to the Company in the sole determination of the remaining Members the Member in question will be treated as a *Death Buy Out* outlined in Section 8.5 of this Limited Liability Company Operating Agreement.

## SECTION 5

## POWERS AND DUTIES OF MANAGERS

5.1 *Management of Company*.

5.1.1  The Members, within the authority granted by the Act and the terms of this Agreement shall have the complete power and authority to manage and operate the Company and make all decisions affecting its business and affairs.

5.1.2  Except as otherwise provided in this Agreement, all decisions and documents relating to the management and operation of the Company shall be made and executed by a majority in Interest of the Members.

5.1.3  Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of a majority in Interest of the Members to manage and operate the business and affairs of the Company.

5.2 *Decisions by Members*. Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall mean a majority of the Members.

5.3 *Withdrawal by a Member*. A Member has no power to withdraw from the Company, except as otherwise provided in Section 8.

## SECTION 6

## SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

6.1 *Organization Expenses*. Member ProofPositive LLC solely with the exclusion of all other Members will continue to make up the existing Monthly Shortfall between current Company Expenses and Company Monthly Residual from 07/01/2022 through 10/01/2022 Company Shortfall. It is expected that within this 120-day window that Company Shortfall shall be overtaken by Company Monthly Residual and existing Company Shortfall between Operating Expenses and Company Monthly Residual will be eliminated. This additional ProofPositive LLC Capital Contribution will be added as it is paid monthly by ProofPositive LLC to ProofPositive LLC's Capital Contribution account in Schedule 2. At the conclusion of or before in the event of Company Monthly Residual exceeding Company Monthly Expenses all expenses incurred in connection with organization of the Company will be paid by the Company.

6.2 *Salary*. A salary will be paid to Member's for the performance of his or her duties under this Agreement. The salary is exclusively for Member's that are working in pursuit of Company business. All Member's whom are working full-time in pursuit of Company business that decline to take a salary such Member will have the amount equivalent to other Members salary added to his/her Capital Contribution amount on a monthly basis. All Members have voted unanimously to increase the salary paid to:

Sania Hashempour and Sarvenaz Esfahani from $4,500.00/Monthly to $9,000.00/Monthly commencing within 60-90 day window as Company Expenses allow:

While any Members are receiving salary and while any Member has not been paid back their Capital Contribution Members agree to not work or take interests in any competing interests of New Vision Capital Group, LLC as determined by a majority of the Members. This arrangement will remain in place until reimbursement of all Capital Contributions.

6.2 *Reimbursement of Capital Contribution*. Reimbursement of Capital Contribution outlined in Listing of Capital Contributions - Schedule 2 will commence upon monthly residuals in excess of $250,000.00/Monthly Gross being paid to New Vision Capital Group, LLC or majority vote by Members. Capital Contribution will be paid back at a rate of 20%/Monthly. Capital Contribution reimbursement shall take place in order of proportion to each Member's relative Capital Contribution in the Company starting with the largest and moving to the smallest as set forth in Schedule 2. [Example: ProofPositive LLC Capital Contribution=$300,000.00. Relief Center LLC Capital Contribution=$150,000.00. ProofPositive LLC would be the first in order of reimbursement of Capital Contribution at 20%/Monthly. As ProofPositive LLC Capital Contribution is reduced through its being paid by Company to a level where it is now equal to Relief Center LLC then Relief Center LLC and ProofPositive LLC would each be paid ½ or 10% each till each Members Capital Contribution was paid back in full.]

6.3 *Legal and Accounting Services*. The Company may obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

## SECTION 7

## BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS,

## FISCAL YEAR, BANKING

7.1 *Method of Accounting*. The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes.

7.2 *Fiscal Year; Taxable Year*. The fiscal year and the taxable year of the Company is the calendar year.

7.3 *Capital Accounts*. The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles.

7.4 *Banking*. All funds of the Company will be deposited in a separate bank account at J.P Morgan Chase Bank in the name of New Vision Capital Group LLC., Account: ███████████, Routing : ███████████ or in an account or accounts of a savings and loan association in the name of the Company as determined by a Majority of the Members. Company funds will be invested or deposited with an institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government. All Members of Company will be named on all accounts and have access to all statements.

7.5 *Expenses*. All Company expenses in excess of $5,000.00 can not be made by a single Member but needs the verbal or written approval of a majority of the Members. If such verbal or written approval is deemed to not have been approved by a majority of the Members it is the sole responsibility of Member and not an encumbrance or expense on the Company.

## SECTION 8

### TRANSFER OF MEMBERSHIP INTEREST

8.1 *Sale or Encumbrance Prohibited*. Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a majority of the other non-transferring Members determined on a per capita basis.

8.2 *Right of First Refusal*. Notwithstanding Section 8.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

8.2.1 The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

8.2.2 For a period of 30 days after receipt of the Notice, the Members may acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

8.2.3 Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not be less than 45 days after expiration of the 30-day notice period.

8.2.4 If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt

DocuSign Envelope ID: 1325E6EF-829A-4732-A94A-3A8354365A12

of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Section 8.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within three months after the expiration of the 30-day period describe above, then the provisions of Section 8.2 will again apply to the Interest proposed to be sold or conveyed.

8.2.5  Notwithstanding the foregoing provisions of Section 8.2, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Section 8.2, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

8.3  *Substituted Parties*. Any transfer in which the Transferee becomes a fully substituted Member is not permitted unless and until:

(1) The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to effect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

(2) The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

8.4  *Death, Incompetency, or Bankruptcy of Member*. On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under Section 8.5, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a majority of the other Members determined on a per capita basis admit the transferee as a fully substituted Member in accordance with the provisions of Section 8.3.

8.4.1  Any transfer of Economic Rights pursuant to Section 8.4 will not include any right to participate in management of the Company, including any right to vote, consent to, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's Interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for

purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

8.5  *Death Buy Out*. Notwithstanding the foregoing provisions of Section 8, the Members covenant and agree that on the death of any Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 90 days of the death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to the provision of Section 8.5.

8.5.1  The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Schedule 3. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Section 8.5.2 will apply in determining the value of the Member's Interest in the Company.

8.5.2  If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Section 8. The appraisal may not consider and discount for the sale of a minority Interest in the Company. In the event the appraisers cannot agree on the value within 30 days after being selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

8.5.3  Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, not be later than 90 days after

DocuSign Envelope ID: 1325E6EF-839A-4738-A04A-3A8354365A12

agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price are determined by appraisals as set forth in Section 8.5.2, the closing will be 30 days after the final appraisal and purchase price are determined. If no personal representative has been appointed within 60 days after the deceased Member's death, the surviving Members have the right to apply for and have a personal representative appointed.

8.5.4  At closing, the Company will pay the purchase price for the deceased Member's Interest in the Company. If the purchase price is less than $1,000.00, the purchase price will be paid in cash; if the purchase price is $1,000.00 or more, the purchase price will be paid as follows:

(1) $1,000.00 in cash, bank cashier's check, or certified funds;

(2) The balance of the purchase price by the Company executing and delivering its promissory note for the balance, with interest at the prime interest rate stated by primary banking institution utilized by the Company, its successors and assigns, at the time of the deceased Member's death. Interest will be payable monthly, with the principal sum being due and payable in three equal annual installments. The promissory note will be unsecured and will contain provisions that the principal sum may be paid in whole or in part at any time, without penalty.

8.5.5  At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

8.5.6  On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then-existing Ownership Interests.

## SECTION 9

## DISSOLUTION AND WINDING UP OF THE COMPANY

9.1 *Dissolution*. The Company will be dissolved on the happening of any of the following events:

DocuSign Envelope ID: 1325E6EF-829A-4733-A94A-3A835436A12

9.1.1  Sale, transfer, or other disposition of all or substantially all of the property of the Company;

9.1.2  The agreement of all of the Members;

9.1.3  By operation of law; or

9.1.4  The death, incompetence, expulsion, or bankruptcy of a Member, or the occurrence of any event that terminates the continued membership of a Member in the Company, unless there are then remaining at least the minimum number of Members required by law and all of the remaining Members, within 120 days after the date of the event, elect to continue the business of the Company.

9.2  *Winding Up*. On the dissolution of the Company (if the Company is not continued), the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's Capital Contributions and obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with Section 2 of this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

9.2.1  To the payment and discharge of any Members outstanding Capital Contributions by percentage based on amounts of highest to lowest, then Company debts and liabilities owed to Members; and

9.2.2  To Members in the amount of their respective adjusted Capital Account balances on the date of distribution.

9.2.3  To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than Members that a majority of the Members deem appropriate.

## SECTION 10

### GENERAL PROVISIONS

10.1  *Amendments*. Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of a majority of the Members.

10.2  *Governing Law*. This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of California (without regard to principles of conflicts of law).

10

DocuSign Envelope ID: 1325E6EF-829A-4732-A94A-3A835436SA12

10.3  *Entire Agreement; Modification*. This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter of this Agreement. No agreements, understandings, restrictions, representations, or warranties exist between or among the members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members.

10.4  *Attorney Fees*. In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

10.5  *Further Effect*. The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

10.6  *Severability*. If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

10.7  *Captions*. The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

10.8  *Notices*. All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to such other address as a Member may specify by notice given in conformance with these provisions to the other Members.

IN WITNESS WHEREOF, the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

MEMBERS:

Relief Center LLC

Printed/Typed Name                    Signature


ProofPositive LLC

Printed/Typed Name                    Signature


Sarvenaz Esfahani

Printed/Typed Name                    Signature


Sania Hashempour

Printed/Typed Name                    Signature

---

**Listing of Members - Schedule 1**


LIMITED LIABILITY COMPANY OPERATING AGREEMENT

FOR **New Vision Capital Management Group, LLC**


LISTING OF MEMBERS

As of the 1st day of August 2022 the following is a list of Members of the Company:


NAME:                                    ADDRESS:

Relief Center LLC,:                      7 Anacapri Laguna Niguel, CA 92677

ProofPositive LLC.,:                     30 N Gould St Ste R, Sheridan, WY 82801

Sania Hashempour:                        3857 Birch st. #25 Newport Beach CA 92660

Sarvenaz Esfahani:                       3857 Birch st. #25 Newport Beach CA 92660




Authorized by Member(s) to provide Member Listing as of this _____ day of
8/4/2022
_____, 2022.
8/4/2022
8/4/2022
8/4/2022


Relief Center LLC                        _DocuSigned by:_
                                         Brian Reale
                                         _____
                                         7EC39A7938ED41F...

Printed/Typed Name                       Signature



ProofPositive LLC                        _DocuSigned by:_
                                         Gail Hanson
                                         _____
                                         BFC40F3774274 2A...

Printed/Typed Name                       Signature



Sarvenaz Esfahani                        _DocuSigned by:_
                                         Sarvenaz Esfahani
                                         _____
                                         FA15139629BF4F0...

DocuSign Envelope ID: 1325E6EF-829A-4733-AD4A-3A835436FA12

Printed/Typed Name                              Signature

Sania Hashempour

Printed/Typed Name                              Signature

---

**Listing of Capital Contributions - Schedule 2**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**FOR New Vision Capital Group, LLC**

**CAPITAL CONTRIBUTIONS**

Pursuant to ARTICLE 2, the Members' initial contribution to the Company capital is stated to be $450,000.00.  The description and each individual portion of this initial contribution is as follows:

| NAME: | CONTRIBUTION: | % OWNERSHIP: |
| --- | --- | --- |
| Relief Center LLC | $150,000.00 | 25% |
| ProofPositive LLC | $300,000.00 | 25% |
| Sania Hashempour | $0 | 25% |
| Sarvenaz Esfahani | $0 | 25% |

8/4/2022

8/4/2022

8/4/2022

SIGNED AND AGREED this_____ day of ___8/4/2022_____, 2022.


**Relief Center LLC**

*Brian Reale*
7EC39A7938ED41F...

Printed/Typed Name                    Signature


**ProofPositive LLC**

*Gail Hanson*
BFC40F3774274ZA...

Printed/Typed Name                    Signature


**Sarvenaz Esfahani**

*Sarvenaz Esfahani*
FA13139029BF4F0...

Printed/Typed Name                    Signature


**Sania Hashempour**

*Sania Hashempour*
276C459E2B0F45A...

Printed/Typed Name                    Signature

---

**Listing of Valuation of Members Interest - Schedule 3**

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

FOR **New Vision Capital Group, LLC**

VALUATION OF MEMBERS INTEREST

Pursuant to ARTICLE 8, the value of each Member's interest in the Company is endorsed as follows:

| NAME: | VALUATION | ENDORSEMENT |
|---|---|---|
| Relief Center LLC | $150,000.00 | |
| ProofPositive LLC | $300,000.00 | |
| Sarvenaz Esfahani | $1.00 | |
| Sania Hashempour | $1.00 | |

SIGNED AND AGREED this _____ day of ___8/4/2022_____, 2022.

8/4/2022
8/4/2022
8/4/2022

Relief Center LLC

_Brian Reale_
7EC39A7938ED41F...

Printed/Typed Name                    Signature

ProofPositive LLC

_Gail Hanson_
BFC40F37742742A...

Printed/Typed Name                    Signature

Sarvenaz Esfahani

Printed/Typed Name                     Signature

Sania Hashempour

Printed/Typed Name                     Signature

**Signed And Executed Affiliate Contract Documented As Exhibit A (Referenced in Section 1-1.3)**

**(Insert Copy of Executed Document)**

**Signed And Executed Affiliate Contract Documented As Exhibit B (Referenced in Section 1-1.3)**

## AFFILIATE REFERRAL AGREEMENT

This Affiliate Referral Agreement (the "Agreement") is made and entered into effective this ___ day of August, 2021 between Nationwide Loan Consultants & Advisors, LLC, a Florida Limited Liability Company (hereinafter referred to as "Company"), and New Vision Capital Group, LLC d/b/a New Vision Debt Relief, a California Limited Liability Company (hereinafter referred to as "Associate"). The parties desire to enter a business relationship whereby Company provides services related to the unsecured loan industry through affiliates referred by Associate. The parties agree as follows:

WHEREAS, Company operates nationwide and provides research and matching services to individuals looking to obtain consumer loans (the "Services");

WHEREAS, Company utilizes affiliates that refer consumers to the Company;

WHEREAS, Associate wishes to refer affiliates to Company for the foregoing purpose; and

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **RESPONSIBILITIES and PROCEDURE:** Associate agrees that in consideration of the mutual covenants set forth herein and other good and valuable consideration as set forth below shall refer affiliates ("Referred Affiliates") to Company, and not any other person or entity, for the provision of research services to such Referred Affiliate's client(s) in relation to borrowing opportunities in the consumer loan industry.

2.      **COMPENSATION:** Company shall pay Associate the sum of five (5%) percent of the gross profit on each transaction with clients derived from the Referred Affiliates ("Fee"). "*Gross Profit*" shall be considered as that amount of money (without reduction for expenses) that is collected and received by Company on each transaction in which Company rendered services to a client of a Referred Affiliate. The Fee identified above shall be paid on a semi-monthly basis. There shall be no escalation of compensation unless agreed to in writing by both parties. In the event Company is required or it elects, in its sole discretion, to issue a refund to a consumer (Referred Affiliate client) of all or a portion of any money upon which the Fee is based, then Associate shall not be entitled to receive or retain that portion of the Fee that correlates to the amount refunded to a consumer. If Company shall have paid Associate a Fee to which Associate was not entitled, either in part or in whole, Associate shall return such Fee or appropriate portions thereof to Company within three (3) days of being notified of such, or at Company's option, Company may deduct the amount of such Fee from future Fees or other amounts payable to Associate under this Agreement.

3.      **EXCLUSIVITY:** Associate agrees that during the term of this Agreement, Associate shall exclusively refer all affiliates to Company for Services, and not any other individual or entity. This means that during the term of this Agreement, Associate agrees that it will not refer affiliates whose clients are in the market for a consumer loan (leads) to any other individual or entity that provides research and matching services, such as those provided by the Company, unless Associate has the explicit written consent of the Company.

4.      **PROFESSIONAL RESPONSIBILITY:**    All parties shall perform their respective responsibilities in a professional, ethical and reasonable manner. Associate shall not make any misrepresentations to any third party, including their clients, regarding any products/services of Company.

1

## ADDENDUM TO AFFILIATE REFERRAL AGREEMENT

This Addendum to the  Affiliate Agreement ("Agreement"), dated August 9, 2021, between Nationwide Loan Consultants and Advisors, LLC ("Company") and New Vision Capital Group, LLC d/b/a New Vision Debt Relief, a California Limited Liability Company  ("Associate") is hereby entered into effective June 13, 2022 and made an integral part of the aforementioned Agreement upon execution of this Addendum by all parties.  The parties agree as follows:

The compensation outlined in section 2 of the Agreement shall be increased from five (5%) percent to ten (10%) percent. Therefore, the first sentence of section 2 in the Agreement shall be deleted and replaced with the following sentence:

*Company shall pay Associate the sum of ten (10%) percent of the gross profit on each transaction with clients derived from the Referred Affiliates ("Fee").*

In all other aspects, the Agreement remains unchanged and in full force and effect.

This Addendum may be executed in multiple counterparts, all of which shall be deemed originals, and with the same effect as if all parties had signed the same document. All of such counterparts shall be construed together with and shall constitute one Addendum. A facsimile or electronic transmission shall be as valid and enforceable as an original. By signing below, the entity (ies) specified herein confirm(s) that the signer for an entity is authorized to execute this document on behalf of and bind the respective entity and each entity shall be entitled to rely on such representation.

COMPANY: Nationwide Loan Consultants & Advisors, LLC

By: Morgan Pepitone
Title: Director
Date: 6/14/2022

ASSOCIATE: New Vision Capital Group, LLC

By: Sania Hahsempour
Title: Managing Partner
Date: 6/14/2022

1

# EXHIBIT 2

1     CHRISTOPHER B. GHIO (259094)
    christopher.ghio@dinsmore.com
2     CHRISTOPHER CELENTINO (131688)
    christopher.celentino@dinsmore.com
3     YOSINA M. LISSEBECK (201654)
    yosina.lissebeck@dinsmore.com
4     DINSMORE & SHOHL LLP
5     655 West Broadway, Suite 800
    San Diego, California 92101
6     Tele: 619.400.0500
7     Fax: 619.400.0501

8     Sarah S. Mattingly (Ky. Bar 94257)
    sarah.mattingly@dinsmore.com
9     DINSMORE & SHOHL, LLP
10     101 S. Fifth Street, Suite 2500
    Louisville, Kentucky 40202
11     Tele: 859-425-1096
    Fax: 502-585-2207
12     (Admitted pro hac vice)

13     Special Counsel to Richard A. Marshack

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

14         **UNITED STATES BANKRUPTCY COURT**

15     **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16   In Re

17

18

19   The Litigation Practice Group P.C.,

20           Debtor(s),

21

22

23

24

25

26

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR
ENTRY OF PROTECTIVE ORDER AND
THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:    Courtroom 5C (via Zoom)[1]
        411 West Fourth Street
        Santa Ana, CA 92701

27

28

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

**PROTECTIVE ORDER**

**1.      DEFINITIONS**

1.1      "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2      This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3      "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4      "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 2, Page 74

1.5     "Party" or "Parties" means person or entity subject to this Protective Order.

**2.     SCOPE OF THIS PROTECTIVE ORDER**

2.1     Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.     DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1     This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2     <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

      3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

      3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

    **4.**    **CHALLENGES TO DESIGNATED INFORMATION**

      4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

Exhibit 2, Page 76

1 resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2 under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3 constitute a concession that the designation is proper or an admission that the designated information

4 is otherwise competent, relevant, or material.

5 **5.** **LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6 5.1 <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7 and designated under this Protective Order may be used for preparation for trial and preparation for

8 any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9 other purpose, without the written consent of the Designating Party. No Confidential Information may

10 be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11 parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12 Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13 of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14 not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15 any subpoena that seeks production or disclosure of any designated information and consulting with

16 the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17 Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18 disclosing person or party to sanctions.

19 5.2 <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20 Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21 reviewed by the following:

22 a) The Court, its personnel, and court reporters;

23 b) Counsel of record, or co-counsel for any Party, or other party that has entered into a

24 joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25 in the Action and are informed of the duties and obligations imposed hereunder;

26 c) The Parties, including their clients, agents and employees who are assisting or have

27 reason to know of the Action;

28 / / /

Exhibit 2, Page 77

d) Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e) Other witnesses or persons with the Designating Party's consent or by court order.

5.3 <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a) The Court, its personnel, and court reporters;

b) Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c) In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d) Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action, and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e) Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4 <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5 <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

7

**7.      DURATION/CONTINUED RESTRICTIONS**

7.1      <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2      <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.      PRIVILEGED OR PROTECTED INFORMATION**

8.1      Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2      If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

### 

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 2, Page 81

1

2

3

4

5

EXHIBIT "A"

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

1 | Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
2 | Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
3 | 655 West Broadway, Suite 800
San Diego, CA 92101
4 | Telephone:  619.400.0500
Facsimile:  619.400.0501
5 | christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
6 | yosina.lissebeck@dinsmore.com

7 | Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
8 | 101 S. Fifth Street, Suite 2500
Louisville, KY 40202
9 | Telephone: 859-425-1096
Facsimile: 502-585-2207
10 | Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

11 |
Special Counsel to Richard A. Marshack,
12 | Chapter 11 Trustee

13 |

14 |

15 | **UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**
16 |

17 |

18 | In Re

19 |

20 | The Litigation Practice Group P.C.,

Debtor(s),

Case No. 8:23-BK-10571-SC

Chapter 11

**EXHIBIT A TO STIPULATED ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C[1] - Via Zoom
         411 W. Fourth Street
         Santa Ana, CA  92701

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

1  This is to certify that:

2      (a)    I am being given access to Confidential Information pursuant to the

3  Stipulated Protective Order that was entered into the main bankruptcy case for

4  Litigation Practice Group, but which is binding and controlling as set forth by the

5  Court's Order on any and all contested matters and  any and all litigation commenced

6  by Trustee;

7      (b)    I have read the Stipulated Protective Order; and

8      (c)    I agree to be bound by the terms and conditions thereof, including,

9  without limitation, to the obligations regarding the use, non-disclosure and return of

10  such Confidential Information. I further agree that in addition to being contractually

11  bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12  reference Court for any violation thereof.

13

14  Date: _____

15

16                              _____
                                        Signature

17

18                              _____
19                                      Printed Name

20

21

22

23

24

25

26

27

28

Exhibit 2, Page 84
EXHIBIT A
Page 3

# EXHIBIT 3

DocuSign Envelope ID: 95A562E3-49A9-4538-B35F-1D61B7B61007

## The Litigation Practice Group PC - Affiliate Agreement

THIS AGREEMENT (the "Agreement") is made and effective as of the 20th day of October, 2022 by and between The Litigation Practice Group PC ("LPG") and **New Vision Debt LLC** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were



1

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1.      Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.      Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.      Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.      If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.      Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6.      Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 85% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $31.46 (15% of the $76.38 plus $20), which LPG shall retain to cover administrative costs for each file.  LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days.  If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense.  LPG has exclusive discretion to grant or deny a requested refund or cancellation.  Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.      LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.      LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9.      This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement.  At that time, this Agreement will automatically



2

Exhibit 3, Page 85

DocuSign Envelope ID: 95A562E3-49A9-4538-B35F-1D61B7BB1007

renew until either party sends written notice of cancellation of this Agreement, which shall be effective 30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement.  If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.     If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default.  The notice of default must state with specificity the act of default alleged.

11.     Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.     The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00.  The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.  The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.     If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account.  Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account.  If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.



3

14.     Affiliate agrees not to use the name LPG or any law firm in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.

15.     Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.     This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.     In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.


**The Litigation Practice Group PC**



DocuSigned by:
Daniel S March
9D494DB1993341E...

**By: Daniel S. March, Managing Shareholder**



**New Vision Debt LLC**

DocuSigned by:
Sania Hashempour
8367EC5EAAF646E...


By: Sarvenaz Moarefian

Title:  **Member**

4

**Electronic Funds Transfer Authorization**

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits LPG to transfer any and all amounts due to **New Vision Debt LLC** ("Affiliate") under the foregoing Agreement by EFT.  By signing below, Affiliate hereby authorizes LPG to initiate EFT transfers at its discretion, with all fees and costs incurred by Affiliate in connection with such transfer to be borne by Affiliate, while all fees and costs incurred by LPG in connection with such transfer to be borne by LPG.

Account Holder Signature: _____    Date: _____
DocuSigned by: Sania Hashempour   8367EC5EAAF646E…                                  10/24/2022

By: Sarvenaz Moarefian


Title:  Member


Account Owner Name: New Vision Debt LLC


Social Security Number / FEIN Number associated with account listed below: ███████


Address: 3857 Birch St #25


City: Newport Beach, CA 92660

Bank Name: Wells Fargo

Routing Number: ███████

Account Number: ███████

Account type :  Checking

5

Exhibit 3, Page 88

# EXHIBIT 4

## The Litigation Practice Group PC - Affiliate Agreement

THIS AGREEMENT (the "Agreement") is made and effective as of the 20th day of October, 2022 by and between The Litigation Practice Group PC ("LPG") and **New Vision Debt LLC** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were



1

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1.      Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.      Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.      Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.      If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.      Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6.      Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 85% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $31.46 (15% of the $76.38 plus $20), which LPG shall retain to cover administrative costs for each file.  LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days.  If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense.  LPG has exclusive discretion to grant or deny a requested refund or cancellation.  Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.      LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.      LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9.      This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement.  At that time, this Agreement will automatically



2

renew until either party sends written notice of cancellation of this Agreement, which shall be effective 30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement. If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.    If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default. The notice of default must state with specificity the act of default alleged.

11.    Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.    The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons. Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other. A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00. The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term. The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure. The parties agree to work together in good faith to remediate any disclosure of confidential information. A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.    If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account. Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account. If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.



14.     Affiliate agrees not to use the name LPG or any law firm  in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.

15.     Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.     This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.     In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**The Litigation Practice Group PC**

DocuSigned by:

*Daniel S March*

9D494DB1993341E

**By: Daniel S. March, Managing Shareholder**

**New Vision Debt LLC**

DocuSigned by:

Sarvanez Moarefian

8367EC5EAAF646E...

By: Sarvenaz Moarefian

Title:  **Member**

4

**Electronic Funds Transfer Authorization**

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits LPG to transfer any and all amounts due to **New Vision Debt LLC** ("Affiliate") under the foregoing Agreement by EFT.  By signing below, Affiliate hereby authorizes LPG to initiate EFT transfers at its discretion, with all fees and costs incurred by Affiliate in connection with such transfer to be borne by Affiliate, while all fees and costs incurred by LPG in connection with such transfer to be borne by LPG.

Account Holder Signature: _____ Date: _____

DocuSigned by:
**Sarvanez Moarefian**
8367EC5EAAF646E...

10/27/2022

By: Sarvenaz Moarefian

Title:  Member

Account Owner Name: New Vision Debt LLC

Social Security Number / FEIN Number associated with account listed below: ██████████

Address: 3857 Birch St #25

City: Newport Beach, CA 92660

Bank Name: Wells Fargo

Routing Number: ██████████

Account Number: ██████████

Account type :  Checking

5

Exhibit 4, Page 94

# EXHIBIT 5

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 24, 2022 (the "**Agreement Date**"), by and between New Vision Debt LLC (collectively the "**Buyer**"), MRD Marketing LLC (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $21,307.09 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1   <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2   <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3   <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4   <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5   <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

### ARTICLE 5.
### COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

### ARTICLE 6.
### CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: 35:192DE6:7ED7:48E3:8F40:AA59EAA2840D

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement", (c) any Excluded Asset or any Excluded Liability.

Section 6.5     Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6     Indemnification Procedures.

(a)     No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)     No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 35:192DE6:7FD7:48E3-8F40-AA59EAA2840D

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1     Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 35:197DE6-7FD7-4873-8F40-AA59FAA2840D

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Exhibit 5, Page 102

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**New Vision Debt LLC**

By: _____

Name: Gail Hanson – Proof Positive LLC
Title: Member

**SELLER:**

**MRD Marketing LLC**

By: _____

Name: Matt Clegg
Title: Managing Partner

<strong>APPROVAL OF ASSIGNMENT AND GUARANTEE</strong>

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____

Name: Daniel S. March
Title: Managing Shareholder

<em>[Signature Page to Accounts Receivable Purchase Agreement]</em>

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)        "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)        "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)        "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)        "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)        "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 6.2</u>.

(f)        "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)        "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)        "**Buyer Indemnified Parties**" shall have the meaning set forth in <u>Section 6.4</u>.

(i)         "**Closing**" shall have the meaning set forth in <u>Section 6.1</u>.

(j)         "**Closing Date**" shall have the meaning set forth in <u>Section 6.1</u>.

(k)        "**Direct Claim**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

(l)         "**Excluded Assets**" shall have the meaning set forth in <u>Section 2.1</u>.

(m)        "**Excluded Liabilities**" shall have the meaning set forth in <u>Section 2.2</u>.

(n)        "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 35197DE6-7FD7-4873-8F40-AA59EAA2840D

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 35107DE6-7FD7-4823-8F40-AA59EAA2840D

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    **Defined Terms**. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    **Sale of Purchased Accounts; Assignment**. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    **Further Assurances**. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    **Terms of the Purchase Agreement**. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: New Vision Debt LLC**

By: _____
Name: Gail Hanson – Proof Positive LLC
Title: Member

**SELLER:**

**MRD Marketing LLC**

By: _____
Name: Matt Clegg
Title: Managing Partner

**Schedule 2.3**
**Wire Instructions**

**$21,307.09**

**Account Holder Name: MRD Marketing LLC**

**Address: 6863 Friars Rd, Ste 101 San Diego, CA 92108**

**Routing Number:** ███████

**Account Number:** ███████

# EXHIBIT 6

DocuSign Envelope ID: E2CA8C23-0BE8-4646-8CB1-6FCD73278748

GH

SH

SE

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 25, 2022 (the "**Agreement Date**"), by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**", and together with the Buyer, the **"Parties"**).

## RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

## ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 <u>No Assumption of Liabilities</u>. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>. Buyer shall pay $500.00, for each Purchased Account (the "**Purchase Price**") for a total of 500 Purchased Accounts.  The aggregate purchase price for the Purchased Accounts shall be $250,000.00 paid from ProofPositive LLC Capital Account of LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC.

8/25/2022

8/25/2022
8/25/2022
8/25/2022

DocuSign Envelope ID: E2CA8C23-0BE9-4646-8CB1-6FCD73278748

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of California and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    <u>Compliance with Laws</u>. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

DocuSign Envelope ID: E2CA8C23-0BF8-4646-8CB1-6FCD73278748





Section 3.7    <u>Legal Proceedings</u>. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 <u>Organization; Good Standing</u>. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

DocuSign Envelope ID: E2CA8C23-0B58-4646-8CB1-6FCD73278748

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient capital accounts in LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

**ARTICLE 5.**
**COVENANTS**

Section 5.1 <u>Appropriate Actions</u>.

(a) <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

**ARTICLE 6.**
**CLOSING**

Section 6.1 <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2 <u>Closing Deliverables of the Seller</u>. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3 <u>Closing Deliverables of the Buyer</u>. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4 <u>Indemnification by the Seller</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties

of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification  Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1  Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2  Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.



Section 7.4    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 <u>Specific Performance</u>. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

ProofPositive LLC

By: _Gail Hanson_

Name:    Gail Hanson

Title:    Managing Member

**SELLER:**

New Vision
Capital
Group LLC

_Sania Hashempour_

_Sarvenaz Esfahani_

By: _Gail Hanson_

Name:

Title:

**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel March_

Name: Daniel S. March

Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: E2CA8C23-0BE8-4646-8CB1-6FCD73278748

### EXHIBIT A

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)      "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)      "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)      "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)      "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any natural Person, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)      "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 6.2</u>.

(f)      "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)      "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)      "**Buyer Indemnified Parties**" shall have the meaning set forth in <u>Section 6.4</u>.

(i)      "**Closing**" shall have the meaning set forth in <u>Section 6.1</u>.

(j)      "**Closing Date**" shall have the meaning set forth in <u>Section 6.1</u>.

(k)      "**Direct Claim**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

(l)      "**Excluded Assets**" shall have the meaning set forth in <u>Section 2.1</u>.

(m)      "**Excluded Liabilities**" shall have the meaning set forth in <u>Section 2.2</u>.

(n)      "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: E2CA8C23-0BF8-4646-8CB1-6FCD7378748

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: E2CA8C23-0B58-4646-8CB1-6FCD73278748

(bb)    "**Purchase Price**" shall have the meaning set forth in Section 2.3.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in Section 6.5.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in Section 6.6(a).

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in Section 2.3.

(ll)    "**Wire Instructions**" shall have the meaning set forth in Section 2.3.

DocuSign Envelope ID: E2CA8C23-0B58-4646-8CB1-6FCD73278748

## EXHIBIT B

## FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is made by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

ProofPositive LLC

By: _Gail Hanson_
        BFC40F37742742A...
Name: Gail Hanson
Title: Managing Member

**SELLER:**

New Vision
Capital
Group LLC

_Gail Hanson_
BFC40F37742742A...

_Sania Hashempour_
276C450E2B0F45A...

By: _Sarvenaz Esfahani_
        FA15139629BF4F0...
Name:
Title:

**Schedule 2.3**
**Wire Instructions**

$250,000.00 paid from ProofPositive LLC Capital Account of LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC.

Accounts Receivable Purchase Agreement

# EXHIBIT 6.1

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 26, 2022 (the "**Agreement Date**"), by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**", and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 <u>No Assumption of Liabilities</u>. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>. Buyer shall pay $500.00, for each Purchased Account (the "**Purchase Price**") for a total of 200 Purchased Accounts.  The aggregate purchase price for the Purchased Accounts shall be $100,000.00 which has been paid in full to New Vision Capital Group LLC through ProofPositive LLC deposits to New Vision Capital Group LLC throughout the month of August 2022.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of California and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    Compliance with Laws. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.



Section 3.7    Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

DocuSign Envelope ID: 55B9B4B2-4077-4482-AAC4-F6636EC8EDCA

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4  <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient capital accounts in LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

**ARTICLE 5.**
**COVENANTS**

Section 5.1  <u>Appropriate Actions</u>.

(a)  <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

**ARTICLE 6.**
**CLOSING**

Section 6.1  <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2  <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3  <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4  <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties

of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification  Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: 55B9B4B2-4077-4482-AAC4-F6836EC8EDCA

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1  Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2 Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 55B9B4B2-4D77-4482-AAC4-F6636EC8EDCA

Section 7.4    Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

ProofPositive LLC

By: *Gail Hanson*

Name:    Gail Hanson

Title:    Managing  Member

**SELLER:**

New Vision
Capital
Group LLC



By: _____

Name:

Title:

### APPROVAL OF ASSIGNMENT

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: *Daniel March*

Name: Daniel S. March

Title: Managing Shareholder

8/28/2022

8/25/2022

8/26/2022

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 6.2</u>.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in <u>Section 6.4</u>.

(i)    "**Closing**" shall have the meaning set forth in <u>Section 6.1</u>.

(j)    "**Closing Date**" shall have the meaning set forth in <u>Section 6.1</u>.

(k)    "**Direct Claim**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

(l)    "**Excluded Assets**" shall have the meaning set forth in <u>Section 2.1</u>.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in <u>Section 2.2</u>.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 55B9B4B2-4077-4182-AAC4-F6836EC8EDCA

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 55B9B4B2-4077-4182-AAC4-F6636EC8EDCA

(bb)     "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)     "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)     "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)     "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)     "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)     "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)  "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)     "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)     "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)     "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)     "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is made by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

ProofPositive LLC

By: _Gail Hanson_
Name: Gail Hanson
Title: Managing Member

**SELLER:**

New Vision Capital Group LLC

_Sarvenaz Esfahani_

_Sania Hashempour_

_Gail Hanson_

By: _____
Name:
Title:

**Schedule 2.3**
**Wire Instructions**

The aggregate purchase price for the Purchased Accounts shall be $100,000.00 which has been paid in full to New Vision Capital Group LLC through ProofPositive LLC deposits to New Vision Capital Group LLC throughout the month of August 2022.

Accounts Receivable Purchase Agreement

8/25/2022

Exhibit 6.1, Page 139 8/25/2022

8/26/2022

# EXHIBIT 7

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 13, 2023 (the "**Agreement Date**"), by and between ProofPositive LLC (collectively the "**Buyer**"), and New Vision Debt Relief (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $265,656.46 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

DocuSign Envelope ID: D7C64ACE-9561-460F-87E8-8C31D476B873

DocuSign Envelope ID: D7C64ACE-9561-460F-87E8-8C51D476B873

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of California and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

DocuSign Envelope ID: D7C64ACF-9561-460F-87E8-8C31D476B873

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give

DocuSign Envelope ID: D7C64ACE-9561-460F-87E8-8C51D476B873

rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or

DocuSign Envelope ID: D7C64ACF-9561-460F-87E8-8C31D47C2873

obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: D7C64ACF-9561-460F-87E8-8C31D476B873

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1      Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2      Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3      Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: D7C64ACE-9561-460F-87E8-8C31D47E0873

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**ProofPositive LLC**

By: _Gail Hanson_
DocuSigned by:
BFC40F3744742A...
    Name: Gail Hanson
    Title: Member

**SELLER:**

**New Vision Debt Relief**

By: _____
    Name: Sania Hashempour
    Title: Principle

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
    Name: Daniel S. March
    Title: Managing Shareholder

DocuSign Envelope ID: D7C64ACF-9561-469F-87E8-8C31D476B873

### EXHIBIT A

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: D7C64ACE-9561-460F-87E8-8C71D476B873

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on-or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: D7C64ACF-9561-460F-97E8-8C51D476B873

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: D7C64ACF-9561-460F-87E8-8C31D476B873

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


**BUYER:**

**ProofPositive LLC**


By: _Gail Hanson_____
　　　Name: Gail Hanson
　　　Title: Member


**SELLER:**

**New Vision Debt Relief**


By: _____
　　　Name: Sania Hashempour
　　　Title: Principle

**Schedule 2.3**
**Wire Instructions**

<u>**$265,656.46**</u>

**Account Holder Name:**

**Address:**

**Routing Number:**

**Account Number:**

# EXHIBIT 8

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 29,2022 (the "**Agreement Date**"), by and between Proof Positive LLC (the "**Buyer**"), and New Vision 2 (the "**Seller**", and together with the Buyer, the **"Parties"**).

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("**LPG**") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $Refer to Sale Agreement, for each Purchased Account (the "**Purchase Price**").  The aggregate purchase price for the Purchased Accounts shall be $Refer to Sale Agreement.  The Buyer shall pay the Purchase Price of $Refer to Sale Agreement(the "**Upfront Cash Payment**") paid to the Seller at the Closing by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1      <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2      <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3      <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4      <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5      <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6      <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

DocuSign Envelope ID: E93357AC-9976-4857-A564-B4BC2C08546F

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or

DocuSign Envelope ID: E93357AC-9976-4857-A564-B4BC2C08546F

obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.    All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Proof Positive

By: _Gail Hanson_
BFC40F3774274A...
Name: Gail Hanson
Title:  Managing Member

**SELLER:**

New Vision 2

By: _____
8EE17407E4E5483...
Name: Serj Guetssoyan
Title:  Mr.

**APPROVAL OF ASSIGNMENT**

        The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_
8D484DB1893841E...
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 8, Page 163

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on-or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: E93357AC-9975-4857-A564-B4BC2C08546F

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: E93357AC-9975-4857-A564-B4BC2C08546F

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between Proof Positive (the "**Buyer**"), and New Vision 2 (the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.  <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.  <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.  <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.  <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Proof Positive

By: _____
      Name: Gail Hanson
      Title: Managing Member

**SELLER:**

New Vision 2

By: _____
      Name: Serj Guetssoyan
      Title: Mr.

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name:**

**Address:**

**Routing Number:**

**Account Number:**

| # | Full Name | Customer ID | Enrolled Date | Monthly Payment |
|---|-----------|-------------|---------------|-----------------|
| 1 | | BATLLC-452990081 | 27-Jan-21 | 216.3 |
| 2 | | BATLLC-487951906 | 11-Aug-21 | 277.71 |
| 3 | | BATLLC-507280306 | 19-Oct-21 | 268.5 |
| 4 | | BATLLC-516959356 | 11-Nov-21 | 486.39 |
| 5 | | BATLLC-517494193 | 15-Nov-21 | 969.77 |
| 6 | | BATLLC-522439240 | 14-Feb-22 | 272.21 |
| 7 | | BATLLC-525510520 | 10-Dec-21 | 373.82 |
| 8 | | BATLLC-531475399 | 4-Jan-22 | 382.83 |
| 9 | | BATLLC-533570380 | 20-Jan-22 | 410.07 |
| 10 | | BATLLC-539149919 | 25-Jan-22 | 330.36 |
| 11 | | BATLLC-539895483 | 25-Jan-22 | 277.85 |
| 12 | | BATLLC-540118107 | 27-Jan-22 | 297.84 |
| 13 | | BATLLC-540781205 | 28-Jan-22 | 376.03 |
| 14 | | BATLLC-542457166 | 3-Feb-22 | 491.26 |
| 15 | | BATLLC-543053635 | 15-Feb-22 | 256.65 |
| 16 | | BATLLC-544791643 | 14-Feb-22 | 512.07 |
| 17 | | BATLLC-544957129 | 14-Feb-22 | 367.2 |
| 18 | | BATLLC-545926069 | 22-Feb-22 | 527.6 |
| 19 | | BATLLC-546228883 | 4-Apr-22 | 377.56 |
| 20 | | BATLLC-546876991 | 4-Mar-22 | 488.92 |
| 21 | | BATLLC-547460011 | 23-Feb-22 | 148.12 |
| 22 | | BATLLC-547463992 | 22-Feb-22 | 261.3 |
| 23 | | BATLLC-547628137 | 23-Feb-22 | 253.17 |
| 24 | | BATLLC-547665025 | 23-Feb-22 | 270.58 |
| 25 | | BATLLC-547897546 | 25-Feb-22 | 371.45 |
| 26 | | BATLLC-548730730 | 7-Mar-22 | 338.29 |
| 27 | | BATLLC-549042613 | 3-Mar-22 | 256.3 |
| 28 | | BATLLC-549318058 | 3-Mar-22 | 598.72 |
| 29 | | BATLLC-549690577 | 15-Mar-22 | 256.84 |
| 30 | | BATLLC-549834115 | 7-Mar-22 | 261.78 |
| 31 | | BATLLC-550490428 | 8-Mar-22 | 447.23 |
| 32 | | BATLLC-550997275 | 10-Mar-22 | 268.14 |
| 33 | | BATLLC-551188000 | 10-Mar-22 | 286.92 |
| 34 | | BATLLC-551279647 | 11-Mar-22 | 334.45 |
| 35 | | BATLLC-551686240 | 14-Mar-22 | 351.11 |
| 36 | | BATLLC-551731288 | 15-Mar-22 | 280.35 |
| 37 | | BATLLC-551739910 | 14-Mar-22 | 502.83 |
| 38 | | BATLLC-552019357 | 15-Mar-22 | 255.91 |
| 39 | | BATLLC-552070999 | 15-Mar-22 | 259.71 |
| 40 | | BATLLC-552345109 | 16-Mar-22 | 276.58 |
| 41 | | BATLLC-552413833 | 16-Mar-22 | 274.05 |
| 42 | | BATLLC-552603670 | 28-Mar-22 | 170.33 |
| 43 | | BATLLC-552625084 | 19-Mar-22 | 397.86 |
| 44 | | BATLLC-552993262 | 18-Mar-22 | 356.83 |
| 45 | | BATLLC-555087601 | 22-Mar-22 | 453.94 |
| 46 | | BATLLC-555283129 | 22-Mar-22 | 250.66 |

| | | | |
|---|---|---|---|
| 47 | BATLLC-555670222 | 24-Mar-22 | 273.39 |
| 48 | BATLLC-555700411 | 23-Mar-22 | 272.26 |
| 49 | BATLLC-556004437 | 24-Mar-22 | 275.74 |
| 50 | BATLLC-556199344 | 19-Apr-22 | 405.04 |
| 51 | BATLLC-556311775 | 28-Mar-22 | 312.03 |
| 52 | BATLLC-557207023 | 28-Mar-22 | 425.52 |
| 53 | BATLLC-557642467 | 30-Mar-22 | 294.9 |
| 54 | BATLLC-557656909 | 31-Mar-22 | 398.22 |
| 55 | BATLLC-557676790 | 30-Mar-22 | 1,023.08 |
| 56 | BATLLC-557854024 | 31-Mar-22 | 264.54 |
| 57 | BATLLC-558195838 | 1-Apr-22 | 269.86 |
| 58 | BATLLC-558239212 | 4-Apr-22 | 236.4 |
| 59 | BATLLC-560691322 | 8-Apr-22 | 308.7 |
| 60 | BATLLC-560720419 | 13-Apr-22 | 398.32 |
| 61 | BATLLC-560957437 | 15-Apr-22 | 322.9 |
| 62 | BATLLC-562327579 | 12-Apr-22 | 503.82 |
| 63 | BATLLC-562521295 | 13-Apr-22 | 317.48 |
| 64 | BATLLC-562533076 | 13-Apr-22 | 265.01 |
| 65 | BATLLC-562613548 | 14-Apr-22 | 259.98 |
| 66 | BATLLC-562637077 | 14-Apr-22 | 285.92 |
| 67 | BATLLC-563032783 | 19-Apr-22 | 281.6 |
| 68 | BATLLC-563055556 | 15-Apr-22 | 251.26 |
| 69 | BATLLC-563297995 | 18-Apr-22 | 329.2 |
| 70 | BATLLC-563303596 | 20-Apr-22 | 368.91 |
| 71 | BATLLC-563311609 | 22-Apr-22 | 280.15 |
| 72 | BATLLC-563499142 | 22-Apr-22 | 382.23 |
| 73 | BATLLC-564105979 | 19-Apr-22 | 254.17 |
| 74 | BATLLC-564156502 | 19-Apr-22 | 286.55 |
| 75 | BATLLC-564162103 | 19-Apr-22 | 601.25 |
| 76 | BATLLC-564222385 | 20-Apr-22 | 285.43 |
| 77 | BATLLC-564365875 | 20-Apr-22 | 270.5 |
| 78 | BATLLC-565098064 | 21-Apr-22 | 252.4 |
| 79 | BATLLC-565153501 | 25-Apr-22 | 252.65 |
| 80 | BATLLC-565259881 | 26-Apr-22 | 257.34 |
| 81 | BATLLC-565668622 | 6-May-22 | 469.86 |
| 82 | BATLLC-565732219 | 25-Apr-22 | 382.61 |
| 83 | BATLLC-565738336 | 25-Apr-22 | 414.07 |
| 84 | BATLLC-566174758 | 26-Apr-22 | 255.91 |
| 85 | BATLLC-566336803 | 26-May-22 | 556.04 |
| 86 | BATLLC-566436178 | 27-Apr-22 | 450.41 |
| 87 | BATLLC-566729983 | 29-Apr-22 | 374.81 |
| 88 | BATLLC-566812423 | 27-Apr-22 | 312.69 |
| 89 | BATLLC-567267295 | 29-Apr-22 | 281.52 |
| 90 | BATLLC-567334564 | 28-Apr-22 | 485.84 |
| 91 | BATLLC-567788479 | 29-Apr-22 | 255.58 |
| 92 | BATLLC-567856417 | 3-May-22 | 478.34 |
| 93 | BATLLC-567942628 | 29-Apr-22 | 489.46 |

| | | | |
|---|---|---|---|
| 94 | BATLLC-568086160 | 2-May-22 | 429.01 |
| 95 | BATLLC-568127656 | 2-May-22 | 293.71 |
| 96 | BATLLC-569020711 | 3-May-22 | 259.11 |
| 97 | BATLLC-570029335 | 16-May-22 | 290.15 |
| 98 | BATLLC-570041821 | 4-May-22 | 297.83 |
| 99 | BATLLC-570168610 | 3-May-22 | 452.74 |
| 100 | BATLLC-570292420 | 4-May-22 | 295.9 |
| 101 | BATLLC-570311983 | 4-May-22 | 348.82 |
| 102 | BATLLC-570346621 | 5-May-22 | 297.77 |
| 103 | BATLLC-570363397 | 4-May-22 | 606.98 |
| 104 | BATLLC-570498025 | 6-May-22 | 260.96 |
| 105 | BATLLC-570498943 | 13-May-22 | 282.47 |
| 106 | BATLLC-570570622 | 17-May-22 | 396.18 |
| 107 | BATLLC-570668908 | 6-May-22 | 728.25 |
| 108 | BATLLC-570912352 | 10-May-22 | 258.09 |
| 109 | BATLLC-572315449 | 10-May-22 | 130.48 |
| 110 | BATLLC-572611693 | 9-May-22 | 251.09 |
| 111 | BATLLC-573081910 | 10-May-22 | 381.1 |
| 112 | BATLLC-573167308 | 13-Jun-22 | 504.22 |
| 113 | BATLLC-573196021 | 12-May-22 | 459.05 |
| 114 | BATLLC-573440041 | 12-May-22 | 253.75 |
| 115 | BATLLC-573451849 | 12-May-22 | 270.62 |
| 116 | BATLLC-573589579 | 12-May-22 | 446.89 |
| 117 | BATLLC-573721972 | 12-May-22 | 500 |
| 118 | BATLLC-574205785 | 13-May-22 | 1,025.60 |
| 119 | BATLLC-574207528 | 18-May-22 | 301.12 |
| 120 | BATLLC-574426858 | 20-May-22 | 252.5 |
| 121 | BATLLC-574449922 | 16-May-22 | 333.25 |
| 122 | BATLLC-574756969 | 18-May-22 | 287.17 |
| 123 | BATLLC-575532964 | 19-May-22 | 364.25 |
| 124 | BATLLC-575590894 | 19-May-22 | 456.61 |
| 125 | BATLLC-575719633 | 19-May-22 | 347.06 |
| 126 | BATLLC-575745919 | 18-May-22 | 327.77 |
| 127 | BATLLC-576128257 | 1-Jun-22 | 242.75 |
| 128 | BATLLC-576134344 | 18-May-22 | 280.86 |
| 129 | BATLLC-576500560 | 19-May-22 | 256.94 |
| 130 | BATLLC-576628009 | 20-May-22 | 254.13 |
| 131 | BATLLC-576806785 | 20-May-22 | 274.43 |
| 132 | BATLLC-578979115 | 23-May-22 | 376.72 |
| 133 | BATLLC-580132234 | 25-May-22 | 254.4 |
| 134 | BATLLC-581286835 | 25-May-22 | 253.51 |
| 135 | BATLLC-581568649 | 26-May-22 | 259.88 |
| 136 | BATLLC-581570284 | 25-May-22 | 264.36 |
| 137 | BATLLC-581590420 | 3-Jun-22 | 377.58 |
| 138 | BATLLC-582342847 | 11-Jul-22 | 349.7 |
| 139 | BATLLC-582345733 | 27-May-22 | 309.89 |
| 140 | BATLLC-582374914 | 27-May-22 | 280.54 |

| | | | |
|---|---|---|---|
| 141 | BATLLC-582628117 | 27-May-22 | 198.63 |
| 142 | BATLLC-583129939 | 31-May-22 | 253.29 |
| 143 | BATLLC-583167607 | 31-May-22 | 280.35 |
| 144 | BATLLC-583185505 | 31-May-22 | 379.59 |
| 145 | BATLLC-583189075 | 31-May-22 | 504.83 |
| 146 | BATLLC-583598809 | 1-Jun-22 | 288.76 |
| 147 | BATLLC-583679629 | 2-Jun-22 | 410.22 |
| 148 | BATLLC-583988665 | 10-Jun-22 | 269.14 |
| 149 | BATLLC-584007574 | 3-Jun-22 | 348.17 |
| 150 | BATLLC-584129884 | 3-Jun-22 | 411.34 |
| 151 | BATLLC-585015904 | 3-Jun-22 | 288.99 |
| 152 | BATLLC-585027436 | 6-Jun-22 | 314.18 |
| 153 | BATLLC-585034780 | 3-Jun-22 | 455.4 |
| 154 | BATLLC-586112935 | 7-Jun-22 | 369.81 |
| 155 | BATLLC-586116103 | 8-Jun-22 | 253.28 |
| 156 | BATLLC-587217208 | 8-Jun-22 | 283.23 |
| 157 | BATLLC-587530231 | 9-Jun-22 | 264.18 |
| 158 | BATLLC-587994172 | 10-Jun-22 | 313.31 |
| 159 | BATLLC-588750373 | 14-Jun-22 | 402.54 |
| 160 | BATLLC-588761575 | 14-Jun-22 | 522.06 |
| 161 | BATLLC-588799012 | 13-Jun-22 | 353.01 |
| 162 | BATLLC-588821161 | 14-Jun-22 | 260.42 |
| 163 | BATLLC-589022259 | 14-Jul-22 | 322.3 |
| 164 | BATLLC-589033273 | 14-Jun-22 | 303.72 |
| 165 | BATLLC-589039018 | 15-Jun-22 | 179.83 |
| 166 | BATLLC-589197232 | 16-Jun-22 | 393.27 |
| 167 | BATLLC-589452802 | 15-Jun-22 | 270.86 |
| 168 | BATLLC-589616791 | 15-Jun-22 | 276.06 |
| 169 | BATLLC-589634974 | 15-Jun-22 | 100 |
| 170 | BATLLC-589827625 | 16-Jun-22 | 356.75 |
| 171 | BATLLC-589874866 | 17-Jun-22 | 225.43 |
| 172 | BATLLC-590088502 | 17-Jun-22 | 264.67 |
| 173 | BATLLC-590817592 | 20-Jun-22 | 253.54 |
| 174 | BATLLC-591166237 | 23-Jun-22 | 255.14 |
| 175 | BATLLC-591287917 | 21-Jun-22 | 297.07 |
| 176 | BATLLC-591785215 | 22-Jun-22 | 250.78 |
| 177 | BATLLC-592046323 | 23-Jun-22 | 253.13 |
| 178 | BATLLC-594653374 | 27-Jun-22 | 294.45 |
| 179 | BATLLC-594693328 | 27-Jun-22 | 347.55 |
| 180 | BATLLC-595284574 | 28-Jun-22 | 253.58 |
| 181 | BATLLC-595783072 | 14-Jul-22 | 290.1 |
| 182 | BATLLC-595798597 | 29-Jun-22 | 282.83 |
| 183 | BATLLC-595800577 | 29-Jun-22 | 256.91 |
| 184 | BATLLC-595876168 | 29-Jun-22 | 501.08 |
| 185 | BATLLC-595984597 | 30-Jun-22 | 312.85 |
| 186 | BATLLC-596004973 | 30-Jun-22 | 303.89 |
| 187 | BATLLC-596146063 | 7-Jul-22 | 366.14 |

| 188 | BATLLC-596409544 | 1-Jul-22 | 286.22 |
| 189 | BATLLC-596442304 | 1-Jul-22 | 326.82 |
| 190 | BATLLC-596470717 | 1-Jul-22 | 257.35 |
| 191 | BATLLC-596471203 | 1-Jul-22 | 704.06 |
| 192 | BATLLC-597157491 | 5-Jul-22 | 260.18 |
| 193 | BATLLC-599902759 | 7-Jul-22 | 358.93 |
| 194 | BATLLC-599904796 | 7-Jul-22 | 282.01 |
| 195 | BATLLC-599913148 | 8-Jul-22 | 310.71 |
| 196 | BATLLC-599918305 | 7-Jul-22 | 250 |
| 197 | BATLLC-599923936 | 7-Jul-22 | 345.98 |
| 198 | BATLLC-599935288 | 7-Jul-22 | 268.98 |
| 199 | BATLLC-599970829 | 7-Jul-22 | 301.53 |
| 200 | BATLLC-600583273 | 8-Jul-22 | 269.07 |
| 201 | BATLLC-600615784 | 8-Jul-22 | 276.1 |
| 202 | BATLLC-600617554 | 8-Jul-22 | 356.99 |
| 203 | BATLLC-600619264 | 8-Jul-22 | 257.61 |
| 204 | BATLLC-600872080 | 12-Jul-22 | 254.15 |
| 205 | BATLLC-600926473 | 11-Jul-22 | 277.35 |
| 206 | BATLLC-600969700 | 12-Jul-22 | 281.6 |
| 207 | BATLLC-600984178 | 11-Jul-22 | 265.89 |
| 208 | BATLLC-601230835 | 12-Jul-22 | 354.21 |
| 209 | BATLLC-601294498 | 12-Jul-22 | 303.04 |
| 210 | BATLLC-601416202 | 20-Jul-22 | 594.26 |
| 211 | BATLLC-601775107 | 13-Jul-22 | 253.87 |
| 212 | BATLLC-601843231 | 13-Jul-22 | 454.51 |
| 213 | BATLLC-602045854 | 13-Jul-22 | 266.85 |
| 214 | BATLLC-602330062 | 18-Jul-22 | 278.4 |
| 215 | BATLLC-602365813 | 14-Jul-22 | 126.08 |
| 216 | BATLLC-602397496 | 14-Jul-22 | 267.38 |
| 217 | BATLLC-602858995 | 15-Jul-22 | 353.66 |
| 218 | BATLLC-602945854 | 15-Jul-22 | 285.06 |
| 219 | BATLLC-603055279 | 15-Jul-22 | 628.11 |
| 220 | BATLLC-604876432 | 18-Jul-22 | 623.24 |
| 221 | BATLLC-604963204 | 18-Jul-22 | 294.52 |
| 222 | BATLLC-605868271 | 19-Jul-22 | 356.26 |
| 223 | BATLLC-605881339 | 19-Jul-22 | 287.66 |
| 224 | BATLLC-605941858 | 20-Jul-22 | 759.63 |
| 225 | BATLLC-606174301 | 20-Jul-22 | 312 |
| 226 | BATLLC-606188353 | 20-Jul-22 | 269.3 |
| 227 | BATLLC-606287329 | 20-Jul-22 | 309.54 |
| 228 | BATLLC-606298177 | 20-Jul-22 | 404.45 |
| 229 | BATLLC-606497668 | 22-Jul-22 | 355.71 |
| 230 | BATLLC-606503776 | 22-Jul-22 | 259.42 |
| 231 | BATLLC-606515443 | 22-Jul-22 | 252.6 |
| 232 | BATLLC-606534892 | 22-Jul-22 | 469.56 |
| 233 | BATLLC-606543283 | 22-Jul-22 | 447.78 |
| 234 | BATLLC-607140571 | 25-Jul-22 | 253.27 |

DocuSign Envelope ID: E93357AC-9075-48E7-A564-B4BC2C08546F

| | | | |
|---|---|---|---|
| 235 | BATLLC-607166836 | 25-Jul-22 | 609.86 |
| 236 | BATLLC-607240369 | 27-Jul-22 | 348.31 |
| 237 | BATLLC-607264903 | 25-Jul-22 | 371.23 |
| 238 | BATLLC-607281358 | 25-Jul-22 | 464.17 |
| 239 | BATLLC-607467658 | 25-Jul-22 | 586.96 |
| 240 | BATLLC-607553095 | 25-Jul-22 | 1,366.99 |
| 241 | BATLLC-607673701 | 26-Jul-22 | 272.23 |
| 242 | BATLLC-607708162 | 26-Jul-22 | 234.63 |
| 243 | BATLLC-607882408 | 26-Jul-22 | 275.4 |
| 244 | BATLLC-608900263 | 28-Jul-22 | 359.14 |
| 245 | BATLLC-609615427 | 29-Jul-22 | 354.03 |
| 246 | BATLLC-610628686 | 1-Aug-22 | 254.42 |
| 247 | BATLLC-610689637 | 1-Aug-22 | 471.13 |
| 248 | BATLLC-611227789 | 2-Aug-22 | 253.22 |
| 249 | BATLLC-611266327 | 2-Aug-22 | 297.37 |
| 250 | BATLLC-611271043 | 2-Aug-22 | 257.41 |
| 251 | BATLLC-611343442 | 2-Aug-22 | 353 |
| 252 | BATLLC-611366302 | 2-Aug-22 | 271.9 |
| 253 | BATLLC-611375044 | 2-Aug-22 | 660.96 |
| 254 | BATLLC-611385271 | 2-Aug-22 | 283.67 |
| 255 | BATLLC-612324952 | 3-Aug-22 | 389.53 |
| 256 | BATLLC-612325258 | 3-Aug-22 | 265.31 |
| 257 | BATLLC-612330112 | 4-Aug-22 | 258.53 |
| 258 | BATLLC-612388519 | 3-Aug-22 | 286.96 |
| 259 | BATLLC-612608602 | 3-Aug-22 | 773.9 |
| 260 | BATLLC-612626548 | 3-Aug-22 | 300.22 |
| 261 | BATLLC-612665731 | 4-Aug-22 | 344.09 |
| 262 | BATLLC-614063795 | 4-Aug-22 | 289.06 |
| 263 | BATLLC-614092383 | 4-Aug-22 | 270.95 |
| 264 | BATLLC-615133441 | 8-Aug-22 | 267.82 |
| 265 | BATLLC-615509818 | 9-Aug-22 | 283.4 |
| 266 | BATLLC-615564499 | 9-Aug-22 | 294.07 |
| 267 | BATLLC-615564544 | 9-Aug-22 | 934.88 |
| 268 | BATLLC-615651985 | 9-Aug-22 | 527.57 |
| 269 | BATLLC-615703237 | 9-Aug-22 | 274.92 |
| 270 | BATLLC-616174966 | 10-Aug-22 | 385.26 |
| 271 | BATLLC-616191007 | 11-Aug-22 | 871.09 |
| 272 | BATLLC-616784791 | 11-Aug-22 | 400.68 |
| 273 | BATLLC-617367979 | 17-Aug-22 | 290.12 |
| 274 | BATLLC-617372809 | 12-Aug-22 | 551.93 |
| 275 | BATLLC-617399596 | 12-Aug-22 | 312.91 |
| 276 | BATLLC-617515969 | 12-Aug-22 | 269.68 |
| 277 | BATLLC-618510859 | 16-Aug-22 | 369.98 |
| 278 | BATLLC-620332402 | 19-Aug-22 | 275.45 |
| 279 | BATLLC-453115071 | 26-Jan-22 | 366.08 |
| 280 | BATLLC-472021566 | 4-Jun-21 | 273.64 |
| 281 | BATLLC-537605368 | 21-Jan-22 | 281.17 |

DocuSign Envelope ID: E93357AC-9075-4857-A564-B4BC2C0B546F

| | | | |
|---|---|---|---|
| 282 | BATLLC-546007333 | 16-Feb-22 | 354.62 |
| 283 | BATLLC-546230203 | 23-Feb-22 | 269.06 |
| 284 | BATLLC-546576796 | 18-Feb-22 | 267.25 |
| 285 | BATLLC-547374223 | 22-Feb-22 | 353.6 |
| 286 | BATLLC-548192977 | 1-Mar-22 | 469.95 |
| 287 | BATLLC-550958362 | 9-Mar-22 | 390.35 |
| 288 | BATLLC-551262733 | 11-Mar-22 | 200.32 |
| 289 | BATLLC-551696467 | 15-Mar-22 | 266.42 |
| 290 | BATLLC-552968215 | 4-Apr-22 | 314.21 |
| 291 | BATLLC-554053549 | 22-Mar-22 | 354.63 |
| 292 | BATLLC-555705607 | 23-Mar-22 | 438.79 |
| 293 | BATLLC-555929371 | 24-Mar-22 | 254.59 |
| 294 | BATLLC-557121616 | 6-Apr-22 | 925.35 |
| 295 | BATLLC-557249158 | 28-Mar-22 | 718.69 |
| 296 | BATLLC-557669680 | 5-Apr-22 | 252.8 |
| 297 | BATLLC-557932294 | 31-Mar-22 | 144.73 |
| 298 | BATLLC-559422403 | 5-Apr-22 | 274.36 |
| 299 | BATLLC-560051125 | 8-Apr-22 | 306.07 |
| 300 | BATLLC-560499412 | 7-Apr-22 | 255.45 |
| 301 | BATLLC-561693688 | 12-Apr-22 | 259.71 |
| 302 | BATLLC-567535879 | 29-Apr-22 | 272.7 |
| 303 | BATLLC-570050986 | 3-May-22 | 253.4 |
| 304 | BATLLC-575706613 | 17-May-22 | 254.16 |
| 305 | BATLLC-576391174 | 19-May-22 | 267.2 |
| 306 | BATLLC-576630094 | 19-May-22 | 373.51 |
| 307 | BATLLC-581327656 | 14-Jun-22 | 255.64 |
| 308 | BATLLC-581636821 | 25-May-22 | 255.2 |
| 309 | BATLLC-582153253 | 27-May-22 | 273.56 |
| 310 | BATLLC-583580740 | 1-Jun-22 | 604.57 |
| 311 | BATLLC-583581748 | 1-Jun-22 | 368.42 |
| 312 | BATLLC-583811017 | 3-Jun-22 | 539.61 |
| 313 | BATLLC-586530796 | 9-Jun-22 | 278.46 |
| 314 | BATLLC-587204878 | 9-Jun-22 | 267.72 |
| 315 | BATLLC-587583397 | 10-Jun-22 | 352.53 |
| 316 | BATLLC-589451308 | 15-Jun-22 | 322.8 |
| 317 | BATLLC-589576108 | 15-Jun-22 | 235.28 |
| 318 | BATLLC-590210620 | 17-Jun-22 | 241.8 |
| 319 | BATLLC-591815956 | 19-Jul-22 | 805.31 |
| 320 | BATLLC-592211794 | 24-Jun-22 | 364.81 |
| 321 | BATLLC-599974048 | 7-Jul-22 | 357.98 |
| 322 | BATLLC-599974222 | 12-Jul-22 | 263.3 |
| 323 | BATLLC-600630100 | 8-Jul-22 | 272.52 |
| 324 | BATLLC-600998644 | 12-Jul-22 | 242.44 |
| 325 | BATLLC-601746163 | 14-Jul-22 | 324.48 |
| 326 | BATLLC-605183416 | 18-Jul-22 | 250.49 |
| 327 | BATLLC-605210758 | 18-Jul-22 | 284.35 |
| 328 | BATLLC-605870902 | 19-Jul-22 | 270.8 |

| | | | |
|---|---|---|---|
| 329 | ███████ | BATLLC-605872366 | 19-Jul-22 | 251.59 |
| 330 | ████████ | BATLLC-608398489 | 27-Jul-22 | 268.49 |
| 331 | ███████ | BATLLC-612584254 | 3-Aug-22 | 255.2 |



| First Payment Cleared Date | Company | Company - Partner | Lead Vendor |
|---|---|---|---|
| 10-Feb-21 | New Vision Debt Relief -2 | | |
| 1-Sep-21 | New Vision Debt Relief -2 | | |
| 3-Dec-21 | New Vision Debt Relief -2 | | |
| 9-Feb-22 | New Vision Debt Relief -2 | | |
| 29-Nov-21 | New Vision Debt Relief -2 | | |
| 15-Feb-22 | New Vision Debt Relief -2 | | |
| 4-Mar-22 | New Vision Debt Relief -2 | | |
| 24-Feb-22 | New Vision Debt Relief -2 | | |
| 11-Feb-22 | New Vision Debt Relief -2 | | |
| 24-Feb-22 | New Vision Debt Relief -2 | | |
| 11-Mar-22 | New Vision Debt Relief -2 | | |
| 23-Feb-22 | New Vision Debt Relief -2 | | |
| 11-Feb-22 | New Vision Debt Relief -2 | | |
| 18-Feb-22 | New Vision Debt Relief -2 | | |
| 7-Apr-22 | New Vision Debt Relief -2 | | |
| 24-Feb-22 | New Vision Debt Relief -2 | | |
| 18-Feb-22 | New Vision Debt Relief -2 | | |
| 4-Mar-22 | New Vision Debt Relief -2 | | |
| 12-Apr-22 | New Vision Debt Relief -2 | | |
| 1-Jul-22 | New Vision Debt Relief -2 | | |
| 10-Mar-22 | New Vision Debt Relief -2 | | |
| 11-Mar-22 | New Vision Debt Relief -2 | | |
| 25-Mar-22 | New Vision Debt Relief -2 | | |
| 25-Mar-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 18-May-22 | New Vision Debt Relief -2 | | |
| 24-Mar-22 | New Vision Debt Relief -2 | | |
| 11-Mar-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 4-Apr-22 | New Vision Debt Relief -2 | | |
| 17-May-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 5-Apr-22 | New Vision Debt Relief -2 | | |
| 18-Apr-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 4-Apr-22 | New Vision Debt Relief -2 | | |
| 15-Apr-22 | New Vision Debt Relief -2 | | |
| 10-May-22 | New Vision Debt Relief -2 | | |
| 8-Apr-22 | New Vision Debt Relief -2 | | |
| 7-Apr-22 | New Vision Debt Relief -2 | | |
| 11-Apr-22 | New Vision Debt Relief -2 | | |
| 7-Apr-22 | New Vision Debt Relief -2 | | |
| 29-Mar-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 5-Apr-22 | New Vision Debt Relief -2 | | |
| 8-Apr-22 | New Vision Debt Relief -2 | | |

| | |
|---|---|
| 8-Apr-22 | New Vision Debt Relief -2 |
| 13-Apr-22 | New Vision Debt Relief -2 |
| 20-May-22 | New Vision Debt Relief -2 |
| 18-May-22 | New Vision Debt Relief -2 |
| 21-Apr-22 | New Vision Debt Relief -2 |
| 21-Apr-22 | New Vision Debt Relief -2 |
| 13-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 28-Apr-22 | New Vision Debt Relief -2 |
| 5-Apr-22 | New Vision Debt Relief -2 |
| 12-Apr-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 11-Apr-22 | New Vision Debt Relief -2 |
| 5-May-22 | New Vision Debt Relief -2 |
| 3-May-22 | New Vision Debt Relief -2 |
| 18-Apr-22 | New Vision Debt Relief -2 |
| 29-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 27-Apr-22 | New Vision Debt Relief -2 |
| 11-May-22 | New Vision Debt Relief -2 |
| 10-May-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |
| 17-Jun-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 3-Jun-22 | New Vision Debt Relief -2 |
| 11-May-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 29-Apr-22 | New Vision Debt Relief -2 |
| 4-May-22 | New Vision Debt Relief -2 |
| 16-May-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 20-Jul-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 26-May-22 | New Vision Debt Relief -2 |
| 2-Jun-22 | New Vision Debt Relief -2 |
| 29-Apr-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 16-May-22 | New Vision Debt Relief -2 |
| 25-Jul-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |
| 11-May-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |

20-May-22  New Vision Debt Relief -2
18-May-22  New Vision Debt Relief -2
13-May-22  New Vision Debt Relief -2
10-Jun-22  New Vision Debt Relief -2
20-May-22  New Vision Debt Relief -2
6-May-22  New Vision Debt Relief -2
6-Jun-22  New Vision Debt Relief -2
2-Jun-22  New Vision Debt Relief -2
25-May-22  New Vision Debt Relief -2
23-May-22  New Vision Debt Relief -2
22-Jun-22  New Vision Debt Relief -2
15-Jun-22  New Vision Debt Relief -2
15-Jun-22  New Vision Debt Relief -2
27-May-22  New Vision Debt Relief -2
23-May-22  New Vision Debt Relief -2
13-Jul-22  New Vision Debt Relief -2
25-May-22  New Vision Debt Relief -2
15-Jun-22  New Vision Debt Relief -2
22-Aug-22  New Vision Debt Relief -2
24-May-22  New Vision Debt Relief -2
15-Jun-22  New Vision Debt Relief -2
3-Jun-22  New Vision Debt Relief -2
6-Jun-22  New Vision Debt Relief -2
19-May-22  New Vision Debt Relief -2
28-Jun-22  New Vision Debt Relief -2
15-Jun-22  New Vision Debt Relief -2
27-May-22  New Vision Debt Relief -2
8-Jun-22  New Vision Debt Relief -2
20-Jun-22  New Vision Debt Relief -2
6-Jun-22  New Vision Debt Relief -2
8-Jun-22  New Vision Debt Relief -2
31-May-22  New Vision Debt Relief -2
10-Jun-22  New Vision Debt Relief -2
15-Jun-22  New Vision Debt Relief -2
25-May-22  New Vision Debt Relief -2
13-Jun-22  New Vision Debt Relief -2
8-Jul-22  New Vision Debt Relief -2
24-Jun-22  New Vision Debt Relief -2
31-May-22  New Vision Debt Relief -2
20-Jun-22  New Vision Debt Relief -2
6-Jun-22  New Vision Debt Relief -2
22-Jun-22  New Vision Debt Relief -2
20-Jul-22  New Vision Debt Relief -2
7-Jul-22  New Vision Debt Relief -2
11-Aug-22  New Vision Debt Relief -2
10-Jun-22  New Vision Debt Relief -2
12-Jul-22  New Vision Debt Relief -2

| | |
|---|---|
| 10-Jun-22 | New Vision Debt Relief -2 |
| 24-Jun-22 | New Vision Debt Relief -2 |
| 14-Jun-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 20-Jun-22 | New Vision Debt Relief -2 |
| 10-Jun-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 10-Jun-22 | New Vision Debt Relief -2 |
| 17-Jun-22 | New Vision Debt Relief -2 |
| 20-Jun-22 | New Vision Debt Relief -2 |
| 16-Jun-22 | New Vision Debt Relief -2 |
| 27-Jun-22 | New Vision Debt Relief -2 |
| 13-Jun-22 | New Vision Debt Relief -2 |
| 23-Jun-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 21-Jul-22 | New Vision Debt Relief -2 |
| 21-Jun-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 6-Jul-22 | New Vision Debt Relief -2 |
| 8-Jul-22 | New Vision Debt Relief -2 |
| 3-Aug-22 | New Vision Debt Relief -2 |
| 6-Jul-22 | New Vision Debt Relief -2 |
| 16-Jun-22 | New Vision Debt Relief -2 |
| 20-Jul-22 | New Vision Debt Relief -2 |
| 14-Jul-22 | New Vision Debt Relief -2 |
| 28-Jul-22 | New Vision Debt Relief -2 |
| 20-Jul-22 | New Vision Debt Relief -2 |
| 1-Jul-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 28-Jun-22 | New Vision Debt Relief -2 |
| 15-Jul-22 | New Vision Debt Relief -2 |
| 14-Jul-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 8-Jul-22 | New Vision Debt Relief -2 |
| 15-Jul-22 | New Vision Debt Relief -2 |
| 11-Jul-22 | New Vision Debt Relief -2 |
| 11-Jul-22 | New Vision Debt Relief -2 |
| 21-Jul-22 | New Vision Debt Relief -2 |
| 28-Jul-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 28-Jul-22 | New Vision Debt Relief -2 |
| 8-Jul-22 | New Vision Debt Relief -2 |
| 12-Jul-22 | New Vision Debt Relief -2 |
| 11-Jul-22 | New Vision Debt Relief -2 |
| 15-Jul-22 | New Vision Debt Relief -2 |

21-Jul-22  New Vision Debt Relief -2
8-Aug-22  New Vision Debt Relief -2
21-Jul-22  New Vision Debt Relief -2
18-Jul-22  New Vision Debt Relief -2
13-Jul-22  New Vision Debt Relief -2
2-Aug-22  New Vision Debt Relief -2
28-Jul-22  New Vision Debt Relief -2
26-Jul-22  New Vision Debt Relief -2
2-Aug-22  New Vision Debt Relief -2
28-Jul-22  New Vision Debt Relief -2
28-Jul-22  New Vision Debt Relief -2
27-Jul-22  New Vision Debt Relief -2
15-Jul-22  New Vision Debt Relief -2
28-Jul-22  New Vision Debt Relief -2
28-Jul-22  New Vision Debt Relief -2
28-Jul-22  New Vision Debt Relief -2
5-Aug-22  New Vision Debt Relief -2
3-Aug-22  New Vision Debt Relief -2
29-Jul-22  New Vision Debt Relief -2
2-Aug-22  New Vision Debt Relief -2
4-Aug-22  New Vision Debt Relief -2
24-Aug-22  New Vision Debt Relief -2
4-Aug-22  New Vision Debt Relief -2
22-Jul-22  New Vision Debt Relief -2
4-Aug-22  New Vision Debt Relief -2
5-Aug-22  New Vision Debt Relief -2
29-Jul-22  New Vision Debt Relief -2
26-Jul-22  New Vision Debt Relief -2
26-Aug-22  New Vision Debt Relief -2
29-Jul-22  New Vision Debt Relief -2
18-Aug-22  New Vision Debt Relief -2
5-Aug-22  New Vision Debt Relief -2
27-Jul-22  New Vision Debt Relief -2
4-Aug-22  New Vision Debt Relief -2
4-Aug-22  New Vision Debt Relief -2
5-Aug-22  New Vision Debt Relief -2
15-Aug-22  New Vision Debt Relief -2
5-Aug-22  New Vision Debt Relief -2
11-Aug-22  New Vision Debt Relief -2
5-Aug-22  New Vision Debt Relief -2
24-Aug-22  New Vision Debt Relief -2
4-Aug-22  New Vision Debt Relief -2
15-Aug-22  New Vision Debt Relief -2
29-Jul-22  New Vision Debt Relief -2
2-Aug-22  New Vision Debt Relief -2
19-Aug-22  New Vision Debt Relief -2
3-Aug-22  New Vision Debt Relief -2

| | |
|---|---|
| 5-Aug-22 | New Vision Debt Relief -2 |
| 5-Aug-22 | New Vision Debt Relief -2 |
| 5-Aug-22 | New Vision Debt Relief -2 |
| 11-Aug-22 | New Vision Debt Relief -2 |
| 11-Aug-22 | New Vision Debt Relief -2 |
| 18-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 29-Jul-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 11-Aug-22 | New Vision Debt Relief -2 |
| 15-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 18-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 18-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 23-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 29-Aug-22 | New Vision Debt Relief -2 |
| 21-Feb-22 | New Vision Capital Group LLC |
| 7-Jul-21 | New Vision Capital Group LLC |
| 9-Mar-22 | New Vision Capital Group LLC |

17-Feb-22  New Vision Capital Group LLC
7-Mar-22  New Vision Capital Group LLC
1-Mar-22  New Vision Capital Group LLC
13-May-22  New Vision Capital Group LLC
23-Mar-22  New Vision Capital Group LLC
25-Mar-22  New Vision Capital Group LLC
18-Mar-22  New Vision Capital Group LLC
24-Mar-22  New Vision Capital Group LLC
20-Apr-22  New Vision Capital Group LLC
7-Apr-22  New Vision Capital Group LLC
13-Apr-22  New Vision Capital Group LLC
15-Apr-22  New Vision Capital Group LLC
21-Apr-22  New Vision Capital Group LLC
6-Apr-22  New Vision Capital Group LLC
11-May-22  New Vision Capital Group LLC
21-Apr-22  New Vision Capital Group LLC
14-Apr-22  New Vision Capital Group LLC
22-Apr-22  New Vision Capital Group LLC
21-Apr-22  New Vision Capital Group LLC
15-Apr-22  New Vision Capital Group LLC
13-May-22  New Vision Capital Group LLC
18-May-22  New Vision Capital Group LLC
25-May-22  New Vision Capital Group LLC
10-Jun-22  New Vision Capital Group LLC
1-Jun-22  New Vision Capital Group LLC
15-Jul-22  New Vision Capital Group LLC
15-Jun-22  New Vision Capital Group LLC
10-Jun-22  New Vision Capital Group LLC
24-Jun-22  New Vision Capital Group LLC
15-Jun-22  New Vision Capital Group LLC
4-Aug-22  New Vision Capital Group LLC
29-Jun-22  New Vision Capital Group LLC
24-Jun-22  New Vision Capital Group LLC
23-Jun-22  New Vision Capital Group LLC
6-Jul-22  New Vision Capital Group LLC
7-Jul-22  New Vision Capital Group LLC
5-Jul-22  New Vision Capital Group LLC
3-Aug-22  New Vision Capital Group LLC
21-Jul-22  New Vision Capital Group LLC
4-Aug-22  New Vision Capital Group LLC
20-Jul-22  New Vision Capital Group LLC
21-Jul-22  New Vision Capital Group LLC
5-Aug-22  New Vision Capital Group LLC
5-Aug-22  New Vision Capital Group LLC
11-Aug-22  New Vision Capital Group LLC
22-Jul-22  New Vision Capital Group LLC
22-Jul-22  New Vision Capital Group LLC

| | |
|---|---|
| 22-Aug-22 | New Vision Capital Group LLC |
| 16-Aug-22 | New Vision Capital Group LLC |
| 11-Aug-22 | New Vision Capital Group LLC |

| Client Status | # Drafts Remaining | Debt Enrolled |
|---|---|---|
| Paused Per Legal - Payment Paused | 0 | 16,456.53 |
| Active File | 3 | 8,277.89 |
| Active File | 9 | 5,954.00 |
| Active File | 41 | 72,991.00 |
| Active File | 36 | 102,197.00 |
| Active File | 30 | 20,083.65 |
| Active File | 25 | 24,535.39 |
| Active File | 0 | 29,977.98 |
| Active File | 29 | 38,243.06 |
| Active File | 20 | 15,534.00 |
| Active File | 0 | 5,594.00 |
| Active File | 0 | 18,263.00 |
| Active File | 21 | 21,959.00 |
| Active File | 0 | 23,993.00 |
| Retention Call Required by Affiliate | 31 | 14,874.00 |
| Active File | 29 | 43,271.00 |
| Active File | 0 | 16,549.00 |
| Active File | 30 | 44,868.00 |
| Active File | 19 | 19,281.00 |
| Active File | 1 | 35,779.00 |
| Active File | 8 | 6,025.00 |
| Active File | 30 | 10,546.00 |
| Active File | 21 | 10,921.00 |
| Active File | 18 | 10,752.00 |
| Active File | 0 | 14,803.26 |
| Enroll Debt | 46 | 33,175.76 |
| Follow Up Regarding Payment | 19 | 9,895.00 |
| Active File | 30 | 45,661.00 |
| Active File | 37 | 18,924.00 |
| Paused Per Legal - Payment Not Paused | 0 | 12,780.00 |
| NSF | 0 | 21,051.00 |
| Active File | 0 | 13,636.00 |
| Active File | 32 | 20,113.00 |
| Active File | 0 | 17,015.00 |
| Active File | 0 | 13,636.00 |
| Active File | 1 | 16,121.00 |
| NSF | 31 | 42,321.00 |
| Active File | 23 | 6,451.00 |
| Active File | 18 | 9,258.00 |
| Active File | 0 | 14,816.00 |
| Active File | 31 | 18,789.00 |
| Active File | 61 | 22,436.00 |
| Active File | 43 | 38,001.00 |
| Active File | 33 | 23,890.81 |
| Active File | 0 | 16,315.00 |
| Active File | 21 | 10,353.00 |

| | | |
|---|---:|---:|
| NSF | 31 | 16,381.00 |
| Active File | 11 | 7,235.00 |
| Active File | 18 | 9,679.00 |
| Active File | 18 | 8,356.00 |
| Paused Per Legal - Payment Not Paused | 21 | 14,882.95 |
| Active File | 17 | 21,621.00 |
| Active File | 0 | 27,226.00 |
| Active File | 0 | 23,013.00 |
| Active File | 26 | 69,479.00 |
| Active File | 0 | 8,338.00 |
| Active File | 26 | 15,365.00 |
| Paused Per Legal - Payment Not Paused | 77 | 30,551.00 |
| Active File | 0 | 12,739.00 |
| Active File | 0 | 35,587.00 |
| Active File | 0 | 21,746.00 |
| Paused- Other | 0 | 41,908.00 |
| Active File | 0 | 15,477.00 |
| Active File | 0 | 17,345.00 |
| Payment Change Required | 0 | 16,827.00 |
| Paused Per Legal - Payment Not Paused | 26 | 16,246.01 |
| Active File | 19 | 11,113.33 |
| Active File | 20 | 10,046.00 |
| Active File | 44 | 31,930.00 |
| Active File | 21 | 18,688.00 |
| Active File | 0 | 32,677.56 |
| Enroll Debt | 0 | 17,151.00 |
| Active File | 0 | 10,651.00 |
| Follow Up Regarding Payment | 26 | 14,263.00 |
| Active File | 32 | 51,761.00 |
| Paused Per Legal - Payment Not Paused | 0 | 13,016.38 |
| Active File | 16 | 8,706.00 |
| Active File | 26 | 13,373.00 |
| Active File | 32 | 16,073.00 |
| Active File | 0 | 28,683.00 |
| Enroll Debt | 46 | 54,324.00 |
| Active File | 0 | 30,054.00 |
| Active File | 32 | 32,677.00 |
| Active File | 18 | 8,774.00 |
| Active File | 33 | 41,369.07 |
| Active File | 0 | 21,242.00 |
| Retention NSF Review | 0 | 20,067.00 |
| NSF | 0 | 29,665.00 |
| Active File | 40 | 19,440.00 |
| NSF | 32 | 35,051.00 |
| Bankruptcy Inquiry | 14 | 9,552.00 |
| Active File | 44 | 45,835.00 |
| Active File | 16 | 5,465.00 |

| | | |
|---|---|---|
| Active File | 8 | 9,979.00 |
| Active File | 21 | 11,840.00 |
| Active File | 14 | 8,369.00 |
| Enroll Debt | 45 | 23,252.00 |
| Active File | 0 | 13,094.00 |
| Active File | 0 | 12,218.00 |
| Active File | 45 | 23,942.00 |
| Active File | 34 | 22,720.00 |
| Enroll Debt | 20 | 16,111.00 |
| Payment Change Required | 33 | 45,954.00 |
| Active File | 21 | 9,875.00 |
| Active File | 29 | 14,887.26 |
| Active File | 33 | 30,837.00 |
| Active File | 32 | 25,064.00 |
| Active File | 0 | 8,490.00 |
| Active File | 69 | 14,812.00 |
| Active File | 23 | 11,935.00 |
| Active File | 31 | 17,083.00 |
| Active File | 47 | 48,941.00 |
| Active File | 34 | 32,640.00 |
| Active File | 33 | 14,163.00 |
| Active File | 0 | 7,841.00 |
| Active File | 33 | 31,546.00 |
| Paused Per Legal - Payment Not Paused | 44 | 20,093.00 |
| Active File | 33 | 55,753.00 |
| Active File | 36 | 19,962.00 |
| Active File | 15 | 7,324.00 |
| Active File | 22 | 14,212.00 |
| Active File | 33 | 17,171.00 |
| Active File | 23 | 16,072.00 |
| Active File | 27 | 27,017.00 |
| Active File | 39 | 35,095.00 |
| Active File | 0 | 8,677.00 |
| Active File | 90 | 46,694.00 |
| Active File | 32 | 16,603.00 |
| Active File | 21 | 11,010.00 |
| Active File | 23 | 10,727.00 |
| Active File | 22 | 10,118.00 |
| NSF | 44 | 44,854.00 |
| Payment Change Required | 19 | 8,296.00 |
| Active File | 20 | 9,035.00 |
| NSF | 48 | 23,357.00 |
| NSF | 21 | 10,079.00 |
| NSF | 46 | 35,137.00 |
| Active File | 35 | 22,799.00 |
| Active File | 21 | 14,641.00 |
| Retention Call Required by Resolution Specialist | 15 | 8,287.00 |

| | | |
|---|---:|---:|
| Payment Change Required | 66 | 27,079.00 |
| Active File | 20 | 10,311.00 |
| Active File | 0 | 12,878.00 |
| Active File | 45 | 33,985.00 |
| Active File | 20 | 23,486.00 |
| Retention Call Required by Affiliate | 0 | 10,743.00 |
| Active File | 47 | 47,076.00 |
| Active File | 28 | 15,246.00 |
| Active File | 33 | 25,898.00 |
| Retention Call Required by Affiliate | 0 | 28,796.00 |
| Active File | 0 | 31,239.00 |
| Retention Call Required by Affiliate | 33 | 19,721.00 |
| Active File | 33 | 43,082.00 |
| Active File | 45 | 32,812.00 |
| Active File | 18 | 8,237.00 |
| Active File | 23 | 11,211.18 |
| Active File | 15 | 7,551.00 |
| Active File | 33 | 10,622.00 |
| Active File | 0 | 13,777.00 |
| Enroll Debt | 34 | 43,784.00 |
| Retention NSF Review | 46 | 30,750.00 |
| Enroll Debt | 12 | 7,655.00 |
| Active File | 35 | 20,333.00 |
| Active File | 16 | 10,663.00 |
| Active File | 0 | 9,502.00 |
| Active File | 18 | 16,965.00 |
| Active File | 28 | 14,955.00 |
| Active File | 31 | 16,428.00 |
| Active File | 40 | 25,726.00 |
| Active File | 22 | 15,622.00 |
| Enroll Debt | 68 | 36,460.00 |
| Enroll Debt | 21 | 10,777.00 |
| Enroll Debt | 34 | 12,306.00 |
| Active File | 21 | 10,433.00 |
| Active File | 16 | 9,220.00 |
| Active File | 34 | 14,490.00 |
| Active File | 47 | 18,810.00 |
| Active File | 46 | 25,695.00 |
| Active File | 34 | 22,605.00 |
| Active File | 29 | 12,183.00 |
| Active File | 46 | 23,246.04 |
| Active File | 31 | 14,916.00 |
| Active File | 0 | 7,224.00 |
| Active File | 0 | 36,423.00 |
| Active File | 36 | 23,502.00 |
| Active File | 0 | 9,338.00 |
| Active File | 22 | 16,185.52 |

| Active File | 46 | 22,781.19 |
| Active File | 34 | 20,740.00 |
| Active File | 23 | 9,658.00 |
| Active File | 0 | 54,315.00 |
| Active File | 46 | 19,656.00 |
| Active File | 29 | 19,691.00 |
| Active File | 34 | 16,707.00 |
| Paused Per Legal - Payment Not Paused | 46 | 25,719.98 |
| Active File | 52 | 54,246.59 |
| Active File | 16 | 11,232.00 |
| NSF | 22 | 10,356.00 |
| Active File | 28 | 15,386.00 |
| Active File | 0 | 15,542.00 |
| Active File | 18 | 8,986.00 |
| Active File | 23 | 16,288.00 |
| Enroll Debt | 23 | 11,056.10 |
| Active File | 22 | 9,072.00 |
| Active File | 0 | 8,596.00 |
| Active File | 34 | 16,207.00 |
| Active File | 17 | 7,628.00 |
| Active File | 11 | 7,735.00 |
| Active File | 35 | 18,599.00 |
| Active File | 47 | 59,745.48 |
| Active File | 34 | 14,174.00 |
| Active File | 0 | 32,232.00 |
| Active File | 23 | 10,228.00 |
| Active File | 0 | 8,191.00 |
| Active File | 70 | 18,693.00 |
| Active File | 35 | 15,390.00 |
| Active File | 36 | 23,798.00 |
| Bankruptcy Inquiry | 35 | 21,318.11 |
| Active File | 23 | 31,904.00 |
| Active File | 34 | 54,191.00 |
| Active File | 19 | 9,907.00 |
| Active File | 17 | 13,365.00 |
| Active File | 15 | 7,651.00 |
| Active File | 0 | 39,795.00 |
| Enroll Debt | 23 | 13,453.00 |
| Active File | 23 | 10,375.00 |
| Active File | 35 | 19,184.00 |
| Active File | 11 | 9,242.00 |
| Retention Call Required by Resolution Specialist | 35 | 26,674.00 |
| Active File | 47 | 22,360.00 |
| Active File | 0 | 14,060.00 |
| Active File | 0 | 51,179.00 |
| Active File | 0 | 42,168.00 |
| Active File | 22 | 8,019.00 |

| | | |
|---|---|---|
| Active File | 0 | 20,539.00 |
| Active File | 17 | 11,337.00 |
| Active File | 47 | 29,317.00 |
| Active File | 35 | 29,423.00 |
| Active File | 21 | 23,984.00 |
| Active File | 23 | 67,766.00 |
| Enroll Debt | 23 | 10,551.01 |
| Active File | 0 | 39,773.00 |
| Active File | 21 | 8,752.00 |
| Active File | 17 | 11,824.00 |
| Active File | 29 | 19,324.00 |
| Active File | 0 | 7,024.00 |
| Active File | 23 | 22,485.00 |
| Active File | 29 | 11,763.00 |
| Active File | 0 | 8,933.00 |
| Active File | 27 | 11,272.00 |
| Active File | 43 | 32,261.00 |
| Active File | 0 | 8,191.00 |
| Active File | 51 | 76,232.28 |
| Active File | 47 | 25,686.00 |
| Active File | 17 | 11,726.00 |
| Active File | 17 | 7,602.00 |
| Active File | 0 | 8,648.00 |
| Active File | 0 | 10,164.00 |
| Active File | 0 | 72,269.00 |
| Active File | 0 | 21,743.00 |
| Active File | 47 | 29,725.00 |
| Active File | 23 | 11,561.00 |
| Active File | 0 | 10,474.00 |
| Active File | 0 | 13,715.00 |
| Retention Call Required by Affiliate | 23 | 11,221.00 |
| Active File | 0 | 15,815.00 |
| Active File | 44 | 94,331.00 |
| Active File | 0 | 22,997.00 |
| Active File | 0 | 14,283.00 |
| Active File | 0 | 15,407.00 |
| Active File | 23 | 41,318.00 |
| Active File | 44 | 45,645.00 |
| Active File | 23 | 10,333.00 |
| Active File | 0 | 24,296.00 |
| Active File | 25 | 16,085.00 |
| Active File | 0 | 6,932.00 |
| Active File | 35 | 26,621.00 |
| Active File | 0 | 19,101.00 |
| Active File | 22 | 7,820.00 |
| Active File | 19 | 14,581.00 |
| Bankruptcy Inquiry | 1 | 9,529.27 |

| | | |
|---|---|---|
| Active File | 42 | 23,692.00 |
| Active File | 19 | 12,184.00 |
| Active File | 5 | 6,808.00 |
| Active File | 45 | 39,456.81 |
| Active File | 0 | 39,900.19 |
| Paused Per Legal - Payment Not Paused | 0 | 31,267.00 |
| Active File | 0 | 49,480.00 |
| Active File | 19 | 12,003.00 |
| Active File | 0 | 22,405.17 |
| Active File | 0 | 50,544.00 |
| Active File | 23 | 29,742.48 |
| Enroll Debt | 14 | 8,860.00 |
| Active File | 19 | 49,738.00 |
| Active File | 31 | 64,523.00 |
| Enroll Debt | 19 | 8,994.00 |
| Active File | 53 | 17,101.00 |
| Paused Per Legal - Payment Not Paused | 33 | 21,135.00 |
| Active File | 43 | 25,722.00 |
| Active File | 31 | 14,316.00 |
| Active File | 0 | 19,430.00 |
| Active File | 45 | 21,158.00 |
| Enroll Debt | 19 | 8,052.08 |
| Active File | 32 | 14,200.00 |
| Active File | 16 | 7,687.00 |
| Payment Change Required | 33 | 24,942.00 |
| Active File | 18 | 7,963.00 |
| Active File | 22 | 9,926.00 |
| Active File | 0 | 15,946.00 |
| Active File | 46 | 69,694.00 |
| Active File | 0 | 24,484.00 |
| Active File | 35 | 39,891.00 |
| Active File | 0 | 16,531.00 |
| Active File | 43 | 19,704.00 |
| Active File | 27 | 17,861.00 |
| Payment Change Required | 22 | 14,687.00 |
| Active File | 23 | 8,334.00 |
| Active File | 0 | 5,880.70 |
| Active File | 47 | 85,071.00 |
| Follow Up Regarding Payment | 22 | 16,106.02 |
| Active File | 17 | 11,772.00 |
| NSF | 46 | 20,030.00 |
| Active File | 34 | 15,853.00 |
| Active File | 35 | 13,145.00 |
| Active File | 24 | 14,256.00 |
| Active File | 44 | 19,814.00 |
| Active File | 0 | 11,278.00 |
| Active File | 0 | 15,698.20 |

| | | |
|---|---|---|
| Enroll Debt | 30 | 12,029.00 |
| Active File | 95 | 46,997.00 |
| Paused Per Legal - Payment Not Paused | 23 | 9,529.00 |

# EXHIBIT 9

DocuSign Envelope ID: D45A9CEC-D186-49A5-A237-925586AEEDAE

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of October 13, 2022 (the "**Agreement Date**"), by and between New Vision Debt 2 (the "**Buyer**"), and Proof Positive LLC (the "**Seller**", and together with the Buyer, the **"Parties"**).

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("**LPG**") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $0.00, for each Purchased Account (the "**Purchase Price**").  The aggregate purchase price for the Purchased Accounts shall be $0.00  The Buyer shall pay the Purchase Price of $0.00 (the "**Upfront Cash Payment**") paid to the Seller at the Closing by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").

DocuSign Envelope ID: D16A9CEC-D186-49A5-A237-935586AF1DAE

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or

obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: D45A9CEC-D486-49A5-A237-935586AE4DAE

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: D46A9CEC-D486-49A5-A237-935586AE4DAE

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Exhibit 9, Page 201

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

New Vision Debt 2

By: _____
     Name: Serj Guetssoyan
     Title:

**SELLER:**

Proof Positive LLC

By: _____
     Name: Gail Hanson
     Title: Managing Member

**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
     Name: Daniel S. March
     Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: D16A9CEC-D186-49A5-A237-935586AE4DAE

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: D46A9CEC-D486-49A5-A297-935586AE4DAE

(bb)    "**Purchase Price**" shall have the meaning set forth in Section 2.3.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in Section 6.5.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in Section 6.6(a).

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in Section 2.3.

(ll)    "**Wire Instructions**" shall have the meaning set forth in Section 2.3.

DocuSign Envelope ID: D16A9CEC-D186-49A5-A237-935586AEFDAE

### EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between New Vision Debt 2 (the "**Buyer**"), and Proof Positive LLC(the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the  Purchase  Agreement.    The  terms  of  the  Purchase  Agreement,  including,  but  not  limited  to,  the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

New Vision Debt 2

By: _____
       Name: Serj Guetssoyan
       Title:

**SELLER:**

Proof Positive LLC

By: _____
       Name: Gail Hanson
       Title: Managing Member

VOID

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name: New Vision Debt LLC**

**Address: 3857 Birch St #25, Newport Beach, CA 92660**

**Routing Number:** ▇▇▇▇▇▇▇

**Account Number:** ▇▇▇▇▇▇▇



# EXHIBIT 10



**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Debt LLC

Exhibit 10, Page 210

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/17/2022 | | 19,026.37 | Fedwire Debit Via: Wells Fargo NA/1 21000248 NC: New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 1:33 Imad: 1017B1Qgc08C0020237 Trn: 36831 00290Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | | 15,299.07 | Fedwire Debit Via: Wells Fargo NN121000248 A/C: New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 4:23 Imad: 1021 Bi Qgc04C004958 Trn: 5052200294Io |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | | 7,391.84 | Fedwire Debit Via: Wells Fargo NN121000248 NC: New Vision Debt LLC Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 6:57 Imad: 1 02BB1 Qgc02C01 1570 Trn: 7395700301 Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | | 19,267.82 | Fedwire Debit Via Wells Fargo NN1 21000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 2:13 Imad: 1 109B1Qgc06C008395 Trn: 411630031 3Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | | 3,008.72 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 2:15 Imsd: I 09BIQgc0SC0C0A03 Trn: 416810031 No |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 20,759.80 | Fedwire Debit Vie Walls Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 7:26 Imad: 11 10B1Qgc08C048481 Trn: 80588003141o |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 27,924.63 | Fedwire Debit Via Walls Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 7:53 Imad: I125B10gc07C029363 Trn: 42755003291o |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 17,773.99 | Fedwire Debit Vie Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 7:53 Imsd:1 12510 Qgc05C009629 Trn: 42560003291o |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/5/2022 | | 31,540.94 | Fedwire Debit Vie Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 5:00 Imsd: 1205B1 0gc08C03861 6 Trn: 55699003391o |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/12/2022 | | 15,752.13 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Rat: Weekly Disbursement/Time/1 7:04 Imad: 121281 Qgc05C05L229 Trn: 7781 0003461o |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | | 1,664.78 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Debursement/Time/1 7:25 Imad: 1219B1Qgc08C042799 Trn: 80415003531o |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/21/2022 | | 23,148.91 | Fedwire Debit Via Wells Fargo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 4:32 Imad: 122161 Qgc03C003946 Trn: 480350036Iio |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 983.10 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 3:58 Imad: 1227Bl0gc0lC0l623l Trn: 48035003610 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/28/2022 | | 29,059.77 | Fedwire Debit Via Wells Fargo NN121000243 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 7:01 mcd: 1 22BB1 Cgc06C022798 Trn: 7406000362Ilo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 14,878.80 | Fedwire Debit Via Wells Fargo NN121000243 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 4:36 Imad: 123081 Qgc08C06774 4 Trn: 55731 003640 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 342.78 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Weekly Disbursement/Time/1 7:15 Imad: 123081 0gc08C03508 Trn: 70927003641o |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 19,768.82 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 4:53 Imad: 01 10B1Qgc03C005369 Trn: 4991 00001 0Io |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 20,030.85 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1 657 ETTRN:20230113005025O4 SERVICE REF:01 8390 BNF:NEW VISION DEBT LLC ID:1 194227912 BNF BK:WELLS FARGO BANK, NA ID:1 21000248 PMT DET:421 5005820 1.1.323 WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/18/2023 | | 250.38 | WIRE TYPE:WIRE OUT DATE23O1 18 TIME1 344 ET TRN:202301 1800426297 SERVICE REF:011234 BNF:NEW VISION DEBT LLC ID:1194227912 BNF BK:WELLS FARGO BANK, NA ID:121000248 PMT DET:4219571 12W EEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 26,602.80 | Fedwire Debit Via: Wells Fargo NN121000248 NC: New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 5:47 Imad: 012481 Qgc08C032068 Trn: 56543000241o |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 1,233.70 | Fedwire Debit Via: Wells Fargo NN121000248 NC: New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 5:47 Imad: 012461 QgcO2COCOS1 90T Trn: 56551 00024Io |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 28,108.32 | Fedwire Debit Vie Wells Fargo NN121000248 A/C: New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/17:47 Imad: 0207B1QgcO7C031941 Trn: 66488003081o |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 973.06 | Fedwire Debit Via: Wells Fargo NN121000248 NC: New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/17:47 Imad: 0207B1QgcO7C031937 Trn: 66487000381o |
| | | | | | | **344,791.38** | |

DRAFT FORM - SUBJECT TO CHANGE

# EXHIBIT 11

**GROBSTEIN TEEPLE**

New Vision Capital Group, LLC

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | [redacted] | 7/31/2021 | 7/28/2021 | | 4,611.18 | WIRE TRANS TRN 0728027693 072821 UBOC0930 UB1 32558N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | [redacted] | 8/31/2021 | 8/4/2021 | | 2,560.01 | WIRE TRANS TRN 0804022002 080421 UBOC0930 UB4731 N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 8/31/2021 | 8/11/2021 | | 4,690.48 | WIRE TRANS TRN 0811021527 081121 UBOC0930 UB059952N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 8/31/2021 | 8/20/2021 | | 4,442.55 | WIRE TRANS TRN 0820019202 082021 UBOC U8012096N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 8/31/2021 | 8/20/2021 | | 994.56 | WIRE TRANS TRN 0820021984 082021 UBOC U8009975N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 8/31/2021 | 8/25/2021 | | 5,368.53 | WIRE TRANS TRN 0825024030 082521 UBOC U8987549N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 9/30/2021 | 9/1/2021 | | 4,450.68 | WIRE TRANS TRN 0901027852 090121 UBOC U8944379N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 9/30/2021 | 9/9/2021 | | 1,231.74 | WIRE TRANS TRN 0909021730 090921 UBOC U8909090N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 9/30/2021 | 9/16/2021 | | 3,308.16 | WIRE TRANS TRN 0916025688 091621 UBOC U8868548N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 9/30/2021 | 9/22/2021 | | 2,746.34 | WIRE TRANS TRN 0922021177 092221 UBOC U8842721N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 9/30/2021 | 9/30/2021 | | 6,667.16 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 10/29/2021 | 10/7/2021 | | 757.35 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 10/29/2021 | 10/14/2021 | | 4,161.00 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 10/29/2021 | 10/22/2021 | | 3,122.80 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 11/30/2021 | 11/2/2021 | | 30,000.00 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 11/30/2021 | 11/5/2021 | | 4,277.34 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 11/30/2021 | 11/12/2021 | | 4,071.34 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 11/30/2021 | 11/18/2021 | | 4,073.67 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | 11/30/2021 | 11/26/2021 | | 3,968.51 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | [redacted] | | 12/2/2021 | | 5,021.66 | WIRE TO New Vision Capital Group, |
| UnionBank | The Litigation Practice Group PC | [redacted] | 12/31/2021 | 12/9/2021 | | 4,104.39 | WIRE TRANS TRN 1209021654 120921 UBOC U8426480N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 12/31/2021 | 12/9/2021 | | 180.21 | WIRE TRANS TRN 1209021613 120921 UBOC U8426591N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 12/31/2021 | 12/17/2021 | | 980.29 | WIRE TRANS TRN 1217017500 121721 UBOC U8838001N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 12/31/2021 | 12/17/2021 | | 3,665.94 | WIRE TRANS TRN 1217017531 121721 UBOC U8382935N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 12/31/2021 | 12/23/2021 | | 1,462.49 | WIRE TRANS TRN 1223024562 122321 UBOC U8341313N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 12/31/2021 | 12/31/2021 | | 3,278.20 | WIRE TRANS TRN 1231023055 123121 UBOC U8305895N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 12/31/2021 | 12/31/2021 | | 409.32 | WIRE TRANS TRN 1231023030 123121 UBOC U8305958N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/10/2022 | | 1,356.62 | WIRE TRANS TRN 0110021648 011022 UBOC U8269103N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/10/2022 | | 644.27 | WIRE TRANS TRN 0110021634 011022 UBOC U8269139N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/10/2022 | | 1,174.78 | WIRE TRANS TAN 0110021644 011022 UBOC U82691 12N Sent To: JPMORGAN CHASE BANK Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/13/2022 | | 1,875.71 | WIRE TRANS TRN 0113021449 011322 UBOC U8246609N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/13/2022 | | 1,317.90 | WIRE TRANS TAN 0113021440 011322 UBOC U8246636N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/13/2022 | | 2,246.62 | WIRE TRANS TRN 0113021456 011322 UBOC U8246591 N Sent To: JPMORGAN CHASE BANK Beneficiary: 1/New Vision Capital Group LLC |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 11, Page 212

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Capital Group, LLC

Exhibit 11, Page 213

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Memo | Debit/Charge |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/21/2022 | | WIRE TRANS TAN 0121016134 012122 UBOC UB210954N Sent To: JPMORGAN CHASE BANK, NA | 2,602.77 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/21/2022 | | Beneficiary: 1/New Vision Capital Group, LLC | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/21/2022 | | WIRE TRANS TAN 0121016116 012122 UBOC UB210999N Sent To: NEW VISION CAPITAL GROUP, LLC | 743.53 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/21/2022 | | WIRE TRANS TRN 0121016110 012122 UBOC UB211017N Sent To: JPMORGAN CHASE BANK Beneficiary: | 487.73 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/28/2022 | | WIRE TRANS TAN 0128019405 012822 UBOC UB1 701 OON Sent To: NEW VISION CAPITAL GROUP, LLC | 753.23 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/28/2022 | | 1/New Vision Capital Group LLC | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/28/2022 | | WIRE TRANS TAN 0128019422 012822 UBOC UB170052N Sent To: JPMORGAN CHASE BANK, NA | 1,785.30 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/28/2022 | | Beneficiary: 1/New Vision Capital Group, LLC | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/28/2022 | | WIRE TRANS TAN 0128019392 012822 UBOC UB170136N Sent To: JPMORGAN CHASE BANK Beneficiary: | 239.91 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 1/31/2022 | 1/28/2022 | | 1/New Vision Capital Group LLC | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/4/2022 | | WIRE TRANS TRN 0204022621 020422 UBOC UB131481N Sent To: NEW VISION CAPITAL GROUP, LLC | 454.92 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/4/2022 | | Beneficiary: | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/4/2022 | | WIRE TRANS TRN 0204022638 020422 UBOC UB131292N Sent To: JPMORGAN CHASE BANK Beneficiary: | 1,270.04 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/4/2022 | | 1/New Vision Capital Group LLC | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/4/2022 | | WIRE TRANS TRN 0204022631 020422 UBOC UB131301N Sent To: JPMORGAN CHASE BANK, NA | 1,194.64 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/11/2022 | | Beneficiary: 1/New Vision Capital Group, LLC | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/11/2022 | | WIRE TRANS TAN 0211017117 021122 UBOC UB102915N Sent To: JPMORGAN CHASE BANK, NA | 5,314.69 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/11/2022 | | Beneficiary: 1/New Vision Capital Group, LLC | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/11/2022 | | WIRE TRANS TAN 0211017055 021122 UBOC UB103062N Sent To: NEW VISION CAPITAL GROUP, LLC | 355.14 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/11/2022 | | Beneficiary: | |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/11/2022 | | WIRE TRANS TRN 0211017101 021122 UBOC UB102951N Sent To: JPMORGAN CHASE BANK Beneficiary: | 2,071.43 |
| UnionBank | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/11/2022 | | 1/New Vision Capital Group LLC | |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/18/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 3,355.32 |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/18/2022 | | Disbursement Tm: 51874000049lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/18/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 3,024.05 |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/18/2022 | | Disbursement Tm: 51873000049lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/25/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 4,159.23 |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/25/2022 | | Disbursement Tm: 63660000056lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/25/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 794.14 |
| Chase | The Litigation Practice Group PC | ■■■ | 2/28/2022 | 2/25/2022 | | Disbursement Tm: 63660000056lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/4/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 4,864.52 |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/4/2022 | | Disbursement Tm: 53647000063lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/4/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 1,874.48 |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/4/2022 | | Disbursement Tm: 53646000063lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/10/2022 | | Book Transfer Debit A/C: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 12,269.86 |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/10/2022 | | Disbursement Tm: 741 4000069lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/18/2022 | | Book Transfer Debit A/C: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly | 7,615.37 |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/18/2022 | | Disbursement Tm: 4569500077lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/24/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 5,635.49 |
| Chase | The Litigation Practice Group PC | ■■■ | 3/31/2022 | 3/24/2022 | | Disbursement Tm: 59751000083lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/1/2022 | | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 7,916.68 |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/1/2022 | | Disbursement Tm: 50232000091lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/7/2022 | | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 7,077.11 |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/7/2022 | | Disbursement Tm: 56904000097lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/18/2022 | | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 12,183.52 |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/18/2022 | | Disbursement Tm: 43554000088lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/21/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 4,409.91 |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/21/2022 | | Disbursement Tm: 48665001110 | |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/28/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 9,977.01 |
| Chase | The Litigation Practice Group PC | ■■■ | 4/30/2022 | 4/28/2022 | | Disbursement Tm: 59174001138lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 5/31/2022 | 5/5/2022 | | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 7,459.78 |
| Chase | The Litigation Practice Group PC | ■■■ | 5/31/2022 | 5/5/2022 | | Disbursement Tm: 71329001125lo | |
| Chase | The Litigation Practice Group PC | ■■■ | 5/31/2022 | 5/13/2022 | | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly | 11,080.93 |
| Chase | The Litigation Practice Group PC | ■■■ | 5/31/2022 | 5/13/2022 | | Disbursement Tm: 74430001133lo | |

2 of 4

DRAFT FORM - SUBJECT TO CHANGE

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Capital Group, LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ███ | 5/31/2022 | 5/19/2022 | | 13,623.79 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 us Ref: Weekly Disbursement Trn: 5546000839/o |
| Chase | The Litigation Practice Group PC | ███ | 5/31/2022 | 5/27/2022 | | 9,669.10 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 7i60001471/o |
| Chase | The Litigation Practice Group PC | ███ | 6/30/2022 | 6/3/2022 | | 10,008.32 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 6204300154lo |
| Chase | The Litigation Practice Group PC | ███ | 6/30/2022 | 6/10/2022 | | 9,443.41 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 5i423006ilo |
| Chase | The Litigation Practice Group PC | ███ | 6/30/2022 | 6/17/2022 | | 17,805.08 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 4823000068lo |
| Chase | The Litigation Practice Group PC | ███ | 6/30/2022 | 6/23/2022 | | 9,420.08 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 65i03000074o |
| Chase | The Litigation Practice Group PC | ███ | 6/30/2022 | 6/30/2022 | | 12,216.77 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 55900008i/o |
| Chase | The Litigation Practice Group PC | ███ | 7/31/2022 | 7/8/2022 | | 9,886.50 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 40364000389/o |
| Chase | The Litigation Practice Group PC | ███ | 7/31/2022 | 7/14/2022 | | 20,641.89 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 51071001 95i/o |
| Chase | The Litigation Practice Group PC | ███ | 7/31/2022 | 7/21/2022 | | 9,512.95 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 52384000202o |
| Chase | The Litigation Practice Group PC | ███ | 7/31/2022 | 7/29/2022 | | 14,847.86 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 37067002i0/o |
| Chase | The Litigation Practice Group PC | ███ | 8/31/2022 | 8/5/2022 | | 13,852.98 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3i005002i17/o |
| Chase | The Litigation Practice Group PC | ███ | 8/31/2022 | 8/11/2022 | | 17,111.06 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 3896800223/o |
| Chase | The Litigation Practice Group PC | ███ | 8/31/2022 | 8/19/2022 | | 16,342.23 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 2834600231.io |
| Chase | The Litigation Practice Group PC | ███ | 8/31/2022 | 8/26/2022 | | 17,356.65 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 44839002380 |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/2/2022 | | 20,743.38 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 us Ret: Weekly Disbursement Trn: 37259002450 |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/2/2022 | | 990.56 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3734002450o |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/9/2022 | | 6,123.09 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 34355002520 |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/9/2022 | | 1,420.31 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 34354002520 |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/16/2022 | | 13,021.41 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 66567002590 |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/16/2022 | | 1,390.88 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 us Ret: Weekly Disbursement Trn: 66566002590 |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/23/2022 | | 3,477.19 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 310310026io |
| Chase | The Litigation Practice Group PC | ███ | 9/30/2022 | 9/23/2022 | | 563.70 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 310310026io |
| Chase | The Litigation Practice Group PC | ███ | 10/31/2022 | 10/3/2022 | | 12,923.01 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 80373002760o |
| Chase | The Litigation Practice Group PC | ███ | 10/31/2022 | 10/3/2022 | | 1,465.81 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 80372002760 |
| Chase | The Litigation Practice Group PC | ███ | 10/31/2022 | 10/6/2022 | | 9,470.28 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 us Ref: Weekly Disbursement Trn: 43094002790 |
| Chase | The Litigation Practice Group PC | ███ | 10/31/2022 | 10/6/2022 | | 347.17 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 us Ret: Weekly Disbursement Trn: 43093002791o |
| Chase | The Litigation Practice Group PC | ███ | 10/31/2022 | 10/17/2022 | | 4,120.28 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3683000290lo |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 11, Page 214

GROBSTEIN TEEPLE

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Capital Group, LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | | 1,756.26 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | | 2,283.26 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tm: 7395900300o |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 3,203.79 | Book Transfer Debit NC: New Vision Capital Group, LLC Sente Ana CA 92705-3538 US Rot Weekly Disbursement Tm 4l586003l3lo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 2,421.38 | Rook Transfer Debit NC: New Vision Capital Group, LLC Sante Ana CA 92705-3538 US Ref Weekly Disbursement Tm 80589003140o |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/14/2022 | | 494.50 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref Extra Payment Cwed Tm. 8522000318zo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 4,122.45 | Book Transfer Debit NC: New Vision Cepitel Group, LLC Sante Ana CA 92705-3538 US Ref Weekly Disbursement Tm 4226900329lo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 3,708.41 | Book Trenstem Debit NC: New Vision Ceptel Group, LLC Ssnte Ans CA 92705-3538 US Ref Weekly Disbursement Tm 4275600329lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/5/2022 | | 4,819.66 | Book Transfer Debit NC New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref Weekly Disbursement Tm 557000039lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/12/2022 | | 4,262.80 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref Weekly Disbursement Tm 7781103446lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | | 4,512.67 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3530 US Ref: Weekly Disbursement Tm 8041 800353lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 6,619.65 | Book Trensfer Debit NC: New Vision Cepitel Group, LLC Sents Ana CA 92705-3538 US Ref: Weekly Disbursement Tm 6980600361lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 6,465.96 | Book Transfer Debit NC: New Vision Capital Group, LLC Sente Ana CA 92705-3538 US Ref Weekly Disbursement Tm 6980600361lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 4,915.89 | Book Transfer Debit NC: New Vision Capital Group, LLC [(C Sente Ana CA 92705-3538 US Ref Weekly Disbursement Tm 5573300364l0 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 3,849.71 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Rat: Weakly Disbursement Tm. 55732003640l0 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 4,807.93 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tmf 4991 6000 t0J0 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 4,508.31 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tm: 4991 70000lo |
| Bank of America Litigation Practice Group PC | | | 1/31/2023 | 1/13/2023 | | 3,744.84 | WIRE TYPE:WIRE OUT DATE230113 TIME1 657 ETTRN:2023011300502488 SERVICE REF563398 BNF:NEW VISION CAPITAL GROUP, 1D3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT 501578 01 1 323 NV4 WEEKLY DISBURSEMENT |
| Bank of America Litigation Practice Group PC | | | 1/31/2023 | 1/13/2023 | | 5,081.72 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1 657 ETTRN:2023011300502495 SERVICE REF:563406 BNF:NEW VISION CAPITAL GROUP, ID:3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET:421 501350 01. 1 3.23 NV3 WEEKLY DISBURSEMENT |
| Bank of America Litigation Practice Group PC | | | 1/31/2023 | 1/24/2023 | | 9,787.01 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref Weekly Disbursement Tm 5670900024o |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 14,521.10 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tm: 6649300038lo |
| Bank of America Litigation Practice Group PC | | | 2/28/2023 | 2/9/2023 | | 9,294.95 | WIRE TYPE:WIRE OUT DATE230209 TIME:1 546 ET TRN:2023020900429954 SERVICE REF:468570 BNF:NEW VISION CAPITAL GROUP ID:3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET:PCM ADFEPT POP Other |
| | | | | | | **627,170.52** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 11, Page 215

# EXHIBIT 12

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Debt Relief LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | | 12/31/2021 | 12/2/2021 | | 239.01 | WIRE TO New Vision Debt Relief |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/18/2022 | | 1,810.92 | Ref: Weekly Disbursement/Time/1 4:20 lmad: 021 881 QgcD:C008355 Tm: 5i875000049lo |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/25/2022 | | 2,120.94 | Fedwire Debit Via: Union LA Aka Ubcc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 5:26 lmad: 022581 QgcO3CO:1334 Tm: 6366200050lo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/4/2022 | | 837.99 | Ref: Weekly Disbursement/Time/1 5:50 lmad: 030481 QgcO7CO1 3607 Tm: 5364800063lo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/10/2022 | | 3,747.46 | US Ref: Weekly Disbursement/Time/1 6:56 lmad: 031 081 QgcO5CO 1928 Tm: 741 3900069lo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/18/2022 | | 2,501.15 | Fedwire Debit Via: union LA Aka uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 3:20 lmad: 031 881 QgcO2CO08138 Tm: 4569400077lo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/24/2022 | | 1,890.78 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 5:08 lmad: 032481 QgcO7CO09086 Tm: 5975000083lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/1/2022 | | 2,707.21 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 3:49 lmad: 0401 81 QgcO2CO12219 Tm: 5023100091lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/7/2022 | | 2,023.39 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 4:50 lmad: 040781 QgcO7CO1 1448 Tm: 5690300097lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/18/2022 | | 3,688.93 | Ref: Weekly Disbursement/Time/12:50 lmad: 041 881 QgcOl C007923 Tm: 4355000108lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/21/2022 | | 2,296.64 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 3:12 lmad: 0421B1 QgcO08060I Tm: 4866500111lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/28/2022 | | 2,675.92 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 3:53 lmad: 042881 QgcO6CO1 3703 Tm: 5917300118lo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/5/2022 | | 2,888.05 | Ref: Weekly Disbursement/Time/17:05 lmad: 050581 QgcO6CO 2981 Tm: 71328001 25lo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/13/2022 | | 2,931.47 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 5:50 lmad: O5I38IQgcO7CO186i 1 Tm: 7442900i33lo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/19/2022 | | 3,090.97 | US Ref: Weekly Disbursement/Time/1 4:24 lmad: 051 991 QgcO8CO24380 Tm: 5546000139lo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/27/2022 | | 3,729.93 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660us Ref: Weekly Disbursement/Time/6:49 lmad: 052781QgcO7CO0964 Tm: 7i60900047lo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/3/2022 | | 2,706.88 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 Ref: Weekly Disbursement/Time/1 7:20 lmad: 060381 QgcO8CO30 7 Tm: 62042001 54lo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/10/2022 | | 3,257.67 | Ref: Weekly Disbursement/Time/1 4:45 lmad: 061 0B1 QgcO3CO05555 Tm: 51422001611o |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/17/2022 | | 2,799.86 | US Ref: Weekly Disbursement/Time/1 3:15 lmad: 061 781 QgcO5CO07788 Tm: 48212001 68lo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/23/2022 | | 4,236.43 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/15:31 lmad: 0623B1QgcO8CO276001 Tm: 6510200174lo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/30/2022 | | 3,530.86 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 3:37 lmad: 063081QgcO4CO02318 Tm: 5590700183lo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/8/2022 | | 2,088.06 | Ret: Weekly Disbursement/Time/12:47 lmad: 070881QgcO7C01 1543 Tm: 4046300088lo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/14/2022 | | 3,543.86 | US Ref: Weekly Disbursement/Time/12:54 lmad: 071 481 QgcO2CO04867 Tm: 5107000195lo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/21/2022 | | 2,609.71 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660us Ref: Weekly Disbursement/Time/1 3:55 lmad: 0721B1QgcO7CO0693 Tm: 6238300202lo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/29/2022 | | 4,201.32 | US Ref: Weekly Disbursement/Time/1 1:24 lmad: 072981 QgcO5CO 5570 Tm: 370560021 Olo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/5/2022 | | 3,924.60 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 1:27 lmad: 080581QgcO6CO08503 Tm: 3004000217lo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/11/2022 | | 3,915.35 | US Ref: Weekly Disbursement/Time/1 1:28 lmad: 0811 B1QgcO2CO05913 Tm: 3896700223lo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/19/2022 | | 2,367.42 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/10:44 lmad: 081 981 QgcO8CO 0931 Tm: 2834500231 lo |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 12, Page 217

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Debt Relief LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/26/2022 | | 4,528.47 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 Tm: 4483800238Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/2/2022 | | 2,281.37 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 1:50 Imad: 0902831Qgc04C007109 Tm: 3725800245Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/9/2022 | | 703.59 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 1:57 Imad: 090981 Qgc02C006506 Tm: 3435300252Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/16/2022 | | 1,019.48 | Fedwire Debit Via: union LA aka uboc/ 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/J 6:44 imad: 0916B1Qgc01C008467 Tm: 6656500259Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/23/2022 | | 849.90 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/J 1:02 Imad: 0923BIQgc03C001085 Tm: 3030002661Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/3/2022 | | 1,414.05 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 7:25 Imad: 1 00381 Qgc03C02l586 Tm: 80371 00276Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/6/2022 | | 3,446.47 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 Ref: Weekly Disbursement/Time/J 2:30 Imad: 1006BIQgc08C02452 Tm: 4309200279Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/17/2022 | | 5,937.50 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/J 1:33 Imad: 1017BIQgc08C02023 Tm: 3682900290o |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | | 3,171.04 | Fedwire Debit Via: union LA Aka uboc/ 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/J 4:23 Imad: 1021 Bi Qgc08C024824 Tm: 5052000294Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | | 2,363.93 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 6:57 Imad: 1 02881 Qgc02C01579 Tm: 7395600301 Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | | 4,589.52 | Fedwire Debit Via Union LA Aka Uboc/1 22000495 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 2:14 Imsrt 1 109BIQgc04C005050 Tm: 415850031 3J0 |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 4,038.29 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 7:26 Imsrt .11 10B1Qgc08C048472 Tm: 8058700314Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 371.41 | Fedwire Debit Via Union LA Ake Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Dlsburement/Timel 7:26 Imacl ii 10B1Qgc08C048500 Tm: 8058600314Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 5,616.60 | Fedwire Debit Via: Union LA Aks Uboc/1 22000495 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/J 7:53 Imet: l 1258IQgc08C02474l Tm: 4275400329Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 4,440.85 | Fedwire Debit Via: Union LA Ake Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 7:53 Imet: l 1258IQgc07C029344 Tm: 4226700329Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/5/2022 | | 7,772.43 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 4:59 Imad: 120581 Qgo08C03860 Tm: ssgsoosggio |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/12/2022 | | 2,252.90 | Fadiwra Debit Via: Union LA Ake Uboc/1 22000496 NC: Now Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 7:04 Imad 121281 Qgc08C0S 240 Tm: 7180900345k |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/12/2022 | | 350.16 | Fadiwra Debit Vie: Union LA Ake Uboc/1 22000496 NC: Now Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 7:04 Imad 121281 Qgc08C0J 237 Tm: 7780800345k |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | | 5,282.39 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 7:25 Imacl 121 9BiQgc06C0l7811 Tm: 8044400353Jo |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/9/2023 | | 17,219.01 | WIRE TYPEWIRE OUT DATE:230209 TIME1 533 ETTRN203230206004423927 SERVICE REF014591 BNF-NEW VISION DEBT RELIEF-2 ID:1 194227912 BNF BK:WELLS FARGO BANK, N.A. ID:1 21 000248 PMT DET Z0JPR6JJB POP Other |
| | | | | | | **156,012.14** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 12, Page 218

# EXHIBIT 13

In re: The Litigation Practice Group PC
Summary of Disbursements
4 Years Pre-Petition (03/20/2019 - 03/20/2023)



| Payee | Sum of Disbursements | Transaction Count |
|---|---|---|
| New Vision 6 | 1,441.18 | 1 |

# EXHIBIT 14



*Legal Counsel.*

**DINSMORE & SHOHL** LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
www.dinsmore.com

Tyler Powell
(859) 425-1046 (direct) ^ (859) 425-1099 (fax)
Tyler.powell@dinsmore.com

September 15, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

New Vision Debt Relief LLC
accounting@newvisiondebt.com

> Re:    In re: The Litigation Practice Group, P.C.
>        U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571

Dear Sir/Madam:

This firm represents Richard A. Marshack, solely in his capacity as Chapter 11 Trustee ("Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("Debtor") in the above-referenced bankruptcy case.  Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including avoidance actions.

After a review of the Debtor's books and records, the Trustee believes that he may have claims against you to avoid and recover certain payments. This letter is written in an attempt to settle such claims, and its contents may not be used for any other purpose.

Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain payments made to creditors within the 90-day period preceding the filing of a bankruptcy case. We have completed our preliminary investigation and have identified certain transfers from the Debtor(s) to you within the 90-day period prior to March 20, 2023, the date upon which the Debtor filed its bankruptcy case.  These transfers are listed on the attached "Preference Transfer Schedule" showing the date and amount, according to the Debtor's books and records, of each transfer or other payment. The payments referenced on the "Preference Transfer Schedule" total $116,018.68.  It appears that these transfers are preferential transfers which can be avoided by the Trustee and recovered from you pursuant to 11 U.S.C. §§ 547(b) and 550(a).  This means that the Trustee can file suit in the bankruptcy court to recover these sums and object to payment of any claims you have against the Debtor until the suit is resolved.

Additionally, if you have filed a proof of claim against the Debtor, that claim may be disallowed pursuant to Section 502(d) of the Bankruptcy Code for failure to return an avoidable transfer. This means that if the preference claims against you are not resolved, then you may not

receive a distribution from the Debtor's bankruptcy estate. The Trustee reserves the right to object to any proof of claim that you have filed or may file in the debtors' bankruptcy cases.



In the alternative, if you believe a valid defense to recovery exists for some or all of the transfers from the Debtor, please bring such defenses to our attention and we will assess any evidence you provide in support of a defense.  We have made efforts to analyze your reasonably known affirmative defenses to the avoidance of the preference payments. Based on our currently available information and given the nature of your relationship with the Debtor, we do not believe there are any potential defenses to reduce your liability for the preference payments.  There may be information or facts that we do not have to assess your potential defenses.  If you intend to assert a defense, please provide all documents evidencing any alleged defenses under 11 U.S.C. § 547(c), including, but not limited to, contracts, invoices and any other documentation showing the date, terms and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by you to the Debtors.  To properly assert a defense, such information must show the date of receipt of the Debtors' payment and the amount, deposit date, and any proof of deposit for any or all of the transfers.  In addition, if you assert an ordinary course of business defense, please provide the previous information for the one year period immediately preceding March of 2023, or for the period that you actually did business with the Debtor, if less than one year.  Please make arrangements to provide any evidence in support of a defense to us as soon as possible.

If we have not received any reply to this letter by September 28, 2023, we will proceed to pursue recovery of the preferential transfers by filing suit against you in the bankruptcy court.  The Trustee also reserves all rights to bring additional claims against you as the investigation into your relationship with the Debtor continues and/or after discovery begins once a suit is filed.

Of course, we would be happy to discuss this matter with you or your counsel.

Very truly yours,

DINSMORE & SHOHL LLP

Tyler Powell, Partner of Counsel

2

**The payment proposal set forth above is understood, acknowledged and voluntarily agreed to.  In exchange for a waiver and release from all claims that could be asserted by the Trustee of The Litigation Practice Group, P.C. pursuant to 11 U.S.C. §§ 547 and 550, I am authorized to accept this proposal on behalf of Point Break Holdings, LLC.  The sum of $_____ is enclosed.  I understand I may amend my claim to include the amount paid as part of my unsecured claim**.

_____

**BY**: _____

**TITLE**: _____

**DATE**: _____

*Enclosure*

3

**The Litigation Practice Group, P.C. Preference Transfer Schedule**

| Vendor Name | Payment Date | Payment Amount |
|---|---|---|
| New Vision Debt Relief LLC | 1/24/2023 | $1,233.70 |
| New Vision Debt Relief LLC | 1/24/2023 | $26,602.80 |
| New Vision Debt Relief LLC | 1/10/2023 | $19,768.82 |
| New Vision Debt Relief LLC | 12/30/2022 | $342.78 |
| New Vision Debt Relief LLC | 12/30/2022 | $14,878.80 |
| New Vision Debt Relief LLC | 12/28/2022 | $29,059.77 |
| New Vision Debt Relief LLC | 12/27/2022 | $983.10 |
| New Vision Debt Relief LLC | 12/21/2022 | $23,148.91 |
| | | **Total: $ 116,018.68** |

# EXHIBIT 15

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

New Vision Debt LLC

Exhibit 15, Page 227

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▇ | 12/31/2022 | 12/21/2022 | | 23,148.91 | Fedwire Debit Vie. Wells Fergo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Rot: Weekly Disbursement/Time/1 4:32 Imad:122161 Qgc08Q29946 Trn: 5987400355Io |
| Chase | The Litigation Practice Group PC | ▇ | 12/31/2022 | 12/27/2022 | | 983.10 | Fedwire Debit Vie. Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 3:58 Imad:i22780qc0iC0i623i Trn: 480350036iIo |
| Chase | The Litigation Practice Group PC | ▇ | 12/31/2022 | 12/28/2022 | | 29,059.77 | Fedwire Debit Vie Wells Fergo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 7:01 mcd:i22BB1 Qgc06c022798 Trn: 74060008362Io |
| Chase | The Litigation Practice Group PC | ▇ | 12/31/2022 | 12/30/2022 | | 14,878.80 | Fedwire Debit Via Wells Fargo NN121000243 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 4:36 Imad: 123081 Qgc06C067744 Trn: 55731003640o |
| Chase | The Litigation Practice Group PC | ▇ | 12/31/2022 | 12/30/2022 | | 342.78 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 7:15 Imad: 123081 0gc08C08508 Trn: 70927003641o |
| Chase | The Litigation Practice Group PC | ▇ | 12/31/2022 | 1/10/2023 | | 19,768.82 | Fedwire Debit Vie Wells Fargo NN121000248 NC New Vision Debt LLC Nenport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 4:53 Imad: 01 1081Qgd03C005369 Trn: 4991 06001 0Io |
| Bank of America | Litigation Practice Group PC | ▇ | 1/31/2023 | 1/13/2023 | | 20,030.85 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1 657 ET TRN:202301 1800426297 SERVICE REF:011234 BNF-NEW VISION DEBT LLC ID:1 1942279 12 BNF BK:WELLS FARGO BANK, NA ID:1 21 000248 PMT DET:421 5009820 1.1 323 WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | ▇ | 1/31/2023 | 1/18/2023 | | 250.38 | WIRE TYPE:WIRE OUT DATE:230118 TIME:1 344 ET TRN:202301 1800436297 SERVICE REF:011234 BNF-NEW VISION DEBT LLC ID:1194227912 BNF BK:WELLS FARGO BANK, NA ID:121000248 PMT DET:4219571 12W EKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | ▇ | 1/31/2023 | 1/24/2023 | | 26,602.80 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursemee/Time/1 5:47 Imad: 012481 Qgc08C032068 Trn: 56543000240o |
| Chase | The Litigation Practice Group PC | ▇ | 1/31/2023 | 1/24/2023 | | 1,233.70 | Fedwire Debit Via. Wells Fargo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/i 5:47 Imad: 012461 Qgc02QCOOSI 90 Trn: 56551 000240o |
| Chase | The Litigation Practice Group PC | ▇ | 2/28/2023 | 2/7/2023 | | 28,108.32 | Fedwire Debit Via Wells Fargo NA/121000248 A/C: New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/17-47 Imad: 0207B1Ogc07C031941 Trn: 664880003810 |
| Chase | The Litigation Practice Group PC | ▇ | 2/28/2023 | 2/7/2023 | | 973.06 | Fedwire Debit Via. Wells Fargo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/17-47 Imad: 0207B1Ogc07C031937 Trn: 664870003810 |
| | | | | | | **165,381.29** | |

DRAFT FORM - SUBJECT TO CHANGE

# EXHIBIT 16



*Legal  Counsel.*

**DINSMORE & SHOHL** LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
www.dinsmore.com

Tyler Powell
(859) 425-1046 (direct) ^ (859) 425-1099 (fax)
Tyler.powell@dinsmore.com

September 15, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

New Vision Capital Group LLC
3857 Birch St #25
Newport Beach, CA 92660
Accounting@newvisiondebt.com

      Re:     In re: The Litigation Practice Group, P.C.
               U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571

Dear Sir/Madam:

      This firm represents Richard A. Marshack, solely in his capacity as Chapter 11 Trustee ("Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("Debtor") in the above-referenced bankruptcy case.  Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including avoidance actions.

      After a review of the Debtor's books and records, the Trustee believes that he may have claims against you to avoid and recover certain payments. This letter is written in an attempt to settle such claims, and its contents may not be used for any other purpose.

      Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain payments made to creditors within the 90-day period preceding the filing of a bankruptcy case. We have completed our preliminary investigation and have identified certain transfers from the Debtor(s) to you within the 90-day period prior to March 20, 2023, the date upon which the Debtor filed its bankruptcy case.  These transfers are listed on the attached "Preference Transfer Schedule" showing the date and amount, according to the Debtor's books and records, of each transfer or other payment. The payments referenced on the "Preference Transfer Schedule" total $ 40,954.46.  It appears that these transfers are preferential transfers which can be avoided by the Trustee and recovered from you pursuant to 11 U.S.C. §§ 547(b) and 550(a).  This means that the Trustee can file suit in the bankruptcy court to recover these sums and object to payment of any claims you have against the Debtor until the suit is resolved.

      Additionally, if you have filed a proof of claim against the Debtor, that claim may be disallowed pursuant to Section 502(d) of the Bankruptcy Code for failure to return an avoidable

transfer. This means that if the preference claims against you are not resolved, then you may not receive a distribution from the Debtor's bankruptcy estate. The Trustee reserves the right to object to any proof of claim that you have filed or may file in the debtors' bankruptcy cases.



In the alternative, if you believe a valid defense to recovery exists for some or all of the transfers from the Debtor, please bring such defenses to our attention and we will assess any evidence you provide in support of a defense. We have made efforts to analyze your reasonably known affirmative defenses to the avoidance of the preference payments. Based on our currently available information and given the nature of your relationship with the Debtor, we do not believe there are any potential defenses to reduce your liability for the preference payments. There may be information or facts that we do not have to assess your potential defenses. If you intend to assert a defense, please provide all documents evidencing any alleged defenses under 11 U.S.C. § 547(c), including, but not limited to, contracts, invoices and any other documentation showing the date, terms and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by you to the Debtors. To properly assert a defense, such information must show the date of receipt of the Debtors' payment and the amount, deposit date, and any proof of deposit for any or all of the transfers. In addition, if you assert an ordinary course of business defense, please provide the previous information for the one year period immediately preceding March of 2023, or for the period that you actually did business with the Debtor, if less than one year. Please make arrangements to provide any evidence in support of a defense to us as soon as possible.

If we have not received any reply to this letter by September 28, 2023, we will proceed to pursue recovery of the preferential transfers by filing suit against you in the bankruptcy court. The Trustee also reserves all rights to bring additional claims against you as the investigation into your relationship with the Debtor continues and/or after discovery begins once a suit is filed.

Of course, we would be happy to discuss this matter with you or your counsel.

Very truly yours,

DINSMORE & SHOHL LLP

Tyler Powell, Partner of Counsel

2

The payment proposal set forth above is understood, acknowledged and voluntarily agreed to.  In exchange for a waiver and release from all claims that could be asserted by the Trustee of The Litigation Practice Group, P.C. pursuant to 11 U.S.C. §§ 547 and 550, I am authorized to accept this proposal on behalf of Point Break Holdings, LLC.  The sum of $_____ is enclosed.  I understand I may amend my claim to include the amount paid as part of my unsecured claim.

_____

**BY**: _____

**TITLE**: _____

**DATE**: _____

*Enclosure*

3

**The Litigation Practice Group, P.C. Preference Transfer Schedule**

| Vendor Name | Payment Date | Payment Amount |
|---|---|---|
| New Vision Capital Group LLC | 1/24/2023 | 9,787.01 |
| New Vision Capital Group LLC | 1/10/2023 | 4,508.31 |
| New Vision Capital Group LLC | 1/10/2023 | 4,807.93 |
| New Vision Capital Group LLC | 12/30/2022 | 3,849.71 |
| New Vision Capital Group LLC | 12/30/2022 | 4,915.89 |
| New Vision Capital Group LLC | 12/27/2022 | 6,619.65 |
| New Vision Capital Group LLC | 12/27/2022 | 6,465.96 |
| | | **Total: $ 40,954.46** |

# EXHIBIT 17

**GROBSTEIN TEEPLE**

**Exhibit 17, Page 234**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

New Vision Capital Group LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 6,619.65 | Book Transfer Debit NC: New Vision Capital Group, LLC Sents Ane CA 92705-3530 US Ref Weekly Disbursement Tm 6980500361Lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 6,465.96 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref Weekly Disbursement Tm 6980600361Lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 4,915.89 | Book Transfer Debit NC: New Vision Capital Group, JJC Santa Ana CA 92705-3538 US Ref Weekly Disbursement Tm 55733003640 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 3,849.71 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref. Weekly Disbursement Tm. 55732003640 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 4,807.93 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Rat: Weekly Disbursement Tm' 4991 6000 tOJ0 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 4,508.31 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tm: 4991 70000Jo |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 3,744.84 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1 657 ET TRN:2023011300502488 SERVICE REF565393B BNF:NEW VISION CAPITAL GROUP, ID:3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET:421 501570 01 1 323 NN4 WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 5,081.72 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1 657 ET TRN:2023011300502495 SERVICE REF:563406 BNF:NEW VISION CAPITAL GROUP, ID:3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET:421 501350 01. 1 3 23 NV3 WEEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 9,787.01 | Book Transfer Debit NC: New Vision Capital Group, LLC Sante Ana CA 92705-3538 US Ref Weekly Disbursement Tm 56709000240 |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 14,521.10 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 664910003810 |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/9/2023 | | 9,294.95 | WIRE TYPE:WIRE OUT DATE230209 TIME:1 546 ET TRN:2023020900429954 SERVICE REF:468570 BNF:NEW VISION CAPITAL GROUPI ID:3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET:PCM KDFEPT POP Other |
| | | | | | | **73,597.07** | |

DRAFT FORM - SUBJECT TO CHANGE

# EXHIBIT 18

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

New Vision Debt Relief LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Litigation Practice Group PC | ▮▮▮ | 2/28/2023 | 2/9/2023 | | 17,219.01 | WIRE TYPE:WIRE OUT DATE:230209 TIME:1533 ET TRN:2023020900423927 SERVICE REF:014591 BNF:NEW VISION DEBT RELIEF - 2 ID:1 194227912 BNF BK:WELLS FARGO BANK, N.A. ID:1 21 000248 PMT DET:ZUPREFJJB |
| | | | | | | | POP Other |
| | | | | | **17,219.01** | |

Exhibit 18, Page 236

DRAFT FORM - SUBJECT TO CHANGE

1 of 1

# EXHIBIT 19

In re: The Litigation Practice Group PC
Summary of Disbursements
90 Days Pre-Petition (12/20/2022 - 03/20/2023)



| Payee | Sum of Disbursements | Transaction Count |
|-------|---------------------:|------------------:|
| New Vision 6 | 1,441.18 | 1 |

# EXHIBIT 20



LAWYERS

610 NEWPORT CENTER DRIVE, SUITE 700
NEWPORT BEACH, CALIFORNIA 92660
TELEPHONE 949.717.3000
FACSIMILE 949.717.3100

CALLJENSEN.COM

October 6, 2023

OUR FILE NUMBER
QUI10-01

**<u>BY EMAIL ONLY</u>**

Tyler Powell
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, KY 40507
Tyler.powell@dinsmore.com

  Re: **<u>CONFIDENTIAL SETTLEMENT COMMUNICATION</u>**
     <u>In re: The Litigation Practice Group, P.C.</u>, CDCA, Case No. 8:23-bk-10571

Mr. Powell:

  This firm represents New Vision Debt LLC and related entity New Vision Capital Group, LLC (collectively "New Vision"). We received your letters dated September 15, 2023, regarding the Trustee's potential claims against New Vision, and thank you for the courtesy of giving us time to respond. We do not believe New Vision owes any money to the LPG estate.

Exhibit 20, Page 240

Tyler Powell
October 6, 2023
Page 2

Very truly yours,

Kyle R. Bevan
For Call & Jensen
A Professional Corporation

# EXHIBIT 21

In re: The Litigation Practice Group PC
Summary of Disbursements
Post-Petition Activity (3/20/2023 - Present)



| Payee | Sum of Disbursements | Transaction Count |
|---|---|---|
| New Vision Capital Group LLC | 20,000.00 | 1 |



# EXHIBIT 22

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | New Vision Debt LLC |
| Debtor 2 (Spouse, if filing) | New Vision Capital Group LLC |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 8:23-bk-10571-SC |

**FILED**

FEB 23 2024

By Omni Agent Solutions, Claims Agent
For U.S. Bankruptcy Court
Central District of California

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1:    Identify the Claim

**1. Who is the current creditor?**

New Vision Debt LLC, New Vision Capital Group LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor   New Vision debt 2, New Vision 6, NV4,NV3

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

New Vision Debt LLC
Name

3857 Birch St #25
Number    Street

Newport Beach    CA    92705
City    State    ZIP Code

Contact phone 9493107264

Contact email newvisioncapitalgroup@gmail.com

Where should payments to the creditor be sent? (if different)

New Vision Capital Group LLC
Name

3857 Birch St. #25
Number    Street

Newport Beach    CA    92660
City    State    ZIP Code

Contact phone 9493107264

Contact email newvisioncapitalgroup@gmail.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____   Filed on ___/___/___
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

102396-1 AD

Exhibit 22, Page 245

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __B__ __A__ __T__ ____

**7. How much is the claim?** $_____1.00__. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Attachment A.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | |
| | ☐ Yes. Check one: | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    02/22/2024
                    MM / DD / YYYY

*Sarvenaz Moarefian*
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Sarvenaz | Moarefian | |
| | First name | Middle name | Last name |
| Title | Partner | | |
| Company | Newvision Capital Group LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 3857 Birch St #25 | | |
| | Number        Street | | |
| | Newport Beach | CA | 92660 |
| | City | State | ZIP Code |
| Contact phone | 714-721-1199 | Email | newvisioncapitalgroup@gmail.com |

---

Official Form 410    **Proof of Claim**    page 2

# **ATTACHMENT A**

Newvision Capital Group, LLC, known as "NewvisionDebt," primarily association with The

Litigation Practice Group P.C. ("LPG") by offering support for marketing services.

"NewvisionDebt," on multiple occasions offered Financing to cover Marketing fee owed on

behalf of LPG. In exchange for account receivables at 70% to be assigned to "NewvisionDebt,"

LPG acknowledged this assignment, provided regular reports on collections and amounts owed

and occasionally made direct payments based on those reports. with accounting details to be

furnished in an updated Proof of Claim. "NewvisionDebt" is actively assessing the complete

scope of its claim and intends to amend the Proof of Claim once its review of records and

financing accounting for LPG is finalized.

*Attachment A to Proof of Claim Filed by Newvision Capital Group, LLC*

The Litigation Practice Group P.C. Claims Processing
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367

hibit 22, Page 249

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:    Dinsmore & Shohl, LLP, 655 W. Broadway, Suite 800, San Diego, California  92101

A true and correct copy of the foregoing document:

**SECOND AMENDED COMPLAINT FOR: (1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS; (2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS; (3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS; (4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS; (5)  AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DAYS OF THE PETITION DATE; (6) AVOIDANCE, RECOVERY AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS; (7) CONVERSION; (8) PARTICIPATING IN SCHEME TO CONTINUE TO DEEPEN LPG'S CONTINUING INSOLVENCY; (9) AIDING AND ABETTING; (10) TURNOVER; (11) AVOIDANCE, PRESERVATION, AND RECOVERY OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS; (12) AVOIDANCE, PRESERVATION, AND RECOVERY OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS; (13) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS; (14) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS; (15) AVOIDANCE, RECOVERY AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS; (16) TORTIOUS INTERFERENCE WITH CONTRACT; (17) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONSHIP; AND (18) DISALLOWANCE OF CLAIMS** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On January 15, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:


Christopher Ghio on behalf of Plaintiff Richard A. Marshack
christopher.ghio@dinsmore.com, bonnie.connolly@dinsmore.com
Brandon J. Iskander on behalf of Interested Party Courtesy NEF
biskander@goeforlaw.com, kmurphy@goeforlaw.com;jfountain@goeforlaw.com
Yosina M Lissebeck on behalf of Plaintiff Richard A. Marshack
Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com;ayrton.celentino@dinsmore.com
Richard A Marshack (TR)
pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com
Kenneth Misken on behalf of U.S. Trustee United States Trustee (SA)
Kenneth.M.Misken@usdoj.gov
Jacob Newsum-Bothamley on behalf of Plaintiff Richard A. Marshack
jacob.bothamley@dinsmore.com, bonnie.connolly@dinsmore.com
United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

☐    Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**PROOF OF SERVICE**

**2. SERVED BY UNITED STATES MAIL**:

On January 15, 2026, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEFENDANTS**

New Vision Capital Group, LLC
c/o Incorp Services, Inc.
Attn: Steven Picket
5716 Corsa Ave.
Westlake Village, CA 91362-7355

New Vision Capital Group, LLC
c/o Sarvenaz Esfahani Moarefian, Manager
c/o Sania Hashempour, Manager
3857 Birch St., Ste. 25
Newport Beach, CA 92660

Sania Hashempour
77 Trofello Ln.
Aliso Viejo, CA 92656-6215

New Vision Debt LLC
c/o Registered Agents, Inc.
1401 21st St., Ste. R
Sacramento, CA 95811

New Vision Debt LLC
c/o Registered Agents Inc.
30 N. Gould St., Ste. R
Sheridan, WY 82801

**DEFENDANTS**

QuikStart LLC
c/o Serj Guetssoyan, Manger
c/o Sarvenaz Esfahani Moarefian, Manager
1309 Coffeen Ave., Ste. 1200
Sheridan, WY 82801

QuikStart LLC
c/o Registered Agent: Cloud Peak Law LLC
1095 Sugar View Dr., Ste. 500
Sheridan, WY 82801

Serj Guetssoyan
2590 Redhill Ave., Unit 5174
Santa Ana, CA 92705-9007

**JUDGE'S COPY**

The Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
411 West Fourth St, Suite 5130/Ctrm 5C
Santa Ana, CA 92701-4593

☒   Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 15, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 15, 2026 | Bonnie Connolly | /s/ Bonnie Connolly |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2016*                                                    **PROOF OF SERVICE**